**ORIGINAL**

1    **MUSICK, PEELER & GARRETT** LLP
      ATTORNEYS AT LAW
2      225 BROADWAY, SUITE 1900
      SAN DIEGO, CALIFORNIA 92101-5028
      TELEPHONE 619-525-2500
3      FACSIMILE 619-231-1234

4    Richard S. Conn (State Bar No. 065513)
        r.conn@mpglaw.com
5    Susan J. Field (State Bar No. 086200)
        s.field@mpglaw.com
6    Barbora Pulmanova (State Bar No. 234028)
        b.pulmanova@mpglaw.com
7
     Attorneys for NATIONAL INDEMNITY COMPANY
8
                    **UNITED STATES DISTRICT COURT**
9
                  **SOUTHERN DISTRICT OF CALIFORNIA**
10
                                          **'08 CV 7 7 2    L    POR**
11
     STEVE POIZNER, INSURANCE          Case No.
12   COMMISSIONER OF THE STATE
     OF CALIFORNIA, in his capacity as   Complaint Filed:
13   Liquidator of Frontier Pacific Insurance
     Company,                          San Diego Superior Court Case
14                                     No. 37-2008-00080104-CU-MC-CTL
                    Plaintiff,
15                                     **NOTICE OF REMOVAL OF**
            vs.                        **ACTION UNDER**
16                                     **28 U.S.C. § 1441(b)**
     NATIONAL INDEMNITY                **[DIVERSITY JURISDICTION]**
17   COMPANY, a Nebraska corporation;
     and DOES 1 through 10,
18
                    Defendant.
19

20

21   TO THE CLERK OF THE ABOVE-ENTITLED COURT:

22            PLEASE TAKE NOTICE that Defendant National Indemnity

23   Company hereby removes to this Court this civil action, pursuant to 28 U.S.C. §

24   1441 et seq.  Removal of the action is proper for the reasons listed below.

25            Plaintiff Steve Poizner, is the Insurance Commissioner of the State of

26   California, and is the Liquidator of Frontier Pacific Insurance Company

27   ("Liquidator").  Plaintiff Steve Poizner, in his capacity as Liquidator, is a citizen of

28   California.

583512.1

1    Defendant National Indemnity Company ("National Indemnity") is a

2 Nebraska corporation with a principal place of business in Omaha, Nebraska.

3    Thus, Liquidator and National Indemnity Company are completely

4 diverse.

5    Liquidator filed a Complaint in the Superior Court of California for the

6 County of San Diego, under case number 37-2008-00080104-CU-MC-CTL on or

7 about March 17, 2008 naming National Indemnity as a defendant.

8    Attached hereto as Exhibit A is a copy of all pleadings, process and

9 orders filed in the State Court action which have been served on Liquidator.

10    Defendant National Indemnity was served with a copy of the

11 Complaint and Summons on April 4, 2008. This was the first notice Defendant had

12 from which it could be ascertained that the action was removable.

13    National Indemnity files this Notice of Removal with the United States

14 District Court within thirty (30) days after the first receipt of a copy of the

15 Complaint in this action.

16    Pursuant to 28 U.S.C. § 1332(a)(2), this Court has original jurisdiction

17 over any civil action between citizens of a State and citizens or subjects of a foreign

18 state where the matter in controversy exceeds the sum or value of $75,000.00.

19    In this action, the amount in controversy exceeds $75,000.00.

20 Specifically, Liquidator seeks a declaration of the court that National Indemnity may

21 not assert the defense of set off against certain claims of the Liquidator, including

22 one claim in the amount of $4,883,090.00. In addition, Liquidator seeks the costs of

23 suit and such other relief as the Court may deem just and proper.

24    Accordingly, this action is properly removed by National Indemnity

25 pursuant to 28 U.S.C. § 1441(a), because this Court has original jurisdiction over the

26 action and San Diego County, California is located within the jurisdiction of the

27 Federal District Court for the Southern District of California.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

583512.1

2

1        Written notice to the San Diego County District Clerk and to the

2    Liquidator shall promptly be filed with said court and served upon Liquidator, as

3    required by 28 U.S.C. § 1446(d).  A copy of said Notice to Clerk and Adverse party

4    of Filing of Notice of Removal (without exhibit) is attached hereto as Exhibit B.

5        Accompanying this Notice of Removal are a Civil Cover Sheet and a

6    check in the amount of $350.00 for the required filing fee.

7        WHEREFORE, Defendant National Indemnity respectfully requests

8    that the above-entitled action, now pending in the Superior Court of San Diego

9    County, California, be removed therefrom to this court.

10

11    DATED: April 25, 2008        MUSICK, PEELER & GARRETT LLP

12

13    By: _____

14        Richard S. Conn
    Attorneys for NATIONAL INDEMNITY
15        COMPANY

16

17

18

19

20

21

22

23

24

25

26

27

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

583512.1

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)

**EXHIBIT  A**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:   330 West Broadway
MAILING ADDRESS:  330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME:      Central
TELEPHONE NUMBER: (619) 685-6055

PLAINTIFF(S) / PETITIONER(S):   Steve Poizner Insurance Commissioner Of The State Of California

DEFENDANT(S) / RESPONDENT(S): National Indemnity Company

STEVE POIZNER INSURANCE COMMISSIONER OF THE STATE OF CALIFORNIA VS. NATIONAL INDEMNITY

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER: 37-2008-00080104-CU-MC-CTL |
|---|---|

Judge:  Ronald L. Styn                                    Department: C-62

**COMPLAINT/PETITION FILED:** 03/18/2008

## CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

SDSC CIV-721 (Rev. 11-06)                **NOTICE OF CASE ASSIGNMENT**                Page: 1



FILED
CIVIL BUSINESS OFFICE
CENTRAL DIVISION

08 MAR 17 PM 1:03

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  EDMUND G. BROWN JR.,
     Attorney General of the State of California
2  W. DEAN FREEMAN,
     Supervising Deputy Attorney General
3  FELIX E. LEATHERWOOD,
     Supervising Deputy Attorney General
4  DIANE SPENCER SHAW, State Bar No. 073970
   LISA W. CHAO, State Bar No. 198536
5    Deputy Attorneys General
   300 South Spring Street, Suite 1702
6  Los Angeles, CA 90013
   Telephone: (213) 897-2486
7  Fax: (213) 897-5775

8  LASZLO KOMJATHY, JR., State Bar No. 99861
   Department of Insurance
9  45 Fremont Street, 24th Floor
   San Francisco, CA 94105
10 Telephone: (415) 538-4413

11 Attorneys for Plaintiff Steve Poizner, Insurance Commissioner
   of the State of California in his capacity as
12 Liquidator of Frontier Pacific Insurance Company

13

14        **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15             **IN AND FOR THE COUNTY OF SAN DIEGO**

16

17  | STEVE POIZNER, INSURANCE | Case No.  37-2008-00080104-CU-MC-CTL |
18  COMMISSIONER OF THE STATE OF
    CALIFORNIA, in his capacity as Liquidator    COMPLAINT FOR DECLARATORY
19  of Frontier Pacific Insurance Company,       RELIEF

20                              Plaintiff,

21        v.

22  NATIONAL INDEMNITY COMPANY, a
    Nebraska corporation; and DOES 1 through
23  10,

24                              Defendants.

25

26       Plaintiff,  Steve Poizner, Insurance Commissioner of the State of California ("Plaintiff" or

27  "Liquidator"), in his capacity as Liquidator of Frontier Pacific Insurance Company ("FPIC"),

28  alleges:

                    Complaint for Declaratory Relief
                                1

**INTRODUCTION**

1.    This lawsuit seeks declaratory relief for a determination that Frontier Pacific Insurance Company's right to recover monies owed by National Indemnity Company ("NICO") pursuant to an indemnity contract is not subject to any claim of offset for monies that were previously owed to NICO from Frontier Insurance Company ("Frontier"), FPIC's parent company.

2.    Frontier, NICO and FPIC are parties to a reinsurance contract. Frontier and NICO entered into an amendment to the reinsurance contract identified as Endorsement No. 3. Pursuant to Endorsement No. 3, NICO paid Frontier $45 million and compromised and released NICO's claims for unpaid premiums due as of December 31, 2003 from Frontier and FPIC. Even though FPIC is not a party to Endorsement No. 3, NICO asserts that the terms of Endorsement No. 3 authorize NICO to offset monies it owes FPIC against the debts NICO discharged unless Frontier directs NICO to release FPIC from the discharged debts.

**PARTIES**

3.    Frontier Pacific Insurance Company was a corporation existing under the laws of the State of California and was licensed to transact the business of insurance in the State of California.

4.    At all times pertinent herein, FPIC is and was a wholly owned subsidiary of Frontier, which was licensed to transact insurance in the State of New York and is currently under an order of rehabilitation in the proceeding entitled *In the Matter of the Rehabilitation of Frontier Insurance Company*, Supreme Court of the State of New York, County of Sullivan, Index No. 1357/03 ("Rehabilitation Court").

5.    On November 30, 2001, Plaintiff Insurance Commissioner of the State of California was appointed the Liquidator of FPIC by the above-entitled court in the proceeding entitled *Insurance Commissioner v. Frontier Pacific Insurance Company*, San Diego County Superior Court Case No. GIC774028.

6.    Defendant National Indemnity Company, at all times pertinent herein, is and was

1   a corporation with its principal place of business in Nebraska, and authorized to engage and did

2   engage in various classes of insurance business in the State of California.

3       7.    The true names and capacities, whether individual, corporate, associate or

4   otherwise, of DOES 1 through 10, are unknown to the Liquidator, who therefore sues these

5   Defendants by such fictitious names.  The Liquidator will seek leave to amend this complaint to

6   show the true names and capacities of the fictitiously named Defendants when and as they are

7   ascertained.  The Liquidator joins the fictitiously named Defendants upon the belief that they

8   participated in, contributed to, or are responsible for, the circumstances, obligations and damages

9   set forth in this complaint

10   .

11                     **JURISDICTION**

12       8.    Pursuant to Insurance Code section 1058, the above-entitled court has jurisdiction

13   to hear and determine this action since it affects the interests of FPIC and of the Liquidator.

14

15                 **GENERAL ALLEGATIONS**

16            **The NICO Novated Reinsurance Contracts**

17       9.    On May 3, 1995, FPIC and Frontier entered into a reinsurance agreement with

18   Centre Reinsurance Company of New York ("Centre Re"), entitled Coinsured Aggregate Excess

19   Loss Reinsurance Agreement effective January 1, 1995 ("Centre Re Agreement"), wherein

20   Centre Re agreed to indemnify FPIC and Frontier for the ultimate net loss incurred by FPIC and

21   Frontier on all business written by FPIC and Frontier subject to certain exclusions.  Attached

22   hereto and incorporated herein by reference as Exhibit "A" is a true and genuine copy of the

23   Centre Re Agreement.

24       10.    The Centre Re Agreement allowed Frontier and FPIC to withhold 100% of the

25   cumulative Accident Year Reinsurance Premium due Centre Re less Centre Re's cumulative

26   Reinsurer's margin of 8% of premium ("Centre Re Funds Held") so that Frontier and FPIC could

27   reimburse itself for defined losses under the agreement.

28       11.    Plaintiff is informed and believes that sometime after the effective date of the

Complaint for  Declaratory Relief
3

1   Centre Re Agreement, Zurich Reinsurance (North America), Inc. ("Zurich Re") became the

2   successor company to Centre Re.

3          12.    On July 15, 1998, Frontier and its subsidiaries, FPIC, United Capitol Insurance

4   Company ("United") and Western Indemnity Insurance Company ("Western") entered into a

5   reinsurance agreement with Zurich Re entitled Aggregate Excess Loss Reinsurance Agreement

6   ("Zurich Re Agreement") (together with Centre Re Agreement, the "Reinsurance Agreements").

7   Pursuant to this agreement, Zurich Re agreed to indemnify Frontier, FPIC, United and Western

8   for the ultimate net loss incurred on all business written by the Frontier, FPIC, United and

9   Western subject to certain exclusions and on the aggregate results of all the individual reinsured

10  companies.  The allocations were based upon each individual reinsured company's net

11  experience with no right of offset on any balances payable or recoverable to or from any

12  individual reinsured company that is a party to the Zurich Re Agreement.  Attached hereto and

13  incorporated herein by reference as Exhibit "B" is a true and genuine copy of the Zurich Re

14  Agreement.

15         13.    The Zurich Re Agreement also allowed the reinsured companies to withhold

16  100% of the cumulative Accident Year Reinsurance Premium due Zurich Re less cumulative

17  Reinsurer's margin of 8.75% of premium so that Frontier, FPIC, United and Western could

18  reimburse itself for defined losses under the agreement.

19         14.    On December 21, 2000, FPIC, Frontier, United and Western entered into a

20  Novation Agreement with Zurich Re and NICO with an effective date of July 1, 2000.  Attached

21  hereto and incorporated herein by reference as Exhibit "C" is a true and genuine copy of the

22  Novation Agreement.

23         15.    Pursuant to the Novation Agreement, NICO agreed to assume and agrees to

24  perform and to be bound by the obligations and liabilities on the part of Zurich Re and its

25  predecessor Centre Re in connection with the Reinsurance Agreements.  The Novation

26  Agreement also released Zurich Re and its predecessor Centre Re from their obligations and

27  responsibilities in connection with the Reinsurance Agreements.

28         16.    In consideration for the Novation Agreement, NICO received  $68,200,000.00

1  from Zurich Re.

2  **The NICO Aggregate Reinsurance Contract**

3    17.    On September 27, 2000, Frontier entered into an Aggregate Reinsurance

4  Agreement with NICO with an effective date of July 1, 2000 (the "NICO Agreement") wherein

5  NICO reinsured policies issued by Frontier prior to December 31, 1999 with claims made

6  policies limited to claims reported prior to December 31, 1999.  Attached hereto and

7  incorporated herein by reference as Exhibit "D" is a true and genuine copy of NICO Agreement.

8    18.    On January 5, 2001, Frontier, FPIC and NICO entered into an agreement

9  amending the NICO Agreement identified as Endorsement No. 1.   Pursuant to Endorsement No.

10  1,  FPIC was added as an additional insured and NICO agreed to pay on behalf of Frontier and

11  FPIC an amount up to an aggregate limit of $858,554,275 with NICO's liability to FPIC limited

12  to a maximum of $47,089,799 as respects to all covered losses.  Endorsement No. 1 was effective

13  October 1, 2000.  Attached hereto and incorporated herein by reference as Exhibit "E" is a true

14  and genuine copy of Endorsement No. 1.

15    19.    In consideration for including FPIC as an additional named insured under the

16  NICO Agreement, pursuant to paragraph 3 of Endorsement No. 1, Frontier and FPIC paid NICO

17  a premium of $21 million.

18    20.    On August 27, 2001, Frontier was taken into Temporary Rehabilitation by the

19  Superintendent of Insurance of the State of New York, and on October 15, 2001, an Order of

20  Rehabilitation was entered by the Supreme Court of the State of New York, appointing the

21  Superintendent of Insurance of the State of New York as rehabilitator.  Attached hereto and

22  incorporated by reference as Exhibit "F" is a true and genuine copy of the Order of

23  Rehabilitation.

24    21.    Plaintiff is informed and believes and based thereon alleges that at the time that

25  the Order of Rehabilitation was entered, Frontier owed approximately $40 million in premium to

26  NICO under the Novation Agreement to fund the Centre Re Funds Held deficiency due at

27  December 31, 2003.

28    22.    On or about September 21, 2001, Frontier and NICO entered into Endorsement

Complaint for  Declaratory Relief
5

1  No. 2 whereby NICO was designated as an administrator to assist Frontier and to loan money

2  pursuant to the terms of Endorsement No. 2. Attached hereto and incorporated herein by

3  reference as Exhibit "G" is a true and genuine copy of Endorsement No. 2.

4       23.    FPIC is not a party to Endorsement No. 2.

5       24.    Plaintiff is informed and believes and thereupon alleges that pursuant to

6  Endorsement No. 2, NICO loaned Frontier approximately $140 million.

7       25.    Subsequently, Frontier and NICO entered into an Endorsement No. 3 to the NICO

8  Agreement with an effective date of January 1, 2004 subject to approval by the Rehabilitation

9  Court. Attached hereto and incorporated by reference as Exhibit "H" is a true and genuine copy

10  of Endorsement No. 3.

11       26.    Pursuant to Endorsement No. 3 , Frontier and NICO agreed that a) NICO would

12  pay Frontier $50 million, within ten days after court approval of Endorsement No. 3, reduced by

13  the sum of all payments made by NICO after December 31, 2003 in excess of NICO's

14  contractual obligations as amended by Endorsement No. 3 together with interest on the net

15  amount of the $50 million owed to Frontier (Exhibit H ¶ 7); b) NICO would release Frontier

16  from any and all obligations or liability with respect to repayment of net amounts due to NICO

17  ("NICO Balance") of up to $140 million (Exhibit H ¶ 8); c) to the extent that the NICO Balance

18  exceeded $140 million, Frontier agreed to pay NICO the excess and to the extent that the NICO

19  Balance is less than $140 million NICO agreed to pay Frontier that amount by which $140

20  million exceeds the NICO Balance (Exhibit H ¶8); and d) as part of the $140 million NICO

21  Balance forgiveness, **NICO agreed to waive any claim against Frontier to collect any of the**

22  **Centre Re Funds Held balance due at December 31, 2003**  (Exhibit H ¶ 9).

23       27.    Plaintiff is informed and believes and thereupon alleges that at the time

24  Endorsement No. 3 was executed, the unpaid Centre Re Funds Held balance owed by Frontier to

25  NICO was approximately $40 million.

26       28.    Plaintiff is informed and believes and thereupon alleges that although

27  Endorsement No. 3 compromised and released NICO's claim against Frontier and FPIC to fund

28  the premium deficiency in the Centre Re Funds Held as of December 31, 2003, a provision was

1   inserted at Frontier's request which purportedly allowed NICO to collect the amounts waived

2   from the other participants to the Reinsurance Agreements and Novation Agreement including

3   FPIC . However, NICO's alleged right to collect the waived amounts from FPIC is conditioned

4   upon Frontier's election.  By the terms of Endorsement No. 3, NICO is required to abide by

5   Frontier's decision (Exhibit H ¶ 9).

6          29.    The specific provision of Endorsement No. 3 that discharged and relieved Frontier

7   and FPIC from its obligations to fund the Reinsurance Agreements is as follows:

8          "9.    With respect to the Centre Re Funds Held balance at December 31, 2003, the

9                 Reinsurer [NICO] agrees not to collect this amount from Frontier as part of the

10                $140 million of NICO Balance forgiveness referenced above, effective January 1,

11                2004.  The Reinsurer agrees that it may only collect the remaining funds held

12                balance from the other participants to the Centre Re Reinsurance Agreements and

13                the Novation.  In addition, Reinsurer shall abide by Reinsured's [Frontier]

14                decision as to whether or not to relieve Frontier Pacific Insurance Company

15                ("FPIC") from its obligations in respect of the funds held balance under the Centre

16                Re Reinsurance Agreements and Novation."

17         30.    FPIC was not and is not a party to Endorsement No. 3.

18              **Frontier Seeks Court Approval of Endorsement No. 3**

19         31.    On or about July 7, 2004, Frontier submitted its Petition seeking the

20  Rehabilitation Court's approval of Endorsement No. 3.  Attached hereto and incorporated by

21  reference as Exhibit "I" is a true and genuine copy of Frontier's Petition.

22         32.    Objections were filed to Frontier's Petition and on January 4, 2005 Frontier's

23  Petition was initially denied.

24         33.    On or about April 4, 2005, Frontier renewed its petition to approve Endorsement

25  No. 3.  Ronald Labenski, Chief Reinsurance Officer of Frontier Insurance Company in

26  Rehabilitation, in his affidavit in support of Frontier's Petition for court approval of Endorsement

27  No. 3  averred that with the court's approval of Endorsement No. 3, Frontier will receive an

28  infusion of $45 million cash and $145 million of debt relief and that said debt relief includes

1  discharging Frontier's liability to NICO for any deficiency in the Centre Re Funds Held balance

2  due at December 31, 2003 . Attached hereto and incorporated herein by reference as Exhibit "J"

3  is a true and genuine copy of the Affidavit of Ronald Labenski filed by Frontier in support of its

4  Petition for court approval of Endorsement No. 3.

5      34.    On or about April 4, 2005, H. Neal Conolly, the Administrator of Frontier in

6  Rehabilitation, in support of Frontier's Petition for court approval of Endorsement No. 3,

7  executed and submitted his Affirmation in Support of Rehabilitator's Motion to Renew and

8  Reargue wherein at paragraph 7 he affirmatively stated that "NICO agrees to **expunge an**

9  **approximate $145 million** balance in its favor (principally in respect of the separate novation

10  agreement) and to **pay approximately $45 million to the Rehabilitator**." (Emphasis added.)

11  Attached hereto and incorporated herein by reference as Exhibit "K" is a true and genuine copy

12  of Neal Conolly's Affirmation in Support of Rehabilitator's Motion to Renew and Reargue.

13      35.    No objection was filed by NICO to the Affidavit of Ron Labenski or Neal

14  Conolly's Affirmation in Support of Rehabiltator's Motion to Renew and Reargue.

15      36.    After consideration of Frontier's motion to renew and reargue, Endorsement No. 3

16  was approved by the Rehabilitation Court on July 28, 2005.  Attached hereto and incorporated

17  herein by reference as Exhibit "L" is a true and genuine copy of the Rehabilitation Court's Order

18  approving Endorsement No. 3.

19      37.  Plaintiff is informed and believes and thereupon alleges that Endorsement No. 3 has

20  been fully performed by NICO and Frontier and Frontier and FPIC's obligations under the

21  Reinsurance Agreements  for payment of premium has been fully discharged and satisfied.

22                          **Actions By Liquidator**

23      38.    Pursuant to Insurance Code section 1010, et seq., the Insurance Commissioner

24  was appointed the Liquidator of FPIC by order of this Court.  As liquidator, Plaintiff assumed

25  FPIC's obligations and liabilities, including FPIC's obligations and responsibilities under and in

26  connection with the Reinsurance Agreements, the Novation Agreement and the NICO

27  Agreement.

28      39.    Prior to FPIC billing NICO for reimbursement of claims covered by the NICO

1 | reinsurance agreements, FPIC and Frontier reconciled the amounts due from NICO, and then

2 | FPIC and/or Frontier would send the billing to NICO with supporting documentation.

3 |     40.    From 2002 through 2005, the Liquidator's representatives, Frontier and NICO met

4 | regarding Frontier updating the FPIC loss data and reconciling reinsurance cessions.

5 |     41.    In early 2005 it was agreed by NICO, Frontier and the Liquidator that the

6 | Liquidator would await a ruling on Frontier's motion for approval of Endorsement No. 3 before

7 | submitting a reconciled billing for losses ceded to NICO.

8 |     42.    After the receipt of the Rehabilitation Court's order approving Endorsement No. 3

9 | and based on the meetings and discussions held previously, on or about September 20, 2005

10 | Frontier sent to NICO and the Liquidator FPIC's bill in the principal amount of $4,883,090.

11 | Attached hereto and incorporated herein by reference as Exhibit "M" is a true and genuine copy

12 | of the September billing statement without supporting spreadsheets.

13 |     43.    Despite NICO having received the billings from FPIC and the approval of

14 | Endorsement No.3 by the Rehabilitation Court, NICO refuses to pay stating that until Frontier

15 | declares otherwise, FPIC is still obligated to NICO for payment of approximately $40 million

16 | previously owed by Frontier to NICO but discharged pursuant to Endorsement No. 3.

17 |     44.    NICO contends that under the provisions of Endorsement No. 3, despite having

18 | compromised and released Frontier and FPIC from any liability for unpaid premiums, only

19 | Frontier can unilaterally determine whether or not FPIC remains liable to NICO for payment of

20 | any premium deficiency in the Centre Re Funds Held balance due at December 31, 2003 which

21 | liability Frontier satisfied and discharged by NICO pursuant to Endorsement No. 3.

22 |

23 |                  **FIRST CAUSE OF ACTION**

24 |                  **(Declaratory Relief)**

25 |     45.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

26 | through 43 as though the same were fully set forth herein.

27 |     46.    An actual controversy has arisen and now exists between the Liquidator and

28 | NICO concerning their respective rights and duties in that the Liquidator contends that FPIC is

1  not a party to Endorsement No. 3 and is not bound by any obligations created by Endorsement

2  No. 3, while NICO contends that Endorsement No. 3 is controlling.

3       47.    Plaintiff seeks a judicial determination and declaration that he is not bound by

4  obligations that Frontier and NICO attempt to impose upon FPIC pursuant to Endorsement No. 3.

5

6  **SECOND CAUSE OF ACTION**

7  **(Declaratory Relief)**

8       48.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

9  through 46 as though the same were fully set forth herein.

10       49.    An actual controversy has arisen and now exists between the Liquidator and

11  NICO concerning their respective rights and duties under the NICO Agreement. The Liquidator

12  contends that Endorsement No. 3 discharges all obligations for any deficiencies in premiums due

13  from FPIC to NICO through December 31, 2003 under the Novation Agreement, while NICO

14  contends that even though NICO's claims for premium deficiencies owed as of December 31,

15  2003 were compromised and released only Frontier can elect to have FPIC's liability to NICO

16  released including Frontier's premium obligation to NICO under the Novation Agreement to

17  fund the Centre Re Funds Held balance due at December 31, 2003.

18       50.    Plaintiff seeks a judicial determination and declaration that Endorsement No. 3

19  was and is an accord and satisfaction of any obligation owed by either FPIC or Frontier to NICO

20  under the Novation Agreement for any shortfall in premiums due NICO pursuant to the Novation

21  Agreement to fund the Centre Re Funds Held balance due at December 31, 2003 and no

22  outstanding obligation for premiums under the Novation Agreement is due to NICO.

23

24  **THIRD CAUSE OF ACTION**

25  **(Declaratory Relief)**

26       51.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

27  through 49 as though the same were fully set forth herein.

28       52.    An actual controversy has arisen and now exists between the Commissioner and

Complaint for Declaratory Relief
10

1   NICO concerning their respective rights and duties in that NICO contends that it can set-off

2   monies that it owes to FPIC against monies due to NICO from Frontier but otherwise discharged

3   by Endorsement No. 3, while the Commissioner contends that such an attempted set-off violates

4   Insurance Code section 1031.

5      53.    Plaintiff seeks a judicial determination and declaration that NICO's attempts to

6   set-off monies that it owes to FPIC against monies that were due to it from Frontier violates

7   Insurance Code section 1031.

8      WHEREFORE, the Liquidator prays judgment as follows:

9      1.    For a declaration that the Liquidator is not bound by the terms of Endorsement

10  No. 3;

11     2.    For a declaration that Endorsement No. 3 discharged the Liquidator and FPIC

12  from all obligations for premiums due from FPIC to NICO and from Frontier to NICO, if any,

13  under the Novation Agreement to fund the Centre Re Funds Held balance as of December 31,

14  2003;

15     3.    For a declaration that any claimed right by NICO to set-off monies that it owes to

16  FPIC against monies that are due to NICO from Frontier violates Insurance Code section 1031;

17     4.    For costs of suit herein; and

18     5.    For such other and further relief as the court may deem just and proper.

19  Dated: _March 14, 2008_

EDMUND G. BROWN JR.,
Attorney General of the State of California
20  W. DEAN FREEMAN,
Supervising Deputy Attorney General
21  FELIX LEATHERWOOD,
Supervising Deputy Attorney General
22  DIANE SPENCER SHAW
LISA W. CHAO
23  Deputy Attorneys General

24

25  By _Diane Spencer Shaw_
    DIANE SPENCER SHAW
26
Attorney for Plaintiff Steve Poizner,
27  Insurance Commissioner of the State of
California, in his capacity as Liquidator of
28  Frontier Pacific Insurance Company

Complaint for  Declaratory Relief
11

**Coinsured Aggregate Excess of Loss
Reinsurance Agreement**
Effective: January 1, 1995

issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

E. W. Blanch Co.

Reinsurance Services

3500 West 80th Street

Minneapolis, Minnesota  55431

R:\95\A\0000115.DOC

# Table of Contents

| Article | | Page |
|---|---|---|
| I | Term | 1 |
| II | Territory | 1 |
| III | Business Covered | 2 |
| IV | Exclusions | 2 |
| V | Accident Year Limit | 4 |
| VI | Aggregate Limit | 4 |
| VII | Accident Year Retention | 4 |
| VIII | Coinsurance | 5 |
| IX | Accident Year Reinsurance Premium | 5 |
| X | Loss Settlements | 6 |
| XI | Funds Withheld | 6 |
| XII | Experience Account | 8 |
| XIII | Reinsurer's Margin | 9 |
| XIV | Commutation | 9 |
| XV | Reports and Remittances | 10 |
| XVI | Taxes | 11 |
| XVII | Covenants of the Company | 11 |
| XVIII | Definitions | 12 |
| XIX | Ultimate Net Loss | 13 |
| XX | Net Retained Lines | 14 |
| XXI | Right of Offset | 14 |
| XXII | Nonpayment of Premium and Losses | 15 |
| XXIII | Access to Records (BRMA 1C) | 15 |
| XXIV | Currency (BRMA 12A) | 15 |
| XXV | Errors and Omissions (BRMA 14A) | 16 |
| XXVI | Insolvency | 16 |
| XXVII | Arbitration | 17 |
| XXVIII | Service of Suit (BRMA 49D) | 18 |
| XXIX | Agency Agreement | 18 |
| XXX | Regulatory Authority | 18 |
| XXXI | Other Terms and Conditions | 19 |
| XXXII | Intermediary | 20 |
| | Schedule A | |
| | Schedule B | |

## Coinsured Aggregate Excess of Loss
## Reinsurance Agreement
### Effective: January 1, 1995

issued to

### Frontier Insurance Company
#### Rock Hill, New York
and
### Frontier Pacific Insurance Company
#### Los Angeles, California
#### and affiliated insurance companies of
#### The Frontier Insurance Group, Inc.
*(hereinafter referred to collectively as the "Company")*

by

### Centre Reinsurance
### Company of New York
#### New York, New York
*(hereinafter referred to as the "Reinsurer")*


## Article I - Term

A.  The term ("Term") of this Agreement shall commence at 12:01 a.m., Eastern Standard Time, January 1, 1995 ("Effective Date") and shall remain in force until 11:59 p.m., Eastern Standard Time, December 31, 1997 ("Expiration Date"), unless canceled earlier.

B.  Either party may cancel this Agreement as provided for in Article IX - Accident Year Reinsurance Premium, Article XVII - Covenants of the Company, Article XXI - Right of Offset and Article XXII - Nonpayment of Premium and Losses. Either party may rescind this Agreement as provided for in Article XXX - Regulatory Authority.


## Article II - Territory

This Agreement shall apply to policies issued for risks located in the United States of America, its territories, its possessions, the Commonwealth of Puerto Rico, the Caribbean, the District of Columbia and Canada.

## Article III - Business Covered

A. Subject to the terms, conditions and limits, including, but not limited to, the Accident Year Limit and the Aggregate Limit of this Agreement, the Reinsurer agrees to indemnify the Company on an aggregate excess of loss basis for each covered Accident Year for Ultimate Net Loss incurred by the Company on all business written by the Company, except as excluded, in excess of the Accident Year Retention, and net of the amount of Ultimate Net Loss retained in accordance with Article VIII - Coinsurance, arising out of losses occurring during the Term. It is understood that the Company shall have the option to exclude new programs by providing the Reinsurer with prior written notice of its intent within 90 days of inception of the program.

B. It is understood and agreed that losses arising under policies covered hereunder shall be allocated to an Accident Year according to the instructions for compiling the Company's Annual Statement as filed with the Company's state of domicile.

## Article IV - Exclusions

A. This Agreement does not apply to and specifically excludes business written and classified by the Company as:

   1. Reinsurance assumed (other than intercompany reinsurance between the reinsured companies and reinsurance assumed from the NCCI National Workers' Compensation Pool) under obligatory reinsurance agreements, except agency reinsurance where the policies involved are to be reunderwritten in accordance with the underwriting standards of the Company and reissued as the Company's policies at the next anniversary or expiration date.

   2. Loss and/or damage and/or costs and/or expenses arising from seepage and/or pollution and/or contamination, other than contamination from smoke. Nevertheless, this exclusion shall not apply (a) if such interests are insured under a policy containing the Company's standard pollution limitation in effect at policy inception, or (b) where the Company issues a pollution coverage endorsement or policy under its Pest Control Program. This exclusion does not preclude payment of the cost of removing debris of property damaged by a loss otherwise covered hereunder, subject always to a limit of 25% of the Company's property loss under the applicable original policy.

   3. As regards interests which at time of loss or damage are on shore, no liability shall attach hereto in respect of any loss or damage which is occasioned by war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, or martial law or confiscation by order of any government or public authority. This War Exclusion Clause shall not, however, apply to interests which at time of loss or damage are within the territorial limits of the United States of America (comprising the Fifty States of the Union, the District of Columbia, and including

United States ownership), Canada, St. Pierre and Miquelon, provided such interests are insured under policies containing a standard war or hostilities or warlike operations exclusion clause. Nevertheless, this clause shall not be construed to apply to loss or damage occasioned by Riots, Strikes, Civil Commotion, Vandalism, Malicious Damage, including acts committed by agents of any government, party or faction engaged in war, hostilities or other warlike operation, provided such agents are acting secretly and not in connection with any operations of military or naval armed forces in the country where the interest insured is situated.

4.  Nuclear risks as defined in the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (U.S.A.)," the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (Canada)," the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (Canada)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (Canada)" and the "Nuclear Energy Risks Exclusion Clause (Reinsurance) (1994) (Worldwide Excluding U.S.A. & Canada) attached to and forming part of this Contract.

5.  Liability as a member, subscriber or reinsurer of any Pool (other than the NCCI National Workers' Compensation Pool), Syndicate or Association; and any FAIR Plan or other combination of insurers or reinsurers formed for the purpose of covering specific perils, specific classes of business or for the purpose of insuring risks located in specific geographical areas.

6.  Liability of the Company arising by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency fund" includes any guaranty fund, insolvency fund, plan, pool, association, fund or other arrangement, however denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

7.  Rehabilitation, residual market, Second Injury Fund and Guarantee Fund and similar type assessments.

8.  Bid Bonds, Bail Bonds, License and Permit Bonds, Custom House Bonds, and Miscellaneous Bonds.

9.  Retrospectively rated insurance (loss sensitive insurance policies).

10. Policyholder dividends.

## Article V - Accident Year Limit

A.  The Reinsurer's obligation to indemnify the Company in respect of Ultimate Net Loss in excess of the sum of the Accident Year Retention and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article VIII - Coinsurance shall be subject to a total limit of liability for that Accident Year equal to 175% of Accident Year Reinsurance Premium.

B.  The Accident Year Limits shall be subject to Article VI - Aggregate Limit, and shall be used chronologically by Accident Year, i.e., Ultimate Net Loss is deemed to be ceded from the earliest Accident Year first, the next earliest second, and so on. In the event that the estimate of ceded Ultimate Net Loss for an Accident Year changes over time, the cessions of Ultimate Net Loss by Accident Year shall be adjusted accordingly.

## Article VI - Aggregate Limit

A.  The Reinsurer's obligation of indemnity to the Company in respect of Ultimate Net Loss in excess of the Accident Year Retentions and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article VIII - Coinsurance shall be subject to an Aggregate Limit of liability under this Agreement equal to the lesser of:

  1.  175% of the Accident Year Reinsurance Premiums paid for all covered Accident Years; or

  2.  $162,500,000.

B.  The Aggregate Limit of liability hereunder is subject to adjustment as provided for in Article XVII - Covenants of the Company, Article XXI - Right of Offset and Article XXII - Nonpayment of Premium and Losses. Under no circumstances shall the total liability of the Reinsurer under or related to this Agreement exceed the Aggregate Limit.

## Article VII - Accident Year Retention

No claim shall be made under this Agreement for an Accident Year unless and until the Company shall have first incurred Ultimate Net Loss on Business Covered during the Accident Year in question in excess of an Accident Year Retention which shall be equal to the product of the Subject Net Earned Premium Income for the Accident Year and the following applicable factor:

| Accident Year | Applicable Factor |
| --- | --- |
| 1/1/95 through 12/31/95 | 66.0% |
| 1/1/96 through 12/31/96 | 65.0% |
| 1/1/97 through 12/31/97 | 64.0% |

## Article VIII - Coinsurance

If for any Accident Year the Ultimate Net Loss is greater than the sum of the Accident Year Retention and the Reinsurer's applicable Accident Year Limit hereunder for that Accident Year, the Company shall coinsure and retain net for its own account a percentage of Ultimate Net Loss in excess of the Accident Year Retention equal to:

> 100% less the percentage derived by dividing (a) by (b), where,
>
>> (a) equals the Accident Year Limit, and
>>
>> (b) equals the amount of Ultimate Net Loss in excess of the Accident Year Retention.

## Article IX - Accident Year Reinsurance Premium

A.  Subject to Article XI - Funds Withheld, the Company shall pay to the Reinsurer an Accident Year Reinsurance Premium in an amount equal to the product of the following net rates and the Company's projected Subject Earned Premium Income for each covered Accident Year, annually in advance:

| Accident Year | Net Rate |
|---|---|
| 1/1/95 - 12/31/95 | 14.0% |
| 1/1/96 - 12/31/96 | 13.5% |
| 1/1/97 - 12/31/97 | 13.0% |

B.  Appropriate adjustment of the Accident Year Reinsurance Premium shall be made and is payable within 60 days after each December 31. The Accident Year Reinsurance Premium shall be subject to a minimum amount equal to $20 million.

C.  If the projected Accident Year Reinsurance Premium as calculated by multiplying the above net rates by the Company's projected Subject Earned Premium Income (as identified in the planning process of the Company) for the Accident Year is less than the minimum premium, the Company may elect to commute this Agreement effective as of the beginning of such Accident Year.

D.  Upon such commutation, in accordance with paragraph C of Article IX, notice of which must be given in writing within 90 days after the commencement of such Accident Year, the Company shall, notwithstanding anything contained to the contrary in this Agreement, retain all amounts previously designated as "Funds Withheld," and the Reinsurer shall completely and finally be released in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under this Agreement.

## Article X · Loss Settlements

The Reinsurer agrees to abide by the loss settlements made by the Company, provided such loss settlements are within the terms and conditions of the Business Covered and this Agreement. The Reinsurer agrees to pay all Ultimate Net Loss due hereunder and paid by the Company (or payable by the Company in case of insolvency in accordance with Article XXVI - Insolvency) quarterly in arrears, and payment will be due within forty-five (45) days following receipt of an account statement submitted by the Company to the Reinsurer. Ultimate Net Loss payments due by the Reinsurer shall first be paid by way of offset against the balance of the Funds Withheld Account until such account is exhausted.

## Article XI - Funds Withheld

A.  Subject to the terms herein, the Company shall retain any and all Reinsurance Premiums due hereunder on a funds withheld basis, provided however, that the Reinsurer's Margin shall be paid in cash to the Reinsurer and shall not be affected by the terms of this Article. In consideration of the Reinsurer agreeing to the Funds Withheld provision, the Company agrees that the Funds Withheld Balance may be set off by the Reinsurer against liability of any nature whatsoever (whether then contingent, due and payable, or in the future becoming due) that it may then have under this Agreement, and such setoff shall occur as a condition precedent to any payments by the Reinsurer hereunder.

B.  A "Funds Withheld Account" shall be maintained for each Accident Year covered under this Agreement. The "Funds Withheld Balance" shall equal the sum of the "Funds Withheld Account" for the Accident Years covered under this Agreement. The "Funds Withheld Account" for an individual Accident Year shall, at any point in time, be defined as:

   1.  100% of the cumulative Accident Year Reinsurance Premium due hereunder for the Accident Year, less

   2.  The cumulative Reinsurer's Margin paid for the Accident Year as defined herein, less

   3.  100% of cumulative Ultimate Net Loss payments (or offsets against this balance) for the Accident Year made by the Reinsurer, plus

   4.  The cumulative Funds Withheld Investment Credit for the Accident Year since the inception of this Agreement.

C.  Accident Year Reinsurance Premium, net of Reinsurer's Margin, shall be credited to the Funds Withheld Account on the date such monies are payable.

D.  Ultimate Net Loss due from the Reinsurer shall be charged against the Funds Withheld Account on the date such monies are due.

E.  The Funds Withheld Investment Credit in any one calendar year shall be computed separately for each Funds Withheld Account and shall, for any Funds Withheld Account, equal the average daily balance of the Funds Withheld Account during that calendar year (or portion thereof) multiplied by the interest credit rate (or pro rata portion thereof) applicable to the individual Accident Year, credited annually, in arrears. The cumulative Funds Withheld Investment Credit for any Funds Withheld Account shall equal the sum of the Funds Withheld Investment Credit for such account for each calendar year since the inception of this Agreement.

F.  The interest credit rate applicable to the Funds Withheld Account for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year plus seventy (70) basis points as documented in the attached Schedule B of this Agreement.

G.  The Company promises to pay to the Reinsurer the Funds Withheld Balance immediately upon the earlier of: 1) Commutation of this Agreement in accordance with Article XIV - Commutation, 2) an Event of Default, 3) Rescission of the Agreement in accordance with Article XXX - Regulatory Authority, 4) Cancellation in accordance with paragraph B of Article XXI - Right of Offset, or 5) December 31, 2010. The Company shall not have the right to prepay all or part of the Funds Withheld Balance without the Reinsurer's express written consent.

H.  The following shall be defined as "Events of Default," and the whole of the Funds Withheld Balance shall, without notice of demand of any kind being required, become immediately due and payable, together with all accrued interest and other unpaid sums owing in relation thereto:

   1.  Payment Defaults - The Company fails to make any payment under this Agreement when due and in the manner therein provided, except where the Reinsurer receives the overdue payment within fifteen business days of the nonpayment; or

   2.  Executions - Creditors attach or take possession of or distress, execution, sequestration, seizure, attachment or other equivalent or analogous process is levied or enforced upon or sued out against any material amount of the Company's assets; or

   3.  Insolvency - The Company commences a proceeding or proceedings are commenced against it seeking dissolution, winding-up, liquidation, administration, reorganization, suspension or compromise of payments or other relief under any applicable bankruptcy, insolvency or other similar law or seeking the appointment of an administrator or a trustee, receiver, manager, receiver-manager, liquidator, custodian, curator or other similar official of it or any substantial part of the Company's assets, or the Company consents to any such relief (including any bankruptcy petition) or appointment in involuntary proceedings taken against it, or makes a bulk sale of its assets or a general assignment or proposal for the benefit of creditors, or fails or admits

its inability to pay its debts as they become due, or suspends or ceases or threatens to suspend or cease carrying on business; or it takes any action in furtherance of any of the foregoing.

## Article XII - Experience Account

A.  A notional Experience Account shall be calculated by the Reinsurer from the Effective Date of this Agreement and maintained until there is a complete and final release of all the Reinsurer's obligations to the Company.

B.  An "Experience Account" shall be maintained for each Accident Year covered under this Agreement. The Experience Account Balance shall equal the sum of the individual Experience Accounts for all Accident Years covered under this Agreement. The "Experience Account" for an individual Accident Year shall, at any point in time, be defined as:

   1.  100% of the cumulative Accident Year Reinsurance Premium received by the Reinsurer (or Funds Withheld in accordance with Article XI - Funds Withheld) for such Accident Year, less

   2.  The cumulative Reinsurer's Margin paid for the Accident Year as defined herein, less

   3.  100% of cumulative Ultimate Net Loss payments (or offsets against Funds Withheld) for the Accident Year made by the Reinsurer, plus

   4.  The cumulative Experience Account Investment Credit for the Accident Year since inception of this Agreement.

C.  Accident Year Reinsurance Premium, net of the Reinsurer's Margin, shall be credited to the Experience Account on the date such monies are payable.

D.  Ultimate Net Loss payments due from the Reinsurer shall be charged against the Experience Account on the date such monies are due.

E.  The Experience Account Investment Credit in any one calendar year shall be computed separately for each Experience Account and shall, for any Experience Account, equal the average daily balance of the Experience Account during that calendar year (or portion thereof) multiplied by the interest credit rate (or pro rata portion thereof) applicable to the individual Accident Year, credited annually, in arrears. The cumulative Experience Account Investment Credit for any Experience Account shall equal the sum of the Experience Account Credit for such account for each calendar year since the inception of this Agreement.



F.  The interest credit rate applicable to the Experience Account through December 31, 1998 for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year plus seventy (70) basis points as documented in the attached Schedule B of this Agreement.

G.  The interest credit rate applicable to the Experience Account after December 31, 1998 for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year minus one hundred thirty (130) basis points .

## Article XIII - Reinsurer's Margin

The Reinsurer's Margin shall be equal to 8.0% of the Accident Year Reinsurance Premium payable under this Agreement.

## Article XIV - Commutation

A.  Subject to the terms of this Article, the Company may, at its sole option, commute this Agreement at any December 31, beginning on December 31, 1999, with ninety (90) days prior written notice by the Company to the Reinsurer.

B.  If the Company elects to commute this Agreement, the Reinsurer shall pay to the Company the following amounts within sixty (60) business days of the date of Commutation:

  1.  Commuted Value of ceded unpaid Ultimate Net Loss:

    a.  If, at the time of Commutation, the ceded unpaid Ultimate Net Loss, as defined herein, is less than or equal to the balance in the Experience Account, the Reinsurer agrees to pay all ceded unpaid Ultimate Net Loss at the amount valued by the Company.

    b.  If, at the time of Commutation, the ceded unpaid Ultimate Net Loss is greater than the balance in the Experience Account, the ceded unpaid Ultimate Net Loss shall be commuted at a present value amount to be mutually agreed. If the present value amount of the ceded unpaid Ultimate Net Loss cannot be mutually agreed by the Company and the Reinsurer, then a mutually acceptable independent third party actuary shall be called upon to make an independent estimation of the present value amount of the ceded unpaid Ultimate Net Loss (the cost of which shall be shared equally by the Company and Reinsurer). If the actuary's estimation is acceptable to both Reinsurer and Company, then this Agreement shall be commuted at the value as estimated by the actuary. If the actuary's value is unacceptable to either the Company or the Reinsurer, or if the parties cannot agree

EX. A p27

on the selection of the actuary, then this Agreement will not be commuted at that time.

2. Contingent Commission - Upon Commutation under subparagraph 1 above, the Reinsurer shall pay to the Company a Contingent Commission equal to the positive balance, if any, of the Experience Account after deducting the value of the commuted ceded unpaid Ultimate Net Loss as per subparagraph 1 above.

C. Payment of the ceded unpaid Ultimate Net Loss and Contingent Commission, if any, by the Reinsurer as described above shall constitute a complete and final release of the Reinsurer in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under or related to this Agreement.

## Article XV - Reports and Remittances

A. The Company shall furnish to the Reinsurer within thirty-five (35) days after the close of each calendar quarter:

1. Quarterly account of Subject Earned Premium Income segregated by line of business (and for the total of all lines) covered under this Agreement;

2. Quarterly accounts of paid and unpaid Ultimate Net Loss segregated by the line of business (and for the total of all lines) covered under this Agreement;

3. Quarterly accounts of paid Ultimate Net Loss ceded under this Agreement which are due to be paid by the Reinsurer to the Company. As respects the Funds Withheld Balance, Ultimate Net Loss amounts shall be deemed to be paid as of the date the Reinsurer agrees to the amount to be paid and such agreement shall be made within forty-five (45) days after receipt of this account; and

4. A reconciliation of the Funds Withheld Balance from inception to the close of the most recent preceding quarter.

B. The Reinsurer shall furnish to the Company, within thirty-five (35) days after the close of each quarter, a reconciliation of the Experience Account from inception to the close of the most recent preceding quarter.

C. All amounts due and payable under this Agreement shall be remitted directly by wire transfer between the Company and the Reinsurer with notice to the Intermediary, unless such amounts are withheld by the Company in accordance with Article XI - Funds Withheld.

D. Any late payments by either party shall accrue interest at a rate of 1% per month.

## Article XVI - Taxes

The Company shall pay all taxes of any nature associated with this Agreement and undertakes not to claim any deduction of the premium hereon when making Canadian tax returns or when making tax returns, other than Income or Profits Tax returns, to any State or Territory of the United States of America or the District of Columbia. However, this Article shall not impose any liability on the Company for any income, capital gains, profits or other similar taxes payable by the Reinsurer in respect of its operations or this Agreement.

## Article XVII - Covenants of the Company

The Company hereby warrants the following:

A.  The Company agrees to notify the Reinsurer of proposed acquisitions whose business the Company desires covered under this Agreement and not to change its mix of business, policy limits profile, claims handling procedures, loss reserving process (including the allocation of loss adjustment expense between allocated and unallocated), or the levels of reinsurance protection in any manner from that in effect at the inception of this Agreement which materially affects this Agreement or the obligations of the parties hereunder, unless the Company has received the prior written approval of the Reinsurer to such changes or acquisitions. Such approval shall not be unreasonably withheld.

In the event that the Company does not adhere to this Covenant, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.  It is further agreed that the Reinsurer shall be notified of changes in respect of the claims adjusting services currently provided by Pioneer Claim Management, Inc. ("Pioneer"), formerly Wright Adjusting Company. The Company's payments to Pioneer for claims adjustment services that are included in Ultimate Net Loss hereunder shall not exceed the fees as specified in Schedule 1 of the contract between Pioneer and the Company dated January 1, 1987, unless mutually agreed.

C.  The Company agrees that the maximum policy limit covered under this Agreement shall be $5,000,000 and that any policy limits issued in excess of $5,000,000 shall be deemed to be $5,000,000 for all purposes of this Agreement. The exceptions to this Covenant shall be: 1) with respect to policies classified as Workers' Compensation, Excess Workers' Compensation, or Employers Liability, the maximum limit shall be that required by statute in the state in which any losses incurred under said policies shall be deemed to have occurred; and 2) with respect to Surety business, the Company agrees that the maximum


limit of policies covered under this Agreement is $6,000,000 per principal and that any loss otherwise reinsured hereunder in excess of $6,000,000 shall be deemed to be $6,000,000 for purposes of this Agreement.

D. It is further warranted by the Company that inuring reinsurance agreements as set forth in Exhibit A attached to and forming part of this Agreement shall remain in place during the Term, or it is so deemed, unless the Company has received the prior written approval of the Reinsurer to allow changes in the inuring reinsurance structure. Such approval shall not be unreasonably withheld.

## Article XVIII - Definitions

A. "Subject Earned Premium Income" shall mean gross premiums earned during the Accident Year, less return premiums, less premiums for reinsurance ceded which inures to the benefit of this Agreement and amounts paid to the Florida Hurricane Catastrophe Fund.

B. "Subject Net Earned Premium Income" shall mean Subject Earned Premium Income during the Accident Year less premiums ceded to this Agreement.

C. "Accident Year" shall mean each period of twelve consecutive months following the Effective Date of this Agreement or following the anniversary date thereof falling within the Term of this Agreement, or if the period between the Effective Date or any anniversary date and the cancellation date of this Agreement is less than twelve months, such lesser period.

D. "Extra Contractual Obligations" are defined as those liabilities not covered under any other provision of this Agreement and which arise from the handling of any claim on Business Covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original accident, casualty, disaster or loss occurrence.

However, there shall be no recovery hereunder where the loss has been incurred due to the fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee of the Company acting individually or collectively or in collusion with a member of the Board of Directors, a corporate officer, supervisory employee or partner of any other corporation, partnership, or organization involved in the defense or settlement of a claim on behalf of the Company.

EX. A p30

E.  "Excess of Original Policy Limits Loss" shall mean any loss of the Company in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation of an appeal consequent upon such action.

However, there shall be no recovery hereunder where the loss has been incurred due to fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee of the Company acting individually or collectively or in collusion with a member of the Board of Directors, a corporate officer, a supervisory employee or partner of any other corporation, partnership, or organization involved in the defense or settlement of a claim on behalf of the Company.

## Article XIX - Ultimate Net Loss

A.  "Ultimate Net Loss" shall mean the actual loss incurred by the Company and all Allocated Loss Adjustment Expenses ("ALAE") on the Business Covered on the Company's Net Retained Lines, after making deductions for all recoveries, including, but not limited to, the Florida Hurricane Catastrophe Fund, salvages and subrogations and shall include 80% of the amounts of any Extra Contractual Obligations and 80% of the amounts of any Excess of Original Policy Limits Loss.

B.  ALAE shall mean all legal expenses and other expenses (including interest accruing before and/or after entry of judgments) incurred by the Company in connection with the investigation, adjustment, settlement or litigation of claims or losses, including salaries and expenses of the Company's field employees while adjusting such claims or losses and expenses of the Company's officials incurred in connection with claims and losses. ALAE includes, but is not limited to, the cost of claim services currently provided to Company by Pioneer Claim Management, Inc. ("Pioneer"). Should such services be provided by a third party or brought in house (such as through the merger of Pioneer into the Company), the cost of such services shall be deemed to be ALAE.

However, items that the Company currently does not allocate as expenses to Pioneer and currently categorizes as unallocated loss adjustment expenses in its Annual Statement (except as provided above) such as salaries of certain of the Company's officials and certain overhead charges such as rent, postal, lighting, cleaning, etc., shall not be included in ALAE.

C.  All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Agreement shall be applied as if recovered or received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto, provided always that nothing in this clause shall be construed to mean that Ultimate Net Loss under

EX. A p31

this Agreement are not recoverable until the Company's Ultimate Net Loss has been ascertained.

D.  The Ultimate Net Loss, as determined by the Company, is subject to agreement by the Reinsurer. If the Reinsurer disagrees with the Ultimate Net Loss determined by the Company, a mutually agreed upon independent national actuarial firm shall be engaged to evaluate the Ultimate Net Loss covered under this Agreement, and such evaluation shall be binding. Such cost shall be shared equally by the Company and the Reinsurer. If the parties fail to agree on the selection of an independent national actuarial firm, each of them shall name two, of whom the other shall decline one, and the decision shall be made by drawing lots.

E.  Notwithstanding anything contained to the contrary in this Agreement, in arriving at the Ultimate Net Loss of the Company under this Agreement, property catastrophe losses shall be limited to $7,000,000 per Accident Year.

## Article XX - Net Retained Lines

A.  This Agreement applies only to that portion of any policy which the Company retains net for its own account, and in calculating the amount of any loss hereunder and also in computing the amount or amounts in excess of which this Agreement attaches, only loss or losses in respect of that portion of any policy which the Company retains net for its own account shall be included.

B.  The amount of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other reinsurer(s), whether specific or general, any amounts which may have become due from such reinsurer(s), whether such inability arises from the insolvency of such other reinsurer(s) or otherwise.

## Article XXI - Right of Offset

A.  The Company and the Reinsurer may offset any balance or amount due from one party to the other under this Agreement.

B.  In extension and not in limitation to paragraph A above, the Reinsurer shall have an absolute right to offset any amounts due to the Company against the Funds Withheld Balance. In the event that this right of offset between the Company and the Reinsurer is specifically disallowed or judged to be unenforceable by any court of competent jurisdiction, arbitration panel or regulatory body, then all amounts in the Funds Withheld Balance shall immediately become due and payable in full. If the Funds Withheld balance is not remitted to the Reinsurer within fifteen (15) days, the Reinsurer shall have the option to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the Aggregate



Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

## Article XXII - Nonpayment of Premium and Losses

A.  Notwithstanding the foregoing, in the event that the Company fails to pay an Accident Year Reinsurance Premium within 15 days of the date such premium is due, the Reinsurer shall notify the Company in writing via registered mail of the overdue amount. In the event that the Company does not remit the overdue amount to the Reinsurer within 15 days of receiving such notification from the Reinsurer, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account Balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.  In the event the Reinsurer fails to pay losses recoverable from the Reinsurer under the Reports and Remittances terms of this Contract within 15 days of the date such loss payments are due, the Company shall notify the Reinsurer in writing via registered mail of the overdue amounts. In the event that the Reinsurer does not remit the overdue amounts to the Company within 15 days of receiving such notification from the Company, the Company shall have the right to immediately cancel this Agreement by mailing a written Notice of Cancellation to the Reinsurer. The mailing of such Notice shall be sufficient notice and the effective date of cancellation shall be the date the Notice of Cancellation was posted.

## Article XXIII - Access to Records (BRMA 1C)

The Company shall place at the disposal of the Reinsurer at all reasonable times, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Contract and thereafter, all books, records and papers of the Company in connection with any reinsurance hereunder, or the subject matter hereof.

## Article XXIV - Currency (BRMA 12A)

A.  Whenever the word "Dollars" or the "$" sign appears in this Agreement, they shall be construed to mean United States Dollars and all transactions under this Agreement shall be in United States Dollars.



B.  Amounts paid or received by the Company in any other currency shall be converted to
United States Dollars at the rate of exchange at the date such transaction is entered on the
books of the Company.

## Article XXV - Errors and Omissions (BRMA 14A)

Errors and omissions on the part of the Company shall not invalidate the reinsurance under this
Agreement, provided such errors or omissions are corrected promptly after discovery thereof, but
the liability of the Reinsurer under this Agreement or any exhibits or endorsements attached
hereto shall in no event exceed the limits specified herein, nor be extended to cover any risks,
perils or classes of insurance or reinsurance generally or specifically excluded herein.

## Article XXVI - Insolvency

A.  The portion of any risk or obligation assumed by the Reinsurer, when such portion is
ascertained, shall be payable on demand of the Company at the same time as the Company
shall pay its net retained portion of such risk or obligation, with reasonable provision for
verification before payment and the reinsurance shall be payable by the Reinsurer, on the
basis of the liability of the Company under the contract or contracts reinsured without
diminution because of the insolvency of the Company.  In the event of insolvency and the
appointment of a conservator, liquidator or statutory successor of the Company, such portion
shall be payable to such conservator, liquidator or statutory successor immediately upon
demand, with reasonable provision for verification, on the basis of claims allowed against
the Company by any court of competent jurisdiction or by any conservator, liquidator or
statutory successor of the Company having authority to allow such claims, without
diminution because of such insolvency or because such conservator, liquidator or statutory
successor has failed to pay all or a portion of any claims.  Payments by the Reinsurer as
above set forth shall be made directly to the Company or to its conservator, liquidator or
statutory successor, except where the contract of insurance or reinsurance specifically
provides another payee of such reinsurance in the event of the insolvency of the Company.

B.  The Reinsurer shall be given written notice of the pendency of each claim or loss which may
involve the reinsurance provided by this Agreement within a reasonable time after such
claim or loss is filed in the insolvency proceeding.  The Reinsurer shall have the right to
investigate each such claim or loss and interpose at its own expense in the proceeding where
the claim or loss is to be adjudicated, any defense available to the Company, its liquidator,
receiver or statutory successor.  The expense thus incurred by the Reinsurer shall be
chargeable, subject to court approval, against the insolvent Company as part of the expense
of liquidation to the extent of a proportionate share of the benefit which may accrue to the
Company solely a result of the defense undertaken by the Reinsurer.

C.  Nothing contained in this Article is intended to change the relationship of the parties to this
Agreement or to enlarge upon the rights or obligations of either party hereunder except as

provided herein, to wit, to pay the statutory successor of the Company on the basis of the amount of liability determined in the liquidation or receivership proceeding rather than on the basis of the actual amount of loss paid by the liquidator, receiver or statutory successor to allowed claimants.

## Article XXVII - Arbitration

A.    Any dispute arising out of the interpretation, performance or breach of this Agreement, including the formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. Notice requesting arbitration must be in writing and sent certified or registered mail, return receipt requested.

B.    One arbitrator shall be chosen by each party and the two arbitrators shall, before instituting the hearing, choose an impartial third arbitrator (the "Umpire") who shall preside at the hearing. If either party fails to appoint its arbitrator within thirty (30) days after being requested to do so by the other party, the latter, after ten (10) days notice by certified or registered mail of its intention to do so, may appoint the second arbitrator.

C.    If the two arbitrators are unable to agree upon the Umpire within thirty (30) days of their appointment, the two arbitrators shall request the American Arbitration Association ("AAA") to provide a list of possible Umpires with the qualifications set forth in this Article and the parties shall then mutually agree upon an Umpire from this list. If the parties are unable to agree upon the Umpire within thirty (30) days of the receipt of the AAA list or if the AAA fails to provide such a list within thirty (30) days of the request, either party may apply to the United States Federal Court for the Southern District of New York to appoint an Umpire with those qualifications. The Umpire shall promptly notify in writing all parties to the arbitration of his selection.

D.    All arbitrators shall be disinterested active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's of London.

E.    Within thirty (30) days after notice of appointment of all arbitrators, the panel shall meet and determine timely periods for briefs, discovery procedures and schedules for hearings.

F.    The panel shall be relieved of all judicial formality and shall not be bound by the strict rules of procedure and evidence. Unless the panel agrees otherwise, arbitration shall take place in New York, New York, but the venue may be changed when deemed by the panel to be in the best interest of the arbitration proceeding. Insofar as the arbitration panel looks to substantive law, it shall consider the law of the State of New York. The decision of any two arbitrators when rendered in writing shall be final and binding. The panel is empowered to grant interim relief as it may deem appropriate.

G.    To the extent, and only to the extent, that the provisions of this Agreement are ambiguous or unclear, the panel shall make its decision considering the custom and practice of the

EX. A p35

applicable insurance and reinsurance business. The panel shall render its decision within sixty (60) days following the termination of hearings, which decision shall be in writing, stating the reasons thereof. Judgment upon the award may be entered in any court having jurisdiction thereof.

H.  Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator. The remaining costs of the arbitration shall be allocated by the panel. The panel may, at its discretion, award such further costs and expenses as it considers appropriate, including but not limited to attorneys fees, to the extent permitted by law.

## Article XXVIII - Service of Suit (BRMA 49D) - (Applicable if the Reinsurer is not domiciled in the United States of America, and/or is not authorized in any State, Territory or District of the United States where authorization is required by insurance regulatory authorities)

A.  It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of any court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

B.  Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## Article XXIX - Agency Agreement

If more than one reinsured company is named as a party to this Agreement, the first named company shall be deemed the agent of the other reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Agreement, and for purposes of remitting or receiving any monies due any party.

## Article XXX - Regulatory Authority

A.  If the FASB, SEC, insurance regulatory or other regulatory body with appropriate jurisdiction issues an authoritative accounting pronouncement or order that, despite both parties' best faith efforts to comply with such pronouncement or order, significantly changes

the accounting treatment of this Agreement, or if the SEC or insurance regulatory authority deems that this Agreement does not, from its inception, qualify as reinsurance on or before June 30, 1996, and such change is concurred with by the Company's auditors, the Reinsurer or the Company may rescind this Agreement effective concurrently with the date of the pronouncement or order.

B.   Upon such rescission, the value of the ceded Unpaid Ultimate Net Loss will be set to zero ($), and the commutation provisions of this Agreement shall apply (including the Company's obligation to immediately pay the Funds Withheld Balance to the Reinsurer and the Reinsurer's obligation to pay the Company the Contingent Commission). The Reinsurer agrees to refund the Reinsurer's Margin paid to date in the event of such rescission.

C.   The payments of the Contingent Commission and Reinsurer's Margin to the Company by the Reinsurer shall constitute a complete and final release of all of the Reinsurer's obligations to the Company under this Agreement.

## Article XXXI - Other Terms and Conditions

A.   **Governing Law** - This Agreement shall be interpreted and governed by the laws of the State of New York without regard to its principles of choice of law and the laws or regulations for credit for reinsurance.

B.   **Amendment and Alterations** - This Agreement may be changed, altered or amended as the parties may agree, provided such change, alteration or amendment is evidenced in writing or by endorsement executed by the Company and the Reinsurer.

C.   **No Assignment** - This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives. Neither this Agreement, nor any right hereunder, may be assigned by any party without the written consent of the other party hereto.

D.   **No Third Party Rights** - This Agreement is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Agreement except as expressly provided otherwise in Article XXVI - Insolvency.

E.   **No Waiver** - No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

## Article XXXII - Intermediary

E. W. Blanch Co. is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder. All communications (including but not limited to notices and statements) relating to this Agreement shall be transmitted to the Company or the Reinsurer through E. W. Blanch Co., Reinsurance Services, 3500 West 80th Street, Minneapolis, Minnesota 55431. All amounts due under this Agreement (including but not limited to Reinsurance Premium and Ultimate Net Loss shall be remitted directly by wire transfer between the Company and the Reinsurer with notice to the Intermediary.

In Witness Whereof, the parties hereto by their respective duly authorized representatives have executed this Agreement as of the dates undermentioned at:

Rock Hill, New York,   this ____3ᴺᴰ____ day of ____MAY____ 1995.

_____
Frontier Insurance Company
Frontier Pacific Insurance Company

New York, New York,   this ____3ʳᵈ____ day of ____May____ 199 95

_____
Centre Reinsurance Company of New York

## Schedule A

to the

## Coinsured Aggregate Excess of Loss Reinsurance Agreement
### Effective: January 1, 1995

issued to

### Frontier Insurance Company
Rock Hill, New York
and
### Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

### Inuring Reinsurance Agreements

1. North American Reinsurance Casualty Excess, TC581B - $1,000,000 xs $1,000,000 per occurrence for CMP Liability, General Liability and Workers' Compensation. $1,000,000 xs $1,000,000 per physician/per occurrence for Medical Malpractice.

2. North American Reinsurance Casualty Excess, TC581C - $1,000,000 xs $2,000,000 per occurrence for Workers' Compensation.

3. North American Reinsurance Property Per Risk Excess of Loss TP341A - $300,000 xs $200,000 per risk, $900,000 xs $600,000 per occurrence.

4. North American Reinsurance Property Per Risk Excess of Loss TP341B - $500,000 xs $500,000 per risk, $1,500,000 xs $1,500,000 per occurrence.

5. Specific and Aggregate Excess Medical Stop Loss Quota Share through North American Treaty Corporation. Reinsures 75% up to $1 Million per person on specific policies and 75% of up to $1 Million in the aggregate on aggregate policies.

6. High Limits Excess Reinsurance Contract through E. W. Blanch Co., for Excess Medical Benefits Stop Loss Program - $4,000,000 xs $1,000,000 per person for specific policies, and $4,000,000 xs $1,000,000 in the aggregate for aggregate policies.

7. Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $1,000,000 xs $1,000,000 per person, $10,000,000 in the aggregate.

8. Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $3,000,000 xs $2,000,000 per person, $12,000,000 in the aggregate.

9. Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $5,000,000 xs $5,000,000 per person, $15,000,000 in the aggregate.

10. Excess Workers' Compensation First Excess Catastrophe Reinsurance Contract through E. W. Blanch Co., for Excess Workers' Compensation Program, $40,000,000 xs $3,000,000 per occurrence, $1,000,000 maximum any one life.

11. Industrial Aid Aircraft Excess through E. W. Blanch Co., up to $5,000,000 per occurrence xs up to $500,000 per occurrence, maximum any one life up to $2,000,000.

12. Quota Share Agreement between Frontier and Frontier Pacific Insurance Companies. Frontier assumes 50% of the first $500,000 of loss per occurrence/principal for all lines of business except Custom House Bonds, Miscellaneous Bonds, License and Permit Bonds and Bail Bonds. Frontier also assumes 100% of $500,000 excess of $500,000 per occurrence/principal for all lines except as excluded above. Under this agreement, Frontier reinsures Frontier Pacific only.

13. Quota Share Agreement between Frontier, Frontier Pacific and National Guaranty Insurance Company for Contractor Surety bonds. Limit is 50% of $150,000 per principal, 50% of $300,000 per principal in the aggregate.

14. Quota Share Agreement between Frontier and First Delaware Insurance Company for Contractor Surety Bonds. Limit is 33.3% of $150,000 per principal.

15. Excess of Loss Agreement between Frontier and Munich American Reinsurance Company B-2144. Reinsures 66.7% of $350,000 xs $150,000 up to a per principal limit of 66.7% of $600,000. There is an annual aggregate limit of 66.7% of $1,000,000.

16. Automatic Facilities No. CAF 4252. Commercial Umbrella Liability Program with Munich American Reinsurance Company. Up to 80% of $1,000,000 and 100% of $4,000,000 xs $1,000,000 per occurrence.

17. Automatic Facilities No. CAF 4220 Social Service Umbrella Liability Program with Munich American Reinsurance Company. Up to 80% of $1 Million and 100% of $4 Million xs $1 Million per occurrence.

18. Surety Excess of Loss Agreement with NAC Re for Contract Surety Bonds and Subdivision Bonds. Up to 90% of $4 Million xs $1 Million. Annual limit of 90% of $8,000,000.

R:\93\A0000113.DOC

Schedule B

to the

## Coinsured Aggregate Excess of Loss Reinsurance Agreement
### Effective: January 1, 1995

Issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

## Summary of Interest Rates

| Accident Year | Funds Withheld | Experience Account |
|---|---|---|
| 1995 | 8.53% | 8.53% |
| 1996 | To be determined | To be determined |
| 1997 | To be determined | To be determined |

Aggregate Excess of Loss
Reinsurance Agreement

Effective January 1, 1998

# Aggregate Excess of Loss
# Reinsurance Agreement
### Effective: January 1, 1998

issued to

## Frontier Insurance Company
### Rock Hill, New York
## Frontier Pacific Insurance Company
### La Jolla, California
## United Capitol Insurance Company
### Chicago, Illinois
### and
## Western Indemnity Insurance Company
### Houston, Texas
each of which is an affiliated insurance company of
The Frontier Insurance Group, Inc.

by

## Zurich Reinsurance (North America), Inc.
### Stamford, Connecticut

### E. W. Blanch Co.

Reinsurance Services

3500 West 80th Street

Minneapolis, Minnesota  55431

R:\9\R\\C309.DOC

# Table of Contents

| Article | | Page |
|---|---|---|
| I | Preamble and Reinsured Companies | 1 |
| II | Term | 2 |
| III | Territory | 2 |
| IV | Business Covered | 2 |
| V | Exclusions | 3 |
| VI | Accident Year Limit | 5 |
| VII | Aggregate Limit | 6 |
| VIII | Accident Year Retention | 6 |
| IX | Coinsurance | 7 |
| X | Accident Year Base Reinsurance Premium | 7 |
| XI | Additional Reinsurance Premium | 8 |
| XII | Loss Settlements | 8 |
| XIII | Funds Withheld | 8 |
| XIV | Experience Account | 10 |
| XV | Reinsurer's Margin | 11 |
| XVI | Reinsurer's Expenses | 12 |
| XVII | Commutation | 12 |
| XVIII | Reports and Remittances | 13 |
| XIX | Taxes | 13 |
| XX | Covenants of the Company | 14 |
| XXI | Definitions | 15 |
| XXII | Ultimate Net Loss | 16 |
| XXIII | Net Retained Lines | 17 |
| XXIV | Right of Offset | 18 |
| XXV | Nonpayment of Premium and Losses | 18 |
| XXVI | Access to Records (BRMA 1C) | 19 |
| XXVII | Currency (BRMA 12A) | 19 |
| XXVIII | Errors and Omissions (BRMA 14A) | 19 |
| XXIX | Insolvency | 19 |
| XXX | Arbitration | 20 |
| XXXI | Service of Suit (BRMA 49D) | 21 |
| XXXII | Regulatory Authority | 22 |
| XXXIII | Other Terms and Conditions | 22 |
| XXXIV | Intermediary | 23 |
| | Schedule A | |
| | Schedule B | |

*E. W. BLANCH CO.*

Reinsurance Services

R.\99R\14309.DOC



## Aggregate Excess of Loss
## Reinsurance Agreement
Effective: January 1, 1998

issued to

## Frontier Insurance Company
Rock Hill, New York
## Frontier Pacific Insurance Company
La Jolla, California
~~United Capitol Insurance Company~~
Chicago, Illinois
and
## Western Indemnity Insurance Company
Houston, Texas
each of which is an affiliated insurance company of
The Frontier Insurance Group, Inc.
(*hereinafter referred to collectively as the* "Company")

by

## Zurich Reinsurance (North America), Inc.
Stamford, Connecticut
(*hereinafter referred to as the* "Reinsurer")

## Article I - Preamble and Reinsured Companies

A.   The terms of this Agreement shall apply to the aggregated results of the individual reinsured
companies comprising the Company as a group.  Accordingly, the mechanics of this
Agreement shall be based on the aggregated results of all the individual reinsured
companies and allocated based upon each individual reinsured company's net experience.
Balances payable or recoverable by any individual reinsured company or the Reinsurer
cannot serve to offset any balances payable or recoverable to or from any other individual
reinsured company that is a party to this Agreement.

B.   Reports made to the Reinsurer pursuant to this Agreement shall be in sufficient detail to
identify each individual reinsured company's share of the obligations due to the Reinsurer
and the share of the Reinsurer's loss obligations due each individual reinsured company.

C. Any payments by the Reinsurer to any of the individual reinsured companies comprising the Company shall discharge the Reinsurer's liability under this Agreement with respect to such payment.

D. For purposes of sending and receiving notices and payments required by this Agreement, Frontier Insurance Company shall be deemed the agent of all other reinsured companies comprising the Company. In no event, however, shall any reinsured company be deemed the agent of another with respect to the terms of Article XXIX - Insolvency.

## Article II - Term

A. The term ("Term") of this Agreement shall commence at 12:01 a.m., Eastern Standard Time, January 1, 1998 ("Effective Date") and shall remain in force until 11:59 p.m., Eastern Standard Time, December 31, 1999 ("Expiration Date"), unless canceled earlier.

B. Either party may cancel this Agreement as provided for in Article X - Accident Year Base Reinsurance Premium, Article XX - Covenants of the Company, Article XXIV - Right of Offset and Article XXV - Nonpayment of Premium and Losses. Either party may rescind this Agreement as provided for in Article XXXII - Regulatory Authority.

## Article III - Territory

This Agreement shall apply to policies issued for risks located in the United States of America, its territories, its possessions, the Commonwealth of Puerto Rico, the Caribbean, the District of Columbia and Canada.

## Article IV - Business Covered

A. Subject to the terms, conditions and limits, including, but not limited to, the Accident Year Limit and the Aggregate Limit of this Agreement, the Reinsurer agrees to indemnify the Company on an aggregate excess of loss basis for each covered Accident Year for Ultimate Net Loss incurred by the Company on all business written by the Company, except as excluded, in excess of the Accident Year Retention, and net of the amount of Ultimate Net Loss retained in accordance with Article IX - Coinsurance, arising out of losses occurring during the Term. Notwithstanding Article XX - Covenants of the Company, it is understood that the Company shall have the option to exclude new programs by providing the Reinsurer with prior written notice of its intent within 90 days after inception of the program.

B. It is understood and agreed that losses arising under policies covered hereunder shall be allocated to an Accident Year according to the instructions for compiling the Company's Annual Statement as filed with the Company's state of domicile.

secretly and not in connection with any operations of military or naval armed forces in the country where the interest insured is situated.

4. Nuclear risks as defined in the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (U.S.A.)," the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (Canada)," the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (Canada)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (Canada)" and the "Nuclear Energy Risks Exclusion Clause (Reinsurance) (1994) (Worldwide Excluding U.S.A. & Canada) attached to and forming part of this Contract.

5. *Liability* as a member, subscriber or reinsurer of any Pool (other than the NCCI National Workers' Compensation Pool), Syndicate or Association; and any FAIR Plan or other combination of insurers or reinsurers formed for the purpose of covering specific perils, specific classes of business or for the purpose of insuring risks located in specific geographical areas.

6. Liability of the Company arising by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency fund" includes any guaranty fund, insolvency fund, plan, pool, association, fund or other arrangement, however denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

7. Rehabilitation, residual market, Second Injury Fund and Guarantee Fund and similar type assessments.

8. Bid Bonds, Bail Bonds, Custom House Bonds and Miscellaneous Bonds.

9. Retrospectively rated insurance (loss sensitive insurance policies).

10. Policyholder dividends.

11. Environmental and Asbestos Liability Insurance business produced, underwritten and/or managed by URC Environmental.

12. Realtors' Errors and Omissions Insurance business.

13. Differences in Conditions Property Insurance business produced, underwritten and/or managed by Associated International Intermediaries, Inc. or American Custom Insurance Services, Inc.

14. Homeowners and/or Mobile Homeowners Property and Liability Insurance business produced, underwritten and/or managed by Tower Hill, Inc.

15. Workers' Compensation Insurance business produced by Americomp, Inc.

16. All Insurance business written by Regency Insurance Company.

17. All Insurance business written by Lyndon Property Assurance Company.

18. Business produced, underwritten and/or managed by West Cap Insurance Services, Inc.

19. All Captive Insurance business produced by the Company's Alternative Risk Division.

20. Environmental Liability Insurance business produced by Environmental and Commercial Insurance Company.

21. Loss and/or damage and/or costs and/or expenses arising directly or indirectly as a consequence of the inability of a machine and/or software and/or device to respond correctly to the change of the millennium, including but not limited to the machine and/or software and/or device's failure to properly process dates for 1999, 2000 and later, or the leap year during year 2000. Nevertheless, this exclusion shall not apply (a) if such interests are insured under a policy containing the Company's standard millennium endorsement in effect at policy inception, or (b) with respect to business written in jurisdictions where the applicable forms have not been approved by regulatory authorities.

## Article VI - Accident Year Limit

A. The Reinsurer's obligation to indemnify the Company in respect of Ultimate Net Loss in excess of the Accident Year Retention and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article IX - Coinsurance shall be subject to a total limit of liability for that Accident Year equal to 240% of the Accident Year Base Reinsurance Premium.

B. The Accident Year Limits shall be subject to Article VII- Aggregate Limit, and shall be used chronologically by Accident Year, i.e., Ultimate Net Loss is deemed to be ceded from the earliest Accident Year first and the next earliest second. In the event that the estimate of ceded Ultimate Net Loss for an Accident Year changes over time, the cessions of Ultimate Net Loss by Accident Year shall be adjusted accordingly.

## Article VII - Aggregate Limit

A.  The Reinsurer's obligation of indemnity to the Company in respect of Ultimate Net Loss in excess of the Company's Accident Year Retentions and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article IX - Coinsurance shall be subject to an Aggregate Limit of liability under this Agreement equal to the lesser of:

1.  240% of the Accident Year Base Reinsurance Premium for all covered Accident Years; or

2.  $230,000,000; or

3.  At the Reinsurer's option, $200,000,000, if a controlling interest in The Frontier Insurance Group, Inc., defined as greater than 50% of the voting common stock, is acquired by an investor group, exclusive of current management in position as of the inception of this Agreement.

B.  The Aggregate Limit of liability hereunder is subject to adjustment as provided for in Article XX - Covenants of the Company, Article XXIII - Right of Offset and Article XXV - Nonpayment of Premium and Losses. Under no circumstances shall the total liability of the Reinsurer under or related to this Agreement exceed the Aggregate Limit.

## Article VIII - Accident Year Retention

No claim shall be made under this Agreement for an Accident Year unless and until the Company shall have first incurred Ultimate Net Loss on Business Covered during the Accident Year in question in excess of an Accident Year Retention. The Accident Year Retention shall be calculated as follows:

$$X \text{ times } (Y-Z)$$

where X is equal to the actual Subject Net Earned Premium Income for the Accident Year, Y is equal to the actual Weighted Average Benchmark Ratio, as determined in accordance with the attached Schedule A, and for an Accident Year Z equals the percentage set forth opposite such Accident Year:

| Accident Year | Z |
|---|---|
| 1998 | 6.1% |
| 1999 | 4.6% |

Notwithstanding the foregoing, $(Y-Z)$ shall not be less than 65.9% as respects the 1998 Accident Year or 67.4% as respects the 1999 Accident Year.

## Article XI - Additional Reinsurance Premium

A. Subject to the provisions of Article XIII - Funds Withheld, as respects each Accident Year, in addition to the Accident Year Base Reinsurance Premium, the Company agrees to pay the Reinsurer an Additional Reinsurance Premium equal to 33.3% of the Ultimate Net Loss in excess of the product of the actual Weighted Average Benchmark Ratio, as determined in the attached Schedule A, and the Subject Earned Premium Income for such Accident Year. For purposes of this calculation, Ultimate Net Loss for the applicable Accident Year shall not exceed the sum of the Accident Year Retention plus the Ultimate Net Loss ceded to the Reinsurer for such Accident Year.

Within sixty (60) days after the end of each Accident Year hereunder and after the end of each subsequent calendar quarter, the Company shall provide a report to the Reinsurer of the Reinsurer's Ultimate Net Loss arising out of losses occurring during the Accident Year and the Additional Reinsurance Premium (if any) due hereunder. Any Additional Reinsurance Premium due the Reinsurer hereunder shall be payable by the Company to the Reinsurer on such date.

B. For purposes of determining Funds Withheld Account Investment Credit and the Experience Account Investment Credit in accordance with the provisions of Article XIII - Funds Withheld and Article XIV - Experience Account, the Additional Reinsurance Premium shall be deemed paid on the first day of the applicable Accident Year.

## Article XII - Loss Settlements

The Reinsurer agrees to abide by the loss settlements made by the Company, provided such loss settlements are within the terms and conditions of Article IV - Business Covered and this Agreement. The Reinsurer agrees to pay all Ultimate Net Loss due hereunder and paid by the Company (or payable by the Company in case of insolvency in accordance with Article XXIX - Insolvency) quarterly in arrears, and payment will be due sixty (60) days following receipt of an account statement submitted by the Company to the Reinsurer. Ultimate Net Loss payments due by the Reinsurer shall first be paid by way of offset against the balance of the Funds Withheld Account until such account is exhausted.

## Article XIII - Funds Withheld

A. Subject to the terms herein, the Company shall retain any and all Reinsurance Premiums due hereunder on a funds withheld basis, provided however, that the Reinsurer's Margin, as adjusted, shall be paid in cash to the Reinsurer and shall not be affected by the terms of this Article. In consideration of the Reinsurer agreeing to the Funds Withheld provision, the Company agrees that the Funds Withheld Account may be set off by the Reinsurer against liability of any nature whatsoever (whether then contingent, due and payable, or in the

## Article IX - Coinsurance

If for any Accident Year the Ultimate Net Loss is greater than the sum of the Accident Year Retention and the Reinsurer's applicable Accident Year Limit hereunder for that Accident Year, the Company shall coinsure and retain net for its own account a percentage of Ultimate Net Loss in excess of the Accident Year Retention equal to:

> 100% less the percentage derived by dividing (a) by (b), where,

> > (a)  equals the Accident Year Limit, and

> > (b)  equals the amount of Ultimate Net Loss in excess of the Accident Year Retention.

## Article X - Accident Year Base Reinsurance Premium

A.  Subject to Article XII - Funds Withheld, the Company shall pay to the Reinsurer an Accident Year Base Reinsurance Premium in an amount equal to the product of the following net rates and the Company's projected Subject Earned Premium Income for each covered Accident Year, annually in advance:

| Accident Year | Net Rate |
|---|---|
| 1998 | 12.5% |
| 1999 | 11.5% |

B.  Appropriate adjustment of the Accident Year Base Reinsurance Premium shall be made and is payable within 60 days after each December 31. The Accident Year Base Reinsurance Premium shall be subject to a minimum amount equal to $35,000,000.

C.  If the projected Accident Year Base Reinsurance Premium as calculated by multiplying the above net rates by the Company's projected Subject Earned Premium Income (as identified in the planning process of the Company) for the Accident Year is less than the minimum premium, the Company may elect to commute this Agreement effective as of the beginning of such Accident Year.

D.  Upon such commutation, in accordance with paragraph C of Article X, notice of which must be given in writing within 90 days after the commencement of such Accident Year, the Company shall, notwithstanding anything contained to the contrary in this Agreement, retain all amounts previously designated as "Funds Withheld," and the Reinsurer shall completely and finally be released in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under this Agreement.



## Article V - Exclusions

A.  This Agreement does not apply to and specifically excludes business written and/or losses and/or damage and/or costs and/or expenses classified by the Company as:

1.  Reinsurance assumed (other than intercompany reinsurance between the reinsured companies and reinsurance assumed from the NCCI National Workers' Compensation Pool) under obligatory reinsurance agreements, except agency reinsurance where the policies involved are to be reunderwritten in accordance with the underwriting standards of the Company and reissued as the Company's policies at the next anniversary or expiration date.

2.  Loss and/or damage and/or costs and/or expenses arising from seepage and/or pollution and/or contamination, other than contamination from smoke. Nevertheless, this exclusion shall not apply (a) if such interests are insured under a policy containing the Company's standard pollution limitation in effect at policy inception, (b) where the Company, under its Pest Control Program, issues its limited pollution coverage endorsement to a Comprehensive General Liability policy for policy limits not exceeding $1,000,000 Combined Single Limit, or as a separate policy in the State of California for limits not exceeding $100,000 Bodily Injury and $100,000 Property Damage Liability, or (c) with respect to business written in jurisdictions where the applicable forms have not been approved by regulatory authorities. This exclusion does not preclude payment of the cost of removing debris of property damaged by a loss otherwise covered hereunder, subject always to a limit of 25% of the Company's property loss under the applicable original policy. This exclusion shall not apply to the environmental coverage included with policies issued by United Capitol Insurance Company, provided however, that the amount of loss included in Ultimate Net Loss shall be limited to $1,000,000 per policy, per occurrence.

3.  As regards interests which at time of loss or damage are on shore, no liability shall attach hereto in respect of any loss or damage which is occasioned by war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, or martial law or confiscation by order of any government or public authority. This War Exclusion Clause shall not, however, apply to interests which at time of loss or damage are within the territorial limits of the United States of America (comprising the Fifty States of the Union, the District of Columbia, and including bridges between the United States of America and Mexico provided they are under United States ownership), Canada, St. Pierre and Miquelon, provided such interests are insured under policies containing a standard war or hostilities or warlike operations exclusion clause. Nevertheless, this clause shall not be construed to apply to loss or damage occasioned by Riots, Strikes, Civil Commotion, Vandalism, Malicious Damage, including acts committed by agents of any government, party or faction engaged in war, hostilities or other warlike operation, provided such agents are acting