future becoming due) that it may then have under this Agreement only, and such setoff shall occur as a condition precedent to any payments by the Reinsurer hereunder.

B. The "Funds Withheld Account" shall, at any point in time, be defined as:

1. The cumulative Accident Year Base Reinsurance Premium due hereunder, plus

2. The cumulative Additional Reinsurance Premium due hereunder, less

3. The cumulative Reinsurer's Margin paid, less

4. The cumulative Ultimate Net Loss payments (or offsets against this balance) due hereunder from the Reinsurer, plus

5. The cumulative Funds Withheld Investment Credit/Debit since the inception of this Agreement.

C. Accident Year Base Reinsurance Premium and Additional Reinsurance Premium, net of Reinsurer's Margin, shall be credited to the Funds Withheld Account on the date such monies are payable.

D. Ultimate Net Loss due from the Reinsurer shall be charged against the Funds Withheld Account on the date such monies are due.

E. The Funds Withheld Investment Credit/Debit in any one calendar year shall be computed separately for each Accident Year covered under this Agreement and shall equal the average daily balance of the portion of the Funds Withheld Account applicable to such Accident Year during that calendar year (or portion thereof) multiplied by the interest credit/debit rate (or pro rata portion thereof) applicable to the individual Accident Year, credited/debited annually, in arrears. The cumulative Funds Withheld Investment Credit/Debit shall equal the sum of the Funds Withheld Investment Credit/Debit for each calendar year since the inception of this Agreement. For purposes of determining the Funds Withheld Investment Credit/Debit, the adjusted Accident Year Base Reinsurance Premium and the Additional Reinsurance Premium shall be deemed paid on the first day of each applicable Accident Year.

F. The interest credit/debit rate applicable to the Funds Withheld Account for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year plus fifty-five (55) basis points as documented in the attached Schedule B of this Agreement, subject to a minimum interest credit/debit rate of 6.25%.

G. At the Reinsurer's option, the Company promises to pay to the Reinsurer the Funds Withheld Account in whole or in part at any time upon request or immediately upon the earlier of: 1) Commutation of this Agreement in accordance with Article XVII -

*E. W. BLANCH CO.*

Commutation, 2) an Event of Default, 3) Rescission of the Agreement in accordance with Article XXXII - Regulatory Authority, 4) Cancellation in accordance with paragraph B of Article XXIV - Right of Offset, 5) a downgrade of the Company by A. M. Best to B+ or lower, or 6) December 31, 2008. The Company shall not have the right to prepay all or part of the Funds Withheld Account without the Reinsurer's express written consent.

H.  The following shall be defined as "Events of Default:"

1.  Payment Defaults - The Company fails to make any payment under this Agreement when due and in the manner therein provided, except where the Reinsurer receives the overdue payment within fifteen (15) business days of the nonpayment; or

2.  Executions - Creditors attach or take possession of or distress, execution, sequestration, seizure, attachment or other equivalent or analogous process is levied or enforced upon or sued out against any material amount of the Company's assets; or

3.  Insolvency - The Company commences a proceeding or proceedings are commenced against it seeking dissolution, winding-up, liquidation, administration, reorganization, suspension or compromise of payments or other relief under any applicable bankruptcy, insolvency or other similar law or seeking the appointment of an administrator or a trustee, receiver, manager, receiver-manager, liquidator, custodian, curator or other similar official of it or any substantial part of the Company's assets, or the Company consents to any such relief (including any bankruptcy petition) or appointment in involuntary proceedings taken against it, or makes a bulk sale of its assets or a general assignment or proposal for the benefit of creditors, or fails or admits its inability to pay its debts as they become due, or suspends or ceases or threatens to suspend or cease carrying on business; or it takes any action in furtherance of any of the foregoing.

## Article XIV - Experience Account

A.  A notional Experience Account shall be calculated by the Reinsurer from the Effective Date of this Agreement and maintained until there is a complete and final release of all the Reinsurer's obligations to the Company.

B.  The "Experience Account" shall, at any point in time, be defined as:

1.  The cumulative Accident Year Base Reinsurance Premium received by the Reinsurer (or Funds Withheld in accordance with Article XIII - Funds Withheld, plus

2.  The cumulative Additional Reinsurance Premium received by the Reinsurer (or Funds Withheld in accordance with Article XII - Funds Withheld), less

3.  The cumulative Reinsurer's Margin paid as defined herein, less

EX. A  p55

4.  The cumulative Ultimate Net Loss payments (or offsets against Funds Withheld) due hereunder from the Reinsurer, plus

5.  The cumulative Experience Account Investment Credit/Debit since inception of this Agreement.

C.  Accident Year Base Reinsurance Premium and Additional Reinsurance Premium, net of the Reinsurer's Margin, shall be credited to the Experience Account on the date such monies are payable.

D.  Ultimate Net Loss payments due from the Reinsurer shall be charged against the Experience Account on the date such monies are due.

E.  The Experience Account Investment Credit/Debit in any one calendar year shall be computed separately for each Accident Year covered under this Agreement and shall equal the average daily balance of the portion of the Experience Account applicable to such Accident Year during that calendar year (or portion thereof) multiplied by the interest credit/debit rate (or pro rata portion thereof) applicable to the individual Accident Year, credited/debited annually, in arrears. The cumulative Experience Account Investment Credit/Debit shall equal the sum of the Experience Account Investment Credit/Debit for each calendar year since the inception of this Agreement. For purposes of determining the Experience Account Investment Credit/Debit, the adjusted Accident Year Base Reinsurance Premium and the Additional Reinsurance Premium shall be deemed paid on the first day of the applicable Accident Year.

F.  The interest credit/debit rate applicable to the Experience Account for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year minus forty-five (45) basis points as documented in the attached Schedule B of this Agreement, subject to a minimum interest credit rate of 5.25%. If the Funds Withheld Account balance is paid to the Reinsurer, the interest credit/debit rate applicable to the Experience Account balance shall be equal to the one (1) year U.S. Treasury bill rate as published in *The Wall Street Journal* on the first business day of such Accident Year, reset annually.

## Article XV - Reinsurer's Margin

The Reinsurer's Margin shall be equal to 8.75% of the Accident Year Base Reinsurance Premium and the Additional Reinsurance Premium payable under this Agreement.

## Article XVI - Reinsurer's Expenses

As payment for Reinsurer's expenses, the Company shall pay the Reinsurer $225,000 on each January 1 until and including January 1, 2002.

## Article XVII - Commutation

A.  Subject to the terms of this Article, the Company may, at its sole option, commute this Agreement at any December 31 between December 31, 2002 and December 31, 2008, both days inclusive, with ninety (90) days prior written notice by the Company to the Reinsurer; provided, however, that the Company first commutes the Company's Coinsured Aggregate Excess of Loss Reinsurance Agreement, effective January 1, 1995 and expired December 31, 1997.

B.  If the Company elects to commute this Agreement, the Reinsurer shall pay to the Company the following amounts within sixty (60) business days of the date of Commutation:

   1.  Commuted Value of ceded unpaid Ultimate Net Loss:

      a.  If, at the time of Commutation, the ceded unpaid Ultimate Net Loss, as defined herein, is less than or equal to the Experience Account, the Reinsurer agrees to pay all ceded unpaid Ultimate Net Loss at the amount valued by the Company.

      b.  If, at the time of Commutation, the ceded unpaid Ultimate Net Loss is greater than the balance in the Experience Account, the ceded unpaid Ultimate Net Loss shall be commuted at a present value amount to be mutually agreed. If the present value amount of the ceded unpaid Ultimate Net Loss cannot be mutually agreed by the Company and the Reinsurer, then a mutually acceptable independent third party actuary shall be called upon to make an independent estimation of the present value amount of the ceded unpaid Ultimate Net Loss (the cost of which shall be shared equally by the Company and Reinsurer). If the actuary's estimation is acceptable to both Reinsurer and Company, then this Agreement shall be commuted at the value as estimated by the actuary. If the actuary's value is unacceptable to either the Company or the Reinsurer, or if the parties cannot agree on the selection of the actuary, then this Agreement will not be commuted at that time.

   2.  Contingent Commission: Upon Commutation under subparagraph 1 above, the Reinsurer shall pay to the Company a Contingent Commission equal to the positive balance, if any, of the Experience Account after deducting the value of the commuted ceded unpaid Ultimate Net Loss as per subparagraph 1 above.

C.  Payment of the ceded unpaid Ultimate Net Loss and Contingent Commission, if any, by the Reinsurer as described above shall constitute a complete and final release of the Reinsurer

in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under or related to this Agreement.

## Article XVIII - Reports and Remittances

A.  The Company shall furnish to the Reinsurer within thirty-five (35) days after the close of each calendar quarter:

1.  Quarterly account of Subject Earned Premium Income segregated by line of business (and for the total of all lines) covered under this Agreement;

2.  Quarterly accounts of paid and unpaid Ultimate Net Loss segregated by the line of business (and for the total of all lines) covered under this Agreement;

3.  Quarterly accounts of paid Ultimate Net Loss ceded under this Agreement which are due to be paid by the Reinsurer to the Company. As respects the Funds Withheld Account, Ultimate Net Loss amounts shall be deemed to be paid as of the date the Reinsurer agrees to the amount to be paid and such agreement shall be made within sixty (60) days after receipt of this account; and

4.  A reconciliation of the Funds Withheld Account from inception to the close of the most recent preceding quarter.

B.  The Reinsurer shall furnish to the Company, within thirty-five (35) days after the close of each quarter, a reconciliation of the Experience Account from inception to the close of the most recent preceding quarter.

C.  All amounts due and payable under this Agreement shall be remitted directly by wire transfer between the Company and the Reinsurer with notice to the Intermediary, unless such amounts are withheld by the Company in accordance with Article XIII - Funds Withheld.

D.  The Company shall furnish the Reinsurer, within sixty (60) days after each six (6) month period, a report summarizing any changes to the inuring reinsurance protections in place at that time.

E.  Any late payments by either party shall accrue interest at a rate of 1% per month.

## Article XIX - Taxes

The Company shall pay all taxes of any nature associated with this Agreement and undertakes not to claim any deduction of the premium hereon when making Canadian tax returns or when making tax returns, other than Income or Profits Tax returns, to any State or Territory of the

EX. A  p58

United States of America or the District of Columbia. However, this Article shall not impose any liability on the Company for any income, capital gains, profits or other similar taxes payable by the Reinsurer in respect of its operations or this Agreement.

## Article XX - Covenants of the Company

The Company hereby warrants the following:

A.   The Company agrees to notify the Reinsurer of any acquisitions of entities, divisions or books of business with estimated annual written premium in excess of $10,000,000, which the Company desires covered under this Agreement. Such acquisitions will not be covered under this Agreement, unless the Company has received the prior written approval of the Reinsurer of any such acquisitions. Such approval shall not be unreasonably withheld.

Furthermore, the Company agrees not to change its mix of business, policy limits profile, claims handling procedures, or loss reserving process (including the planned allocation of Allocated Loss Adjustment Expenses and Unallocated Loss Adjustment Expenses) in any manner from that in effect at the inception of this Agreement, which materially affects this Agreement or the obligations of the parties hereunder, unless the Company has received the Reinsurer's prior written approval of such changes. Such approval shall not be unreasonably withheld.

In the event that the Company does not adhere to this Covenant, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.   The Company agrees that the maximum policy limit covered under this Agreement shall be $5,000,000 and that any policy limits issued in excess of $5,000,000 shall be deemed to be $5,000,000 for all purposes of this Agreement. The exceptions to this Covenant shall be: 1) with respect to policies classified as Workers' Compensation, Excess Workers' Compensation, or Employers Liability, the maximum limit shall be that required by statute in the state in which any losses incurred under said policies shall be deemed to have occurred; 2) with respect to Surety business, the Company agrees that the maximum limit of policies covered under this Agreement is $6,000,000 per principal and that any loss otherwise reinsured hereunder in excess of $6,000,000 shall be deemed to be $6,000,000 for purposes of this Agreement; 3) with respect to Medical Malpractice business, the Company agrees that the maximum limit of policies covered under this Agreement is $1,000,000 per physician, per occurrence and that any loss otherwise reinsured hereunder in excess of $1,000,000 shall be deemed to be $1,000,000 for purposes of this Agreement; 4) with respect to United Capitol Insurance Company business, the Company agrees that the

maximum limit of property policies covered under this Agreement is $15,000,000 per risk, per occurrence and that any loss otherwise reinsured hereunder in excess of $15,000,000 shall be deemed to be $15,000,000 for purposes of this Agreement; and 5) with respect to United Capitol Insurance Company business, the Company agrees that the maximum limit of liability policies covered under this Agreement is $10,000,000 per occurrence and that any loss otherwise reinsured hereunder in excess of $10,000,000 shall be deemed to be $10,000,000 for purposes of this Agreement.

C.  It is further warranted by the Company that inuring reinsurance agreements in force at the effective date of inception of this Agreement shall remain in place during the Term, or it is so deemed, unless the Company has received the prior written approval of the Reinsurer to allow material changes in the inuring reinsurance structure. Such approval shall not be unreasonably withheld.

## Article XXI - Definitions

A.  "Subject Earned Premium Income" shall mean, on business subject to this Agreement, gross premiums earned during the Accident Year, less return premiums, less premiums for reinsurance ceded which inures to the benefit of this Agreement and amounts paid to the Florida Hurricane Catastrophe Fund.

B.  "Subject Net Earned Premium Income" shall mean Subject Earned Premium Income during the Accident Year less the Accident Year Base Reinsurance Premium ceded to this Agreement.

C.  "Accident Year" shall mean each period of twelve consecutive months following the Effective Date of this Agreement or following the anniversary date thereof falling within the Term of this Agreement, or if the period between the Effective Date or any anniversary date and the cancellation date of this Agreement is less than twelve months, such lesser period.

D.  "Extra Contractual Obligations" are defined as those liabilities not covered under any other provision of this Agreement and which arise from the handling of any claim on Business Covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original accident, casualty, disaster or loss occurrence.

However, there shall be no recovery hereunder where the loss has been incurred due to the fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee

of the Company acting individually or collectively or in collusion with a member of the Board of Directors, a corporate officer, supervisory employee or partner of any other corporation, partnership, or organization involved in the defense or settlement of a claim on behalf of the Company.

E.  "Excess of Original Policy Limits Loss" shall mean any loss of the Company in excess of the limit of its original policy, such loss in excess of the limit having been incurred because of failure by it to settle within the policy limit or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation of an appeal consequent upon such action.

However, there shall be no recovery hereunder where the loss has been incurred due to fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee of the Company acting individually or collectively or in collusion with a member of the Board of Directors, a corporate officer, a supervisory employee or partner of any other corporation, partnership, or organization involved in the defense or settlement of a claim on behalf of the Company.

## Article XXII - Ultimate Net Loss

A.  "Ultimate Net Loss" shall mean the actual loss incurred by the Company, all Allocated Loss Adjustment Expenses and all Unallocated Loss Adjustment Expense on the Business Covered on the Company's Net Retained Lines, after making deductions for all recoveries, including, but not limited to, the Florida Hurricane Catastrophe Fund, salvages and subrogations and shall include 80% of the amounts of any Extra Contractual Obligations and 80% of the amounts of any Excess of Original Policy Limits Loss.

B.  "Allocated Loss Adjustment Expenses" (hereinafter referred to as "ALAE") as used herein shall be defined in accordance with statutory reporting guidelines and shall include, but not be limited to all legal expenses and other expenses (including interest accruing before and/or after entry of judgments) incurred by the Company in connection with the investigation, settlement or litigation of claims or losses, legal expenses in declaratory judgment proceedings or other proceedings in connection with coverage disputes and legal expenses associated with actions or disputes regarding Extra Contractual Obligations and Losses in Excess of Original Policy Limits. ALAE shall also include the claim services currently provided to the Company by Pioneer Claim Management, Inc. (hereinafter referred to as "Pioneer"). Should such services be provided by a third party or brought in-house (such as through the merger of Pioneer into the Company), the cost of such services shall be deemed to be ALAE.

C.  "Unallocated Loss Adjustment Expenses" (hereinafter referred to as "ULAE") as used herein shall be defined in accordance with statutory reporting guidelines and shall include, but not be limited to expenses incurred by the Company in connection with the adjustment

of claims or losses, salaries and expenses of certain of the Company's officials and field employees while adjusting such claims or losses.

D.  All salvages, recoveries or payments recovered or received subsequent to a loss settlement under this Agreement shall be applied as if recovered or received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto, provided always that nothing in this clause shall be construed to mean that Ultimate Net Loss under this Agreement are not recoverable until the Company's Ultimate Net Loss has been ascertained.

E.  If the Reinsurer disagrees with the Ultimate Net Loss determined by the Company, a mutually agreed upon independent national actuarial firm shall be engaged to evaluate the Ultimate Net Loss covered under this Agreement and such evaluation shall be binding. Such cost shall be shared equally by the Company and the Reinsurer. If the parties fail to agree on the selection of an independent national actuarial firm each of the two parties shall name two, of whom the other shall decline one, and the decision shall be made by drawing lots.

F.  Notwithstanding anything contained to the contrary herein, in arriving at the Ultimate Net Loss of the Company under this Agreement, property catastrophe losses shall be limited to $5,000,000 per Accident Year; Medical Malpractice - Occurrence Losses Incurred shall be limited to an amount equal to 77.2% of Accident Year Subject Earned Premium Income applicable to that line of business; Medical Malpractice / Social Service - Claims Made Losses Incurred shall be limited to an amount equal to 90.7% of Accident Year Subject Earned Premium Income applicable to that line of business; Excess Workers' Compensation Losses shall be limited to an amount equal to 65% of Accident Year Subject Earned Premium Income applicable to that line of business; ULAE shall be limited to 9.4% of Accident Year Subject Earned Premium for all business reinsured hereunder; and all Loss Adjustment Expenses (ALAE and ULAE combined) shall be limited to 21.0% of Accident Year Subject Earned Premium Income for all business reinsured hereunder. For purposes of this Article, "Losses Incurred" shall mean losses paid plus reserves for losses outstanding (excluding ALAE and ULAE).

## Article XXIII - Net Retained Lines

A.  This Agreement applies only to that portion of any policy which the Company retains net for its own account, and in calculating the amount of any loss hereunder and also in computing the amount or amounts in excess of which this Agreement attaches, only loss or losses in respect of that portion of any policy which the Company retains net for its own account shall be included.

B.  The amount of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other reinsurer(s), whether specific or general, any amounts which may have become due from

such reinsurer(s), whether such inability arises from the insolvency of such other reinsurer(s) or otherwise.

## Article XXIV - Right of Offset

A.  The Company and the Reinsurer may offset any balance or amount due from one party to the other under this Agreement only.

B.  In extension and not in limitation to paragraph A above, the Reinsurer shall have an absolute right to offset any amounts due to the Company against the Funds Withheld Account. In the event that this right of offset between the Company and the Reinsurer is specifically disallowed or judged to be unenforceable by any court of competent jurisdiction, arbitration panel or regulatory body, then all amounts in the Funds Withheld Account may, upon written request of the Reinsurer, immediately become due and payable in full. If the Funds Withheld Account balance is not remitted to the Reinsurer within fifteen (15) days, the Reinsurer shall have the option to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive Account in the Experience Account balance (or zero if the Experience Account is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

## Article XXV - Nonpayment of Premium and Losses

A.  Notwithstanding the foregoing, in the event that the Company fails to pay an Accident Year Base Reinsurance Premium or Additional Reinsurance Premium within 15 days of the date such premium is due, the Reinsurer shall notify the Company in writing via registered mail of the overdue amount. In the event that the Company does not remit the overdue amount to the Reinsurer within 15 days of receiving such notification from the Reinsurer, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.  In the event the Reinsurer fails to pay losses recoverable from the Reinsurer under Article XVIII - Reports and Remittances within 15 days of the date such loss payments are due, the Company shall notify the Reinsurer in writing via registered mail of the overdue amounts. In the event that the Reinsurer does not remit the overdue amounts to the Company within 15 days of receiving such notification from the Company, the Company shall have the right

to immediately cancel this Agreement by mailing a written Notice of Cancellation to the Reinsurer. The mailing of such Notice shall be sufficient notice and the effective date of cancellation shall be the date the Notice of Cancellation was posted.

## Article XXVI - Access to Records (BRMA 1C)

The Company shall place at the disposal of the Reinsurer at all reasonable times, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Contract and thereafter, all books, records and papers of the Company in connection with any reinsurance hereunder, or the subject matter hereof.

## Article XXVII - Currency (BRMA 12A)

A.   Whenever the word "Dollars" or the "$" sign appears in this Agreement, they shall be construed to mean United States Dollars and all transactions under this Agreement shall be in United States Dollars.

B.   Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange at the date such transaction is entered on the books of the Company.

## Article XXVIII - Errors and Omissions (BRMA 14A)

Errors and omissions on the part of the Company shall not invalidate the reinsurance under this Agreement, provided such errors or omissions are corrected promptly after discovery thereof, but the liability of the Reinsurer under this Agreement or any exhibits or endorsements attached hereto shall in no event exceed the limits specified herein, nor be extended to cover any risks, perils or classes of insurance or reinsurance generally or specifically excluded herein.

## Article XXIX - Insolvency

A.   The portion of any risk or obligation assumed by the Reinsurer, when such portion is ascertained, shall be payable on demand of the Company at the same time as the Company shall pay its net retained portion of such risk or obligation, with reasonable provision for verification before payment and the reinsurance shall be payable by the Reinsurer, on the basis of the liability of the Company under the contract or contracts reinsured without diminution because of the insolvency of the Company. In the event of insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, such portion shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of claims allowed against the Company by any court of competent jurisdiction or by any conservator,

liquidator or statutory successor of the Company having authority to allow such claims, without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claims. Payments by the Reinsurer as above set forth shall be made directly to the Company or to its conservator, liquidator or statutory successor, except where the contract of insurance or reinsurance specifically provides another payee of such reinsurance in the event of the insolvency of the Company.

B.   The Reinsurer shall be given written notice of the pendency of each claim or loss which may involve the reinsurance provided by this Agreement within a reasonable time after such claim or loss is filed in the insolvency proceeding. The Reinsurer shall have the right to investigate each such claim or loss and interpose at its own expense in the proceeding where the claim or loss is to be adjudicated, any defense available to the Company, its liquidator, receiver or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely a result of the defense undertaken by the Reinsurer.

C.   Nothing contained in this Article is intended to change the relationship of the parties to this Agreement or to enlarge upon the rights or obligations of either party hereunder except as provided herein, to wit, to pay the statutory successor of the Company on the basis of the amount of liability determined in the liquidation or receivership proceeding rather than on the basis of the actual amount of loss paid by the liquidator, receiver or statutory successor to allowed claimants.

## Article XXX - Arbitration

A.   Any dispute arising out of the interpretation, performance or breach of this Agreement, including the formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. Notice requesting arbitration must be in writing and sent certified or registered mail, return receipt requested.

B.   One arbitrator shall be chosen by each party and the two arbitrators shall, before instituting the hearing, choose an impartial third arbitrator (the "Umpire") who shall preside at the hearing. If either party fails to appoint its arbitrator within thirty (30) days after being requested to do so by the other party, the latter, after ten (10) days notice by certified or registered mail of its intention to do so, may appoint the second arbitrator.

C.   If the two arbitrators are unable to agree upon the Umpire within thirty (30) days of their appointment, the two arbitrators shall request the American Arbitration Association ("AAA") to provide a list of possible Umpires with the qualifications set forth in this Article and the parties shall then mutually agree upon an Umpire from this list. If the parties are unable to agree upon the Umpire within thirty (30) days of the receipt of the AAA list or if the AAA fails to provide such a list within thirty (30) days of the request, either party may

apply to the United States Federal Court for the Southern District of New York to appoint an Umpire with those qualifications. The Umpire shall promptly notify in writing all parties to the arbitration of his selection.

D.  All arbitrators shall be disinterested active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's of London.

E.  Within thirty (30) days after notice of appointment of all arbitrators, the panel shall meet and determine timely periods for briefs, discovery procedures and schedules for hearings.

F.  The panel shall be relieved of all judicial formality and shall not be bound by the strict rules of procedure and evidence. Unless the panel agrees otherwise, arbitration shall take place in New York, New York, but the venue may be changed when deemed by the panel to be in the best interest of the arbitration proceeding. Insofar as the arbitration panel looks to substantive law, it shall consider the law of the State of New York. The decision of any two arbitrators when rendered in writing shall be final and binding. The panel is empowered to grant interim relief as it may deem appropriate.

G.  To the extent, and only to the extent, that the provisions of this Agreement are ambiguous or unclear, the panel shall make its decision considering the custom and practice of the applicable insurance and reinsurance business. The panel shall render its decision within sixty (60) days following the termination of hearings, which decision shall be in writing, stating the reasons thereof. Judgment upon the award may be entered in any court having jurisdiction thereof.

H.  Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator. The remaining costs of the arbitration shall be allocated by the panel. The panel may, at its discretion, award such further costs and expenses as it considers appropriate, including but not limited to attorneys fees, to the extent permitted by law.

## Article XXXI - Service of Suit (BRMA 49D)

(Applicable if the Reinsurer is not domiciled in the United States of America, and/or is not authorized in any State, Territory or District of the United States where authorization is required by insurance regulatory authorities)

A.  It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.



B.  Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## Article XXXII - Regulatory Authority

A.  If the FASB, SEC, insurance regulatory or other regulatory body with appropriate jurisdiction issues an authoritative accounting pronouncement or order that, despite both parties' best faith efforts to comply with such pronouncement or order, significantly changes the accounting treatment of this Agreement, or if the SEC or insurance regulatory authority deems that this Agreement does not, from its inception, qualify as reinsurance on or before December 31, 1998, and such change is concurred with by the Company's auditors, the Reinsurer or the Company may rescind this Agreement effective concurrently with the date of the pronouncement or order.  In addition, if the Company's independent auditors, despite the best efforts of the Company and the Reinsurer, determine that this Agreement does not meet the risk transfer requirements of the F.A.S.B. 113 and therefore does not qualify for reinsurance accounting treatment, on or before December 31, 1998, the Company or the Reinsurer may rescind this Agreement as of the date of such determination.

B.  Upon such rescission, the value of the ceded Unpaid Ultimate Net Loss will be set to zero ($), and the commutation provisions of this Agreement shall apply (including the Company's obligation to immediately pay the Funds Withheld Account balance to the Reinsurer and the Reinsurer's obligation to pay the Company the Contingent Commission). The Reinsurer agrees to refund the Reinsurer's Margin paid to date in the event of such rescission.

C.  The payments of the Contingent Commission and Reinsurer's Margin to the Company by the Reinsurer shall constitute a complete and final release of all of the Reinsurer's obligations to the Company under this Agreement.

## Article XXXIII - Other Terms and Conditions

A.  Governing Law - This Agreement shall be interpreted and governed by the laws of the State of New York without regard to its principles of choice of law and the laws or regulations for credit for reinsurance.

B.  Amendment and Alterations - This Agreement may be changed, altered or amended as the parties may agree, provided such change, alteration or amendment is evidenced in writing or by endorsement executed by the Company and the Reinsurer.

C.  No Assignment - This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.  Neither this Agreement, nor any right hereunder, may be assigned by any party without the written consent of the other party hereto.

D.  No Third Party Rights - This Agreement is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Agreement except as expressly provided otherwise in Article XXIX - Insolvency.

E.  No Waiver - No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

## Article XXXIV - Intermediary

E. W. Blanch Co. is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder.  All communications (including but not limited to notices and statements) relating to this Agreement shall be transmitted to the Company or the Reinsurer through E. W. Blanch Co., Reinsurance Services, 3500 West 80th Street, Minneapolis, Minnesota 55431. All amounts due under this Agreement (including but not limited to Reinsurance Premium and Ultimate Net Loss shall be remitted directly by wire transfer between the Company and the Reinsurer with notice to the Intermediary.

In Witness Whereof, the parties hereto by their respective duly authorized representatives have executed this Agreement as of the dates undermentioned at:

Rock Hill, New York,  this 15th  day of July  1998.

Frontier Insurance Company
Frontier Pacific Insurance Company
United Capitol Insurance Company
Western Indemnity Insurance Company

New York, New York, this 5th day of August  1998.

Zurich Reinsurance (North America), Inc.

*E. W. BLANCH CO.*

### Schedule A
### Weighted Average Benchmark Ratio

(attached to and forming part of the Aggregate Excess of Loss,
Reinsurance Agreement, Effective: January 1, 1998,
issued to Frontier Insurance Company, Rock Hill, New York
Frontier Pacific Insurance Company, La Jolla, California
United Capitol Insurance Company, Chicago, Illinois, and
Western Indemnity Insurance Company, Houston, Texas
each of which is an affiliated insurance company of
The Frontier Insurance Group, Inc.)

### 1998 Accident Year (To be updated to actual at year end)

| Line of Business | Actual Subject Earned Premium (A) | Benchmark Ratio (B) | Reference Figure (A*B=C) | Weighted Average Benchmark Ratio (C/A) |
|---|---|---|---|---|
| Medical Malpractice -- Occurrence | | 94.9 | | |
| Dental / Social Services - Occurrence | | 61.7 | | |
| Medical Malpractice / Social Service - Claims Made | | 96.7 | | |
| Dental - Claims Made | | 74.1 | | |
| Commercial Multi-Peril | | 78.0 | | |
| General Liability (excluding Excess Workers' Compensation) | | 63.7 | | |
| Excess Workers' Compensation | | 57.0 | | |
| Surety | | 37.6 | | |
| Worker' Compensation | | 62.4 | | |
| Other | | 64.5 | | |
| Total | | | | |

### 1999 Accident Year (To be updated to actual at year end)

| Line of Business | Actual Subject Earned Premium (A) | Benchmark Ratio (B) | Reference Figure (A*B=C) | Weighted Average Benchmark Ratio (C/A) |
|---|---|---|---|---|
| Medical Malpractice -- Occurrence | | 94.9 | | |
| Dental / Social Services - Occurrence | | 61.7 | | |
| Medical Malpractice / Social Service - Claims Made | | 96.7 | | |
| Dental - Claims Made | | 74.1 | | |
| Commercial Multi-Peril | | 78.0 | | |
| General Liability (excluding Excess Workers' Compensation) | | 63.7 | | |
| Excess Workers' Compensation | | 57.0 | | |
| Surety | | 37.6 | | |
| Worker' Compensation | | 62.4 | | |
| Other | | 64.5 | | |
| Total | | | | |

*Weighted Average Benchmark Ratio to be calculated to three (3) decimal places.

*E. W. BLANCH CO.*

Reinsurance Services

## Schedule B

(attached to and forming part of the Aggregate Excess of Loss,
Reinsurance Agreement, Effective: January 1, 1998,
issued to Frontier Insurance Company, Rock Hill, New York
Frontier Pacific Insurance Company, La Jolla, California
United Capitol Insurance Company, Chicago, Illinois, and
Western Indemnity Insurance Company, Houston, Texas
each of which is an affiliated insurance company of
The Frontier Insurance Group, Inc.)

## Summary of Interest Rates

| Accident Year | Funds Withheld | Experience Account |
|---|---|---|
| 1998 | 6.27% | 5.27% |
| 1999 | * | * |

*Percents to be determined in accordance with Article XIII - Funds Withheld and
Article XIV - Experience Account.

*E. W. BLANCH CO.*
Reinsurance Services

R:\98\RU4309.DOC

U.S.A.

## NUCLEAR INCIDENT EXCLUSION CLAUSE - PHYSICAL DAMAGE - REINSURANCE

1.   This Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic Nuclear Energy risks.

2.   Without in any way restricting the operation of paragraph (1) of this Clause, this Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

    I.   Nuclear reactor power plants including all auxiliary property on the site, or
    II.  Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or
    III. Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material," and for reprocessing, salvaging, chemically separating, storing or disposing of "spent nuclear fuel or waste materials, or
    IV.  Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3.   Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate

    (a)   where Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation or
    (b)   where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused.  However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4.   Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5.   It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6.   The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954 or by any law amendatory thereof.

7.   Reassured to be sole judge of what constitutes:

    (a)   substantial quantities, and
    (b)   the extent of installation, plant or site.

Note.-Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that

    (a)   all policies issued by the Reassured on or before 31st December 1957 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply.
    (b)   with respect to any risk located in Canada policies issued by the Reassured on or before 31st December 1958 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply.

12/12/57
N.M.A. 1119
BRMA 35B

NUCLEAR INCIDENT EXCLUSION CLAUSE - PHYSICAL D. .AGE - REINSURANCE
CANADA

This Agreement does not cover any loss or liability accruing to the Reinsured, directly or indirectly, and whether ..urer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2. Without in any way restricting the operation of paragraph 1 of this clause, this Agreement does not cover any loss liability accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance again Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

  (a)    nuclear reactor power plants including all auxiliary property on the site, or

  (b)    any other nuclear reactor installation, including laboratories handling radioactive materials in connection wi reactor installations, and critical facilities as such, or

  (c)    installations for fabricating complete fuel elements or for processing substantial quantities of prescribe substances, and for reprocessing, salvaging, chemically separating, storing or disposing of spent nuclear fuel waste materials, or

  (d)    installations other than those listed in (c) above using substantial quantities of radioactive isotopes or oth products of nuclear fission.

3. Without in any way restricting the operation of paragraphs 1 and 2 of this clause, this Agreement does not cover any lo or liability by radioactive contamination accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsure from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and whi normally would be insured therewith, except that this paragraph 3 shall not operate:

  (a)    where the Reinsured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

  (b)    where the said insurance contains a provision excluding coverage for damage to property caused by or resulti from radioactive contamination, however caused.

4. Without in any way restricting the operation of paragraphs 1, 2 and 3 of this clause, this Agreement does not cover a loss or liability by radioactive contamination accruing to the Reinsured, directly or indirectly, and whether as Insurer Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5. This clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not consider by the Reinsured to be the primary hazard.

6. The term "prescribed substances" shall have the meaning given to it by the Atomic Energy Control Act R.S.C. 1985(c), 16 or by any law amendatory thereof.

7. Reinsured to be sole judge of what constitutes:

  (a)    substantial quantities, and

  (b)    the extent of installation, plant or site.

8. Without in any way restricting the operation of paragraphs 1, 2, 3 and 4 of this clause, this Agreement does not cover a loss or liability accruing to the Reinsured, directly or indirectly, and whether as Insurer or Reinsurer, caused:

  (1)    by any nuclear incident, as defined in the Nuclear Liability Act or any other nuclear liability act, law or statu or any law amendatory thereof or nuclear explosion, except for ensuing loss or damage which results direc from fire, lightning or explosion of natural, coal or manufactured gas;

  (2)    by contamination by radioactive material.

NOTE:    Without in any way restricting the operation of paragraphs 1, 2, 3 and 4 of this clause, paragraph 8 of this cla shall only apply to all original contracts of the Reinsured, whether new, renewal or replacement, which beco effective on or after December 31, 1992.

N.M.A. 1980 (2/19/93)

## NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - REINSURANCE
*(Approved by Lloyd's Underwriters' Fire and Non-Marine Association)*

(1)    This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)    Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

Limited Exclusion Provision.*

I.    It is agreed that the policy does not apply under any liability coverage,
      to    *(injury, sickness, disease, death or destruction*    with respect to which an insured under the
          *(bodily injury or property damage*
      policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II.   Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III.  The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either
      (a)    become effective on or after 1st May, 1960, or
      (b)    become effective before that date and contain the Limited Exclusion Provision set out above;
      provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3)    Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

      Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.*

It is agreed that the policy does not apply:
      I.    Under any Liability Coverage to    *(injury, sickness, disease, death or destruction*
                                              *(bodily injury or property damage*
          (a)    with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or
          (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.    Under any Medical Pay...ents Coverage, or under any Supplementary Pa...ents Provision
relating to *(immediate medical or surgical relief* to expenses incurred with respect
(first aid,
to *(bodily injury, sickness, disease or death* resulting from the hazardous properties of
(bodily injury
nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage to *(injury, sickness, disease, death or destruction*
(bodily injury or property damage
resulting from the hazardous properties of nuclear material, if

(a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured o
(2) has been discharged or dispersed therefrom;

(b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed
stored, transported or disposed of by or on behalf of an insured; or

(c)    the *(injury, sickness, disease, death or destruction* arises out of the furnishing by an insured
(bodily injury or property damage
of services, materials, parts or equipment in connection with the planning, construction, maintenance
operation or use of any nuclear facility, but if such facility is located within the United States of America
its territories, or possessions or Canada, this exclusion (c) applies
only to *(injury to or destruction of property at such nuclear facility*
(property damage to such nuclear facility and any property thereat.

IV.    As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means sourc
material, special nuclear material or byproduct material; "source material", "special nuclear material", an
"byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendator
thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed t
radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material an
(2) resulting from the operation by any person or organization of any nuclear facility included within th
definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutoniun
(2) processing or utilizing spent fuel, or (3) handling processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at an
time the total amount of such material in the custody of the insured at the premises where such equipment c
device is located consists of or contains more than 25 grams of plutonium or uranium 233 or an
combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,
and includes the site on which any of the foregoing is located, all operations conducted on such site and a
premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclea
fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;
(    *With respect to injury to or destruction of property, the word "injury" or "destruction"*
(    "property damage" includes all forms of radioactive contamination of property.
(    *includes all forms of radioactive contamination of property.*

V.    The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3
whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provide
this paragraph (3) shall not be applicable to
(i)    Garage and Automobile Policies issued by the Reassured on New York risks, or
(ii)    statutory liability insurance required under Chapter 90, General Laws of Massachusetts,until 90 day
following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4)    Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed th
paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect t
such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadia
Underwriters' Association of the Independent Insurance Conference of Canada.

---

*NOTE. The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply on
elation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containin
those words.*

21/9/67
N.M.A. 1590

## NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - REINSURANCE
## CANADA

1.    This Agreement does not cover any loss or liability accruing to the Reinsured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber, or association.

2.    Without in any way restricting the operation of paragraph 1 of this clause it is agreed that for all purposes of this Agreement all the original liability contracts of the Reinsured, whether new, renewal or replacement, of the following classes, namely,

> Personal Liability,
> Farmers Liability,
> Storekeepers Liability,

which become effective on or after 31st December 1984, shall be deemed to include, from their inception dates and thereafter, the following provision: --

### Limited Exclusion Provision

This Policy does not apply to bodily injury or property damage with respect to which the Insured is also insured under a contract of nuclear energy liability insurance (whether the Insured is named in such contract or not and whether or not it is legally enforceable by the Insured) issued by the Nuclear Insurance Association of Canada or any other group or pool of insurers or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability.

With respect to property, loss of use of such property shall be deemed to be property damage.

3.    Without in any way restricting the operation of paragraph 1 of this clause it is agreed that for all purposes of this Agreement all the original liability contracts of the Reinsured, whether new, renewal or replacement, of any class whatsoever (other than Personal Liability, Farmers Liability, Storekeepers Liability or Automobile Liability contracts), which become effective on or after 31st December 1984, shall be deemed to include, from their inception dates and thereafter, the following provision: --

### Broad Exclusion Provision

It is agreed that this Policy does not apply:

(a)    to liability imposed by or arising under the Nuclear Liability Act; or

(b)    to bodily injury or property damage with respect to which an Insured under this Policy is also insured under a contract of nuclear energy liability insurance (whether the Insured is named in such contract or not and whether or not it is legally enforceable by the Insured) issued by the Nuclear Insurance Association of Canada or any other insurer or group or pool of insurers or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(c)    to bodily injury or property damage resulting directly or indirectly from the nuclear energy hazard arising from:

(1)    the ownership, maintenance, operation or use of a nuclear facility by or on behalf of an Insured;

(2)    the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; and

(3)    The possession, consumption, use, handling, disposal or transportation of fissionable substances or of other radioactive material (except radioactive isotopes, away from a nuclear facility, which have reached the final stage of fabrication so as to be useable for any scientific, medical, agricultural, commercial or industrial purpose) used, distributed, handled or sold by an Insured.

As used in this Policy:

(I)    The term "nuclear energy hazard" means the radioactive, toxic, explosive or other hazardous properties of radioactive material;

(II)    The term "radioactive material" means uranium, thorium, plutonium, neptunium, their respective derivatives and compounds, radioactive isotopes of other elements and any other substances that the Atomic Energy Control Board may, by regulation, designate as being prescribed substances capable of releasing atomic energy, or as being requisite for the production, use or application of atomic energy;

(III)    The term "nuclear facility" means:

(a)    any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of plutonium, thorium and uranium or any one or more of them;

(b)    any equipment or device designed or used for (i) separating the isotopes of plutonium, thorium and uranium or any one or more of them, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;

(c)    any equipment or device used for the processing, fabricating or alloying of plutonium, thorium or uranium enriched in the isotope uranium 233 or in the isotope uranium 235, or any one or more of them if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste radioactive material;

and includes the site on which any of the foregoing is located, together with all operations conducted thereon and all premises used for such operations.

(IV)    The term "fissionable substance" means any prescribed substance that is, or from which can be obtained, a substance capable of releasing atomic energy by nuclear fission.

(V)    With respect to property, loss of use of such property shall be deemed to be property damage.

N.M.A. 1979

## NUCLEAR INCIDENT EXCLUSION CLAUSE -
### PHYSICAL DAMAGE AND LIABILITY
### (BOILER AND MACHINERY POLICIES) - REINSURANCE - U.S.A.

(1)   This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)   Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph;

This Policy does not apply to "loss," whether it be direct or indirect, proximate or remote

    (a)   from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

    (b)   from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

(3)   However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

(4)   Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that

    (a)   all policies issued by the Reassured effective on or before 30th April, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 30th April, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply,

    (b)   with respect to any risk located in Canada policies issued by the Reassured effective on or before 30th June, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 30th June, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply.

N.M.A. 1166

NUCLEAR INCIDENT EXCLUSION CLAUSE -
PHYSICAL DAMAGE AND LIABILITY
(BOILER AND MACHINERY POLICIES) - REINSURANCE - CANADA

*(Approved by Lloyd's Underwriters' Fire and Non-Marine Association)*

(1)   This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)   Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph;

This Policy does not apply to "loss," whether it be direct or indirect, proximate or remote

(a)   from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

(b)   from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, contributed to or aggravated by an Accident.

(3)   However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

(4)   Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that policies issued by the Reassured effective on or before 31st December, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 31st December, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply.

N.M.A. 1251

## NUCLEAR ENERGY RISKS EXCLUSION CLAUSE (REINSURANCE) (1994)
### (WORLDWIDE EXCLUDING U.S.A. & CANADA)

This agreement shall exclude Nuclear Energy Risks whether such risks are written directly and/or by way of reinsurance and/or via Pools and/or Associations.

For all purposes of this agreement Nuclear Energy Risks shall mean *all first party and/or third party insurances or reinsurances (other than Workers' Compensation and Employers' Liability) in respect of*:-

(I)    All Property on the site of a nuclear power station.
       Nuclear Reactors, reactor buildings and plant and equipment therein on any site other than a nuclear power station.

(II)   All Property, on any site (including but not limited to the sites referred to in (I) above) used or having been used for:-

       (a)   The generation of nuclear energy; or

       (b)   The Production, Use or Storage of Nuclear Material.

(III)  Any other Property eligible for insurance by the relevant local Nuclear Insurance Pool and/or Association but only to the extent of the requirements of that local Pool and/or Association.

(IV)   The supply of goods and services to any of the sites, described in (I) to (III) above, unless such insurances or reinsurances shall exclude the perils of irradiation and contamination by Nuclear Material.

Except as undernoted, Nuclear Energy Risks shall not include:-

(i)    Any insurance or reinsurance in respect of the construction or erection or installation or replacement or repair or maintenance or decommissioning of Property as described in (I) to (III) above (including contractors' plant and equipment);

(ii)   Any Machinery Breakdown or other Engineering insurance or reinsurance not coming within the scope of (i) above;

Provided always that such insurance or reinsurance shall exclude the perils of irradiation and contamination by Nuclear Material.

However, the above exemption shall not extend to:-

(1)   The provision of any insurance or reinsurance whatsoever in respect of:-

      (a)   Nuclear Material;

      (b)   Any Property in the High Radioactivity Zone or Area of any Nuclear Installation as from the introduction of Nuclear Material or - for reactor installations - as from fuel loading or first criticality where so agreed with the relevant local Nuclear Insurance Pool and/or Association.

(2)   The provision of any insurance or reinsurance for the undernoted perils:-

      -   Fire, lightning, explosion;

      -   Earthquake;

      -   Aircraft and other aerial devices or articles dropped therefrom;

      -   Irradiation and radioactive contamination;

      -   Any other peril insured by the relevant local Nuclear Insurance Pool and/or Association;

      in respect of any other Property not specified in (1) above which directly involves the Production, Use or Storage of Nuclear Material as from the introduction of Nuclear Material into such Property.

N.M.A. 1975(a)                                                                                          Page 1

EX. A p79

Definitions:

"Nuclear Material" means:-

  (i)   Nuclear fuel, other than natural uranium and depleted uranium capable of producing energy by a self-sustaining chain process of nuclear fission outside a Nuclear Reactor, either alone or in combination with some other material; and

  (ii)  Radioactive Products or Waste.

"Radioactive Products or Waste" means any radioactive material produced in, or any material made radioactive by exposure to the radiation incidental to the production or utilisation of nuclear fuel, but does not include radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial or industrial purpose.

"Nuclear Installation" means:-

  (i)   Any Nuclear Reactor;

  (ii)  Any factory using nuclear fuel for the production of Nuclear Material, or any factory for the processing of Nuclear Material, including any factory for the reprocessing of irradiated nuclear fuel; and

  (iii) Any facility where Nuclear Material is stored, other than storage incidental to the carriage of such material.

"Nuclear Reactor" means any structure containing nuclear fuel in such an arrangement that a self-sustaining chain process of nuclear fission can occur therein without an additional source of neutrons.

"Production, Use or Storage of Nuclear Material" means the production, manufacture, enrichment, conditioning, processing, reprocessing, use, storage, handling and disposal of Nuclear Material.

"Property" shall mean all land, buildings, structures, plant, equipment, vehicles, contents (including but not limited to liquids and gases) and all materials of whatever description whether fixed or not.

"High Radioactivity Zone or Area" means:-

  (i)   For nuclear power stations and Nuclear Reactors, the vessel or structure which immediately contains the core (including its supports and shrouding) and all the contents thereof, the fuel elements, the control rods and the irradiated fuel store; and

  (ii)  For non-reactor Nuclear Installations, any area where the level of radioactivity requires the provision of a biological shield.

the 1998 Agreement, is hereby deleted in its entirety and amended to read as follows:

Article VII – Aggregate Limit

A. The Reinsurer's obligation of indemnity to the Company in respect of Ultimate Net Loss in excess of the Company's Accident Year Retention and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article IX – Coinsurance shall be subject to an Aggregate Limit of liability under this Agreement equal to the lesser of:

1. $85,000,000; or

2. the Aggregate amount of Ultimate Net Loss incurred in excess of the Accident Year Retention as reported in the Company's 1999 annual statement.

3. At the Reinsurer's option, $70,000,000, if a controlling interest in The Frontier Insurance Group, Inc., defined as greater than 50% of the voting common stock, is acquired by an investor group, exclusive of current management in position as of the inception of this Agreement.

d) It is hereby agreed that effective 11:59 p.m., Eastern Standard Time, December 31, 1998, Article XI "ADDITIONAL REINSURANCE PREMIUM" of the 1998 Agreement, is hereby amended to include an additional paragraph C. which shall read as follows:

C. Should the Ultimate Net Loss divided by the Subject Earned Premium Income for the Accident Year be greater than 73.5%, then the Additional Reinsurance Premium shall be due as described in paragraphs A and B above.

e) It is hereby agreed that effective 11:59 p.m., Eastern Standard Time, December 31, 1998, Paragraph A of Article XVII "COMMUTATION" of the 1998 Agreement, is hereby deleted in its entirety and amended to read as follows:

A. Subject to the terms of this Article, the Company may, at its sole option, commute this Agreement at any December 31st, on or before December 31, 2005, both days inclusive, with ninety (90) days prior written notice by the Company to the Reinsurer; provided, however, that the Company first commutes the Company's Coinsured Aggregate Excess of Loss Reinsurance Agreement, effective January 1, 1995 and expired December 31, 1997 (the "1995 Agreement").

2

f)  It is hereby agreed that effective 11:59 p.m., Eastern Standard Time, December 31, 1998, Article XXIV "RIGHT OF OFFSET" of the 1998 Agreement, is hereby amended to read as follows:

A.  The Company and the Reinsurer may offset any balance or amount due from one party to the other under this Agreement or any other contract heretofore or hereafter entered into between the Company and the Reinsurer, whether acting as assuming reinsurer or ceding company or in any other capacity. This provision shall not be affected by the insolvency of either party to this Agreement.

B.  In extension and not in limitation to paragraph A above, the Reinsurer shall have an absolute right to offset any amounts due to the Company against the Funds Withheld Balance. In the event that this right of offset between the Company and the Reinsurer is specifically disallowed or judged to be unenforceable by any court of competent jurisdiction, arbitration panel or regulatory body, then all amounts in the Funds Withheld Balance shall immediately become due and payable in full. If the Funds Withheld balance is not remitted to the Reinsurer within fifteen (15) days, the Reinsurer shall have the option to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account Balance (or zero if the Experience Account Balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

g)  It is hereby agreed that on the date hereof that Company shall pay to the Reinsurer a cancellation fee of US $10,000,000. This Cancellation and Amendment Agreement shall be of no force and effect unless and until such payment is received by the Reinsurer and shall be void if no such payment is made.

h)  It is hereby understood and agreed that execution of this Cancellation and Amendment Agreement by the parties hereto shall not constitute, nor be construed as, a waiver, express or implied, by any party of any breach or default by any other party in the performance by such other party of its obligations under the Coinsured Aggregate Excess of Loss Reinsurance Agreement effective January 1, 1995 (the "1995 Agreement) or the 1998 Agreement. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights under the 1995 Agreement or the 1998 Agreement.

3

i)      Any further brokerage payable, including any resulting from the execution
        of this Cancellation and Amendment Agreement, shall be paid by the
        Company.


ALL OTHER TERMS AND CONDITIONS OF THE 1995 AGREEMENT AND THE
1998 AGREEMENT REMAIN UNCHANGED.


In Witness Whereof, the parties hereto by their respective duly authorized representatives
have executed this Cancellation and Amendment Agreement as of the dates
undermentioned at:

Rock Hill, New York, this _26th_ day of March, 1999.

                Frontier Insurance Company
                Frontier Pacific Insurance Company
                United Capitol Insurance Company
                Western Indemnity Insurance Company


New York, New York, this _26th_ day of March, 1999.

                Zurich Reinsurance (North America), Inc.


4

# NOVATION AGREEMENT
(hereinafter referred to as the "Novation Agreement")

Effective July 1, 2000

Among

**Frontier Insurance Company**

**Frontier Pacific Insurance Company**

**United Capitol Insurance Company**

And

**Western Indemnity Insurance Company**

Each of which is an affiliated insurance company of The Frontier Insurance Group, Inc.
(hereinafter referred to collectively as the **"Reinsured"**)

And

**Zurich Reinsurance (North America), Inc.** (both directly and as successor company to
Centre Reinsurance Company of New York)
(hereinafter referred to as the **"Reinsurer"**)

And

**National Indemnity Company**
(hereinafter referred to as the **"New Reinsurer"**)

## ATTACHING TO AND FORMING PART OF:
the Coinsured Aggregate Excess of Loss Reinsurance Agreement
Among Frontier Insurance Company, Frontier Pacific Insurance Company and Reinsurer,
Effective January 1, 1995
and
the Aggregate Excess of Loss Reinsurance Agreement
Between Reinsured and Reinsurer, Effective January 1, 1998
(Each as heretofore amended, modified or supplemented
hereinafter referred to collectively as the **"Reinsurance Agreements"**)

## 1. RECITALS

1.1. WHEREAS, the Reinsured and the Reinsurer referred to above have entered into the Reinsurance Agreements; and

1.2. WHEREAS, the Reinsured, the Reinsurer and the New Reinsurer desire that the Reinsurer shall be released from, and the New Reinsurer shall directly assume, responsibility for the Reinsurer's obligations and liabilities under and in connection with the Reinsurance Agreements.

NOW THEREFORE, the parties hereto hereby agree as follows:

## 2. NOVATION; RELEASE; INDEMNIFICATION

2.1. All obligations and liabilities on the Reinsured's part owed to the Reinsurer pursuant to the Reinsurance Agreements shall henceforth be owed to the New Reinsurer as though the New Reinsurer had originally entered into the Reinsurance Agreements as reinsurer in place of Reinsurer. Such obligations and liabilities shall include, without limitation, all liabilities and obligations related to the Funds Withheld Account, as defined in the Reinsurance Agreements.

2.2. The Reinsured hereby releases and fully discharges the Reinsurer, its affiliates and its and their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, from any and all claims, demands, actions, liabilities, obligations, duties, or causes of action, known or unknown which the Reinsured has, might have had, will have, or might have in the future, arising out of or connected with, in whole or in part, any event, act, omission, or transaction relating in any way to the Reinsurance Agreements; provided, however, that this Section 2.2 shall not apply to Reinsurer's obligation under Section 5.1 hereof to make the payment set forth therein.

2.3. The New Reinsurer accepts, assumes and agrees to perform and be bound by the obligations and liabilities expressed to be on the part of the Reinsurer arising pursuant to the Reinsurance Agreements as though the New Reinsurer and not the Reinsurer had originally entered into the Reinsurance Agreements as reinsurer in place of the Reinsurer.

2.4. The New Reinsurer agrees to indemnify, defend and hold the Reinsurer and its directors, officers, employees, agents, representatives, successors or assigns harmless from and against any losses, liabilities, damages, actions, claims, demands, judgments or reasonable expenses asserted or incurred after the effective date of this Novation Agreement and arising out of or connected with, in whole or in part, any event, act, omission, or transaction, relating in any way to the New Reinsurer's acceptance, assumption, performance or exercise of the Reinsurer's rights, duties, obligations or liabilities under, or any other act or omission of the New Reinsurer in respect of, the Reinsurance Agreements. The Reinsurer shall advise the

2

New Reinsurer of any claims under this Section 2.4 promptly after becoming aware thereof, but the failure to so advise shall not affect the New Reinsurer's obligations under this Section 2.4 except only to the extent the New Reinsurer is actually prejudiced by such failure to so advise. The New Reinsurer shall have the right to control, negotiate, litigate, compromise and/or otherwise dispose of or resolve any such claims or liabilities, and the Reinsurer shall tender to the New Reinsurer any such claims, and shall otherwise cooperate with the New Reinsurer in its handling of any such claims; provided, however, that to the extent the Reinsurer reasonably believes that there is a conflict of interest between the New Reinsurer and the Reinsurer, the Reinsurer shall, at its option, retain the right to dispose or resolve the portion of any such claims or liabilities subject to such a conflict of interest; and provided, further that the New Reinsurer shall not settle any claims or liabilities affecting or involving the Reinsurer unless, as part of such settlement, the Reinsurer shall be fully and completely discharged from any claim or liability relating thereto.

2.5. Henceforth the Reinsurance Agreements shall be read and construed as though references therein to the Reinsurer were references to the New Reinsurer and not the Reinsurer.

2.6. The Reinsurer shall have no liability or obligation to any person or entity (including, but not limited to the Reinsured and the New Reinsurer) arising out of or in connection with the Reinsurance Agreements. In furtherance and not in limitation of the foregoing, the New Reinsurer will not make any claim against the Reinsurer arising out of or in connection with any failure on the part of the Reinsurer to comply with any obligations under the Reinsurance Agreements, or any other matter or thing whatsoever arising out of or in connection with the Reinsurance Agreements; provided, however, that nothing herein shall affect the Reinsurer's obligation under Section 5.1 hereof to make the payment set forth therein.

2.7. The Reinsured hereby acknowledges and agrees with, and undertakes to the New Reinsurer that the obligations of the Reinsurer under the Reinsurance Agreements have to date been performed in accordance with the terms of the Reinsurance Agreements and that the Reinsured will not make any claim against the New Reinsurer arising out of or in connection with any failure on the part of the Reinsurer to comply with any such obligations.

3.  **REPRESENTATIONS AND WARRANTIES OF THE REINSURED AND THE NEW REINSURER**

The Reinsured and the New Reinsurer hereby warrant and represent to the Reinsurer that: (i) they are entities in good standing in their respective places of domicile; (ii) that the execution of this Novation Agreement is fully authorized by each of them; (iii) that the person or persons executing this Novation Agreement have the necessary and appropriate authority to do so; (iv) that there are no pending conditions, agreements, transactions, or negotiations to which any of them are a party that would render this Novation Agreement or any part thereof void, voidable, or unenforceable; (v) this Novation Agreement is enforceable against the Reinsured and the New Reinsurer in accordance with the terms and conditions hereof; (vi) they have obtained any and all required corporate, insurance or other regulatory, or other governmental

3

approvals and consents required to execute this Novation Agreement and all such approvals and consents are in effect as of the effective date of this Novation Agreement; (vii) this Novation Agreement, does not and will not conflict with any provisions of any other contracts in place between the Reinsured and any other party, nor will the Reinsured's agreement to enter into this Novation Agreement and accept the terms and conditions hereof conflict with any provisions of any other such contracts; (viii) no proceeding for insolvency, liquidation, rehabilitation, conservation, bankruptcy, dissolution, general assignment for the benefit of creditors, nor regulatory, or other legal, equitable, or statutory proceeding is pending to which the Reinsured or the New Reinsurer is a party or with which Reinsured is involved, and no such proceeding is contemplated, which may in any way prevent, delay, limit, or otherwise inhibit Reinsured's full and timely performance of its duties and obligations under this Novation Agreement; and (ix) neither the Reinsured nor the New Reinsurer is subject to any order, decree, injunction, judgment, settlement, governmental action, or other action by any court, arbitral tribunal, department of insurance, or other governmental authority which may in any way prevent, delay, limit, or otherwise inhibit their full and timely performance of its duties and obligations under this Novation Agreement.

## 4. REPRESENTATIONS AND WARRANTIES OF THE REINSURER

The Reinsurer hereby warrants and represents that: (i) it is an entity in good standing in its place of domicile; (ii) that the execution of this Novation Agreement is fully authorized by the Reinsurer; (iii) that the person or persons executing this Novation Agreement on the part of the Reinsurer shall have the necessary and appropriate authority to do so; (iv) that there are no pending agreements, transactions, or negotiations to which the Reinsurer is a party that would render the Novation Agreement or any party thereof void, voidable, or unenforceable; (v) this Novation Agreement is enforceable against the Reinsurer in accordance with the terms and conditions hereof; and (vi) that no authorization, consent or approval of any government entity is required to make this Novation Agreement valid and binding upon it.

## 5. PAYMENTS BY REINSURER TO NEW REINSURER AND REINSURED TO NEW REINSURER

5.1 Notwithstanding anything else contained herein, the New Reinsurer's obligations hereunder shall be conditioned on that within five (5) business days after execution of this Novation Agreement the Reinsurer shall pay to the New Reinsurer in immediately available funds the sum of US$68,200,000.

5.2 The Reinsured shall pay to the New Reinsurer the Funds Withheld Account for all Accident Years in respect of the Reinsurance Agreement effective January 1, 1995. Until such time as this payment is made, the Funds Withheld Account shall continue to accrue all interest and Funds Withheld Investment Credits. Until such time as the Funds Withheld Account is paid to the New Reinsurer, the Reinsured shall offset balances due from the New Reinsurer as a result of this Novation, against the Funds Withheld Account, in strict accordance with the terms of the Reinsurance Agreement.

4

## 6. CONSIDERATION

The New Reinsurer and the Reinsured acknowledge and agree that Reinsurer's agreements set forth in this Novation Agreement, including, but not limited to, its agreement to pay to the New Reinsurer the amount specified in Section 5.1 hereof, constitutes good and adequate consideration to the Reinsured and the New Reinsurer for the releases, indemnifications and other agreements of the Reinsured and the New Reinsurer under this Novation Agreement, including, but not limited to, the releases set forth in Section 2.2, and the indemnification and assumption of obligations and liabilities set forth in Section 2.4.

## 7. MISCELLANEOUS

7.1. This Novation Agreement may be executed in any number of counterparts by the different parties hereto on separate counterparts, each of which when executed and delivered shall constitute an original, but all of which shall together constitute one and the same instrument.

7.2. This Novation Agreement shall be read and considered as an integral part of the aforementioned Reinsurance Agreements and in the case of any conflict with any part of said Reinsurance Agreements the provisions of this Novation Agreement shall prevail.

7.3. The rights, duties and obligations set forth herein shall inure to the benefit of and be binding upon any and all predecessors, successors, affiliates, officers, directors, employees, parents, subsidiaries, stockholders, liquidators, receivers and assigns of the parties hereto.

7.4. This Novation Agreement contains the entire agreement between the parties as respects its subject matter. All discussions and agreements previously entertained between the parties concerning the subject matter of the commutation are merged into this Novation Agreement.

7.5. This Novation Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing, signed by the parties hereunder.

7.6. The parties hereto and each of them do hereby covenant and agree to do such things and execute such further documents, agreements and assurances as may be necessary or advisable from time to time in order to carry out the terms and conditions of this Novation Agreement in accordance with their true intent.

7.7. This Novation Agreement shall be governed by and construed in accordance with the laws of the State of New York and the parties hereto irrevocably submit to the non-exclusive jurisdiction of the Courts in the State of New York and to the extent permitted by law expressly waive all rights to challenge or otherwise limit such jurisdiction.



5

This Novation Agreement has been duly executed by each of the parties as follows:

For and on Behalf of:

Frontier Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

Frontier Pacific Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

United Capitol Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

Western Indemnity Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000

6

For and on Behalf of:

Zurich Reinsurance (North America), Inc.

Name: Jon Claassen
Title: SVP
Date: December 21, 2000


For and on Behalf of:

**National Indemnity Company**

Name: Brad O Smith
Title: Vice Pres, PLM
Date: December 21, 2000

N:\DATA\UW\UW\BOUND\FRONTIE2\Review2000\novation\NOV_1.doc

7

AGGREGATE REINSURANCE AGREEMENT

Between

FRONTIER INSURANCE COMPANY,

ROCK HILL, N.Y.

and

NATIONAL INDEMNITY COMPANY,

OMAHA, NEBRASKA

1

EX. A  p93

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Frontier Insurance Company, (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall incept at 12:01 A.M. Eastern Daylight Time July 1, 2000 (the "Effective Date"). Unless novated pursuant to Article 7, this Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the Aggregate Limit of Liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all Covered Liabilities.

Reinsurer, through the Claims Administrator, shall pay on behalf of the Reinsured any and all Ultimate Net Loss in relation to Covered Liabilities subject to the terms, conditions, exclusions and Aggregate Limit stated in this Reinsurance.  Subject to Article 12, Reinsurer's obligations to pay, through the Claims Administrator, on behalf of the Reinsured are not dependent upon prior payment by the Reinsured of Ultimate Net Loss, as the parties to this Reinsurance intend that Reinsurer, through the Claims Administrator, shall pay all amounts of Ultimate Net Loss due Insureds and other persons as and when due directly on behalf of the Reinsured in accordance with Article 16.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurers' liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss in connection with Covered Liabilities, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance. Reinsurer, therefore, agrees that its coverage obligation under this Reinsurance is identical in any and all respects to the Reinsured's coverage obligations for Covered Liabilities subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance. The parties to this Reinsurance intend that, subject to the terms, conditions and exclusions of this Reinsurance and the Aggregate Limit, the Reinsured shall be subject to no liability for Ultimate Net Loss whatsoever for Covered Liabilities which are covered by Reinsurer hereunder.

ARTICLE 2.  INDEMNITY

Reinsurer, through the Claims Administrator, hereby agrees to pay on behalf of the Reinsured the Ultimate Net Loss for an amount of up to U.S. $800,000,000 (Eight Hundred Million United States Dollars) (the "Aggregate Limit"). UNDER NO CIRCUMSTANCES WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $800,000,000 (EIGHT HUNDRED MILLION UNITED STATES DOLLARS) IN THE AGGREGATE INCLUSIVE OF ALL EXPENSES AND COSTS BY REASON OF ENTERING INTO THIS REINSURANCE. In applying Article 2, all Ultimate Net Loss arising out of this Reinsurance shall be included in determining the time of exhaustion of the Aggregate Limit. A single Aggregate Limit shall apply to this Reinsurance.

ARTICLE 3. . EXCLUSIONS

A. This Reinsurance shall not cover any liability paid or booked as paid by Reinsured before the Effective Date as determined by the books and records of Reinsured;

B. Save as otherwise expressly provided herein, this Reinsurance shall not cover any liability of the Reinsured that was Due and Payable prior to the Effective Date. This exclusion shall not be construed

2

to exclude from coverage loss payments that are awaiting payment in the normal process following settlement and or billing in respect of such losses.

The phrase "Due and Payable" in this Exclusion B shall mean existing, uncontingent, undisputed and in respect of which payment of a known fixed amount can be enforced either immediately or after a known fixed period of time.

Nothing in this Exclusion B shall be construed to exclude liabilities not accepted or agreed by Reinsured prior to the Effective Date even though Insureds may have presented claims, commenced suits, advices, proofs of loss (or other billing statements) for such liabilities. Examples of such liabilities would include, but not be limited to, liabilities for which Reinsured instituted a coverage investigation, or denied coverage pending further detail or information with respect to environmental, toxic tort, latent disease or asbestos related claims. (These categories are not exclusive but merely by way of example and guide.)

C.  This Reinsurance shall not cover any liability of the Reinsured for: (1) any tortious act of the Reinsured; (2) any failure of the Reinsured to carry out its contractual obligations under the Insurance Policies/Reinsurance contracts in good faith; or (3) any action of the Reinsured in bad faith. Coverage for the Reinsured's liability for any act or omission by the Reinsurer and/or the Claims Administrator, acting on the Reinsured's behalf or as the Reinsured's agent pursuant to this Reinsurance shall not be excluded. With respect to activities not involving the fraud or purposeful tortious conduct of the Reinsured, this Exclusion shall only operate upon a final determination that the Reinsured was guilty of the stated wrongful conduct and then only as respects damages awarded directly therefor.

D.  This Reinsurance shall not cover any tax, whether paid directly by the Reinsured or billed to the Reinsured by or through a cedent, regardless of whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax. Notwithstanding the foregoing, a tax applicable to any expense or fee for which Reinsurer is liable under this Reinsurance shall be included as Ultimate Net Loss and shall not be excluded hereunder.

E.  This Reinsurance shall not cover any liability incurred by Reinsured under Insurance Policies/Reinsurance Contracts issued after December 31, 1999. Furthermore, this Reinsurance shall not cover, under occurrence-based business, occurrences after December 31, 1999. For claims-made business, this Reinsurance shall not cover claims made after December 31, 1999, other than claims which were reported prior to December 31, 1999 as part of tail coverage provided on a policy issued within the covered period.

ARTICLE 4.   DEFINITIONS

A.      Wherever used in this Retrocession, the term "Covered Liabilities" shall mean all insurance and reinsurance obligations of the Reinsured incurred by Reinsured during Accident Years 1999 and prior. "Accident Year" means on occurrence-based business, all occurrences during a given calendar year, and, on claims-made business, all claims made during a given calendar year. Claims

3

made after 12/31/1999 for which coverage is provided by Reinsured under policies written on a claims-made basis where the policy expired prior to 12/31/99 save an extended reporting endorsement shall be understood to have been made during Accident Year 1999 and shall be covered by this Reinsurance.

B.  Wherever used in this Reinsurance, the term "Insurance Policy/Reinsurance Contract" shall mean any and all binders, insurance policies, surety bonds, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insures or reinsures Covered Liabilities.

C.  Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean the sums payable by the Reinsured as Covered Liabilities on or after the Effective Date save as otherwise excluded under Article 3. Ultimate Net Loss shall include, but is not limited to, punitive damages, settlements, judgments, arbitration panel awards, claim payments, Allocated Loss Adjustment Expenses, Unallocated Loss Adjustment Expenses, Administrative Costs, expenses and fees for determining coverage under any Insurance Policy/Reinsurance Contract, expenses to seek any recoveries, consideration for commutations, reinstatement premium payable to Reinsured's reinsurers or Retrocessionaires and any other fees or expenses of any nature or kind for which the Reinsured is liable under any Insurance Policy/Reinsurance Contract.

D.  Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expense" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys fees, expenses, fees and interest accrued prior to or after any judgment, award, agreement or compromise (excluding Administrative Costs) incurred in connection with any defense, investigation or audit of, resistance to or negotiations in relation to Covered Liabilities. Expenses which are not Allocated Loss Adjustment Expenses shall be Unallocated Loss Adjustment Expenses.

E.  Wherever used in this Reinsurance, the term "Administrative Costs" shall mean all costs and expenses (including salaries of officials and employees of the Reinsurer and/or Claims Administrator) incurred by Reinsurer and/or Claims Administrator, in connection with its obligations as described in Article 16 of this Reinsurance on or after the Effective Date, but which are not allocated to a specific loss or to a specific Insurance Policy/Reinsurance Contract. Administrative Costs shall be included in Ultimate Net Loss.

F.  Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured arising under any Insurance Policy/Reinsurance Contract.

G.  Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract, and the term "Claimant" shall mean a person asserting a claim against an Insured for which the Insured claims coverage under an Insurance Policy/Reinsurance Contract.

ARTICLE 5.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

It is hereby understood and agreed that the Reinsured assigns to Reinsurer any rights with respect to salvage, subrogation or reinsurance recoveries which may have accrued to Reinsured prior to the Effective Date

4

*There Nc
None paid recoverchies
(no paid recoverchies)
or unpaid reserve)*

in connection with Covered Liabilities for so long as this Reinsurance is in effect. For so long as this Reinsurance is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insureds in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled. The Reinsured specifically assigns to Reinsurer all rights which Reinsured has to collect subrogation, salvage and all other amounts due Reinsured. The Reinsurer is hereby authorized and empowered to bring any appropriate action to enforce such rights in the name of the Reinsured to the extent Reinsured has been granted said rights. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer.


ARTICLE 6.   PREMIUM

As the sole consideration for the rights and obligations set forth in this Reinsurance, Reinsurer agrees to accept and Reinsured agrees to pay a Reinsurance Premium of $490,000,000 (Four Hundred Ninety Million United States Dollars) less Ultimate Net Loss paid by Reinsured on or after the Effective Date but before September 27, 2000 plus interest from the Effective Date through September 27, 2000 at the rate of three month U.S. Treasury Securities in effect at the close of the financial markets on June 30, 2000 on the average daily balance of Reinsurance Premium less Ultimate Net Loss Paid. Premium shall be payable by noon Eastern Daylight Time on September 27, 2000. It is understood that some components of Ultimate Net Loss used to compute the amount of funds transferred on September 27, 2000 will necessarily be estimates and that a true-up to actual amounts, with interest, will be completed no later than November 1, 2000. Payment shall be made in immediately available U.S. funds as follows:

To National Indemnity Company by wire transfer to:

Wells Fargo Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058
For the account of National Indemnity Company
Account No. 1150001492


ARTICLE 7.   NOVATION

Subject to the approval of the New York Department of Insurance, the Reinsured shall have the option to negotiate a novation or replacement of this Reinsurance at December 31, 2001 or any calendar quarter ending thereafter. The Reinsured shall provide notice of its election of this option to the Reinsurer no less than forty-five (45) days prior to the date it wishes to novate or replace the Reinsurance provided hereunder. Upon novation or replacement, and following execution by the parties of Reinsurer's Novation, Indemnification and Hold Harmless Agreement, Reinsurer shall transfer to the Novating/Replacement Reinsurer 97.5% of Reinsurance Premium, or such other amount as mutually agreed, less all Ultimate Net Loss (including all Allocated and Unallocated Loss Adjustment Expenses and all Administrative Costs) paid by Reinsurer under this Reinsurance.

5

ARTICLE 8.   CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurers to or on behalf of the Reinsured in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange commercially in effect for large transactions on the date the original payment is made by the Reinsurer.

ARTICLE 9.   ERRORS AND OMISSIONS

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it has under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the other do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on any party hereto greater than would have attached had such error or omission not occurred.

ARTICLE 10.   ACCESS TO RECORDS

A.      By Reinsurer. The Reinsured shall make available for inspection, and place at the disposal of Reinsurer at all reasonable times, all records of the Reinsured relating to this Reinsurance. The Reinsured shall also make available for inspection and place at the disposal of Reinsurer at all reasonable times, all records to which the Reinsured may have access, by terms of any reinsurance agreement or otherwise. Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance.

B.      By the Reinsured. The Reinsurer shall make available for inspection, and place at the disposal of the Reinsured at all reasonable times, all records of the Reinsurer relating to Covered Liabilities under this reinsurance. The Reinsurer shall also make available for inspection and place at the disposal of the Reinsured at all reasonable times all such records to which the Reinsurer may have access, by terms of any reinsurance agreement or otherwise. The Reinsured shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsurer relating to the business covered by this Reinsurance, and any Insurance Policy/Reinsurance Contract in the possession of Reinsurer. It is agreed that the Reinsured's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance.

ARTICLE 11.   ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable, except as set forth in the Novation provision. This Reinsurance is the entire agreement between the Reinsurer and the Reinsured and shall

6

not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein. Reinsurer agrees that this Reinsurance shall not be subject to any claims brought by it whatsoever arising out of any alleged statements, representations, disclosures or non-disclosures by, or on behalf of, the Reinsured. No liability shall attach to the Reinsured in this regard save in the event of Reinsured's proven deliberate misrepresentation or non-disclosure.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsurer and the Reinsured. No amendment to the Insurance Policies/Reinsurance Contracts after the Effective Date shall enlarge or alter the obligations or liabilities of the parties hereunder unless the parties have consented in writing to such amendment. This Reinsurance may not be assigned by Reinsured or Reinsurer without the consent of the other party hereto. In the event that any provision of this Reinsurance is found to be invalid, voidable, void or otherwise unenforceable, the intention of the parties is that the remaining provisions shall be reformed so as to carry out their mutual intentions.

ARTICLE 12. INSOLVENCY OF THE REINSURED

In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to Reinsured or to its liquidator, receiver, conservator or statutory successor as and when due by Reinsured under the terms of the Insurance Policies/Reinsurance Contracts.

In the event of the insolvency of the Reinsured , this reinsurance shall be payable directly to the company or to its liquidator, receiver, conservator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the insolvent company without diminution because of the insolvency of the company or because the liquidator, receiver, conservator or statutory successor of the company has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the company shall give written notice to the Reinsurer of the pendency of a claim against the company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the Court, against the company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the company solely as a result of the defense undertaken by the Reinsurer.

It is further understood and agreed that, in the event of the insolvency of the Reinsured, the reinsurance under this Contract shall be payable directly by the Reinsurer to the company or to its liquidator, receiver or statutory successor, except as provided by Section 4118(a) of the New York Insurance Law or except (1) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of the company to such payees.

7

ARTICLE 13.  NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

ARTICLE 14.  RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Reinsurance.

ARTICLE 15.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 100 First Stamford Place
> Stamford, Connecticut 06902
> Attn:     General Counsel
> Telecopy: (203) 363-5221
>
> Frontier Insurance Company
> 195 Lake Louise Marie Road
> Rock Hill, NY 12775
> Attn: President - Telecopy: (845) 796 1900

Any party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties. Notice shall be deemed effective:

1. if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2. if sent by certified mail at the expiration of seventy-two (72) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

ARTICLE 16.  REINSURERS RIGHT TO ASSOCIATE

In connection with this Reinsurance, the Reinsured has entered into a Claims Administration Agreement with National Liability & Fire Insurance Company (the Claims Administrator). Notwithstanding that agreement, the Reinsurer hereunder shall be entitled at its own expense to associate in the handling of any claims, whether direct or reinsurance and commutations, both inwards or outwards, in connection with the business covered hereunder.

8

**Article 17.**   CHANGE IN ADMINISTATIVE PRACTICES OR CORPORATE STRUCTURE

The Reinsured shall not voluntarily undergo or make any change in its administrative practices, corporate structure, or domicile without the prior written consent of the Reinsurer, which shall not be unreasonably withheld. This provision shall not be construed to restrict Reinsured from implementing new internal procedures or protocols in the normal course of its business.

**Article 18.**   ARBITRATION

This Clause shall form a separate Agreement between the Reinsured and the Reinsurer from the main Contract (the terms and conditions of which are more fully expressed hereintofore).

All matters in difference between the Reinsured and the Reinsurer (hereinafter referred to as "the parties") in relation to this reinsurance, including its formation and validity, and whether arising during or after the period of this reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.

Unless the parties agree upon a single Arbitrator within thirty days of one receiving a written request from the other demanding Arbitration, the Claimant (the party requesting Arbitration) shall appoint his Arbitrator and give written notice thereof to the Respondent. Within thirty days of receiving such notice the Respondent shall appoint his Arbitrator and give written notice thereof to the Claimant, failing which the Claimant may nominate an Arbitrator on behalf of the Respondent.

Should the Arbitrators fail to agree, they shall appoint by mutual agreement only, an Umpire to whom the matter in difference shall be referred.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons employed or engaged in a senior position in Insurance or Reinsurance underwriting or claims.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

All costs of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, N.Y. and the Arbitration Tribunal shall apply the laws of New York as the proper law of this Reinsurance.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal shall be in writing and binding upon the parties who covenant to carry out the same. If either of the

9

parties should fail to carry out any award the other may apply for its enforcement to a court of competent jurisdiction in any territory in which the party in default is domiciled or has assets or carries on business.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives

This 27 day of _____, 2000 by Frontier Insurance Company

Title: President

This 27 day of _____, 2000 by National Indemnity Company

Title: vice president

10

EX. A p102

ENDORSEMENT NO. 1

to the

AGGREGATE REINSURANCE AGREEMENT

between

FRONTIER INSURANCE COMPANY,
Rock Hill, New York

and

NATIONAL INDEMNITY COMPANY,
Omaha, Nebraska

631 - 376 - 5

Page 1

WHEREAS, the Frontier Insurance Company (the "Reinsured") and National Indemnity Company (the "Reinsurer") have entered into an Aggregate Reinsurance Agreement effective July 1, 2000 (the "Reinsurance Agreement") concerning "Covered Liabilities" as defined in the Reinsurance Agreement arising from Accident Years 1998 and prior (such liabilities as are covered in the Reinsurance Agreement being referred to herein as the "Covered Business");

WHEREAS, in connection with the mutual agreement of the Reinsured and Reinsurer to add to the Reinsurance Agreement coverage in respect of the 1999 and prior business of Frontier Pacific Insurance Company ("Frontier Pacific"), a subsidiary of the Reinsured;

WHEREAS, the Reinsureds and the Reinsurer have agreed to include within the Reinsurance Agreement coverage for their respective surety business exposures written as of the date of this Endorsement and prior; and

WHEREAS, as a result of the foregoing, the Reinsured and Reinsurer have mutually agreed to clarify in this Endorsement that the Reinsured shall continue to receive the full benefit of its existing reinsurance coverage such that the Reinsurer shall continue to be responsible for the net losses paid by the Reinsured;

NOW, THEREFORE, the Reinsured and Reinsurer agree to modify and amend the Reinsurance Agreement as follows:

1.    With effect from October 1, 2000, the "Reinsured" is amended to include Frontier Pacific. All references to Reinsured throughout the Reinsurance Agreement are understood to be to both Frontier Insurance Company and Frontier Pacific.

2.    The Reinsurance Agreement, Article 2, Indemnity, is hereby deleted and replaced with the following:

Reinsurer, through the Claims Administrator or directly, hereby agrees to pay on behalf of the Reinsured the Ultimate Net Loss for an amount of up to U.S. $858,554,275.    UNDER NO CIRCUMSTANCES WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $858,554,275 IN THE AGGREGATE INCLUSIVE OF ALL EXPENSES AND COSTS BY REASON OF ENTERING INTO THIS REINSURANCE.    In applying Article 2, all Ultimate Net Loss arising out of this Reinsurance shall be included in determining the time of exhaustion of the Aggregate Limit.    A single Aggregate Limit shall apply to this Reinsurance.

Subject to the foregoing, it is understood and agreed that the available limit for each Reinsured shall be further limited as follows: in respect of Frontier

**Page 2**

Insurance Company, the Reinsurer shall be liable for no more than U.S. $811,464,476 Ultimate Net Loss inclusive of all Expenses and Costs by reason of entering into this Reinsurance. In respect of Frontier Pacific, the Reinsurer shall be liable for no more than U.S. $47,089,799 Ultimate Net Loss inclusive of all Expenses and Costs by reason of entering into this Reinsurance. The sublimits set forth in this paragraph are a part of and subject to the Aggregate Limit of Liability of U.S. $858,554,275. All payments made by Reinsurer in respect of either Reinsured, whether made before, on, or after the date of this Endorsement No. 1, shall serve to erode the Aggregate Limit of Liability.

3.   The Reinsureds shall pay to the Reinsurer a premium of $21 million (United States Dollars twenty-one million) in consideration of the Reinsurer's agreement to include Frontier Pacific as a Reinsured under the Agreement. With respect to Frontier Pacific, references to "Effective Date" in the Reinsurance Agreement are understood to be to October 1, 2000. Such premium payment shall be payable as of October 1, 2000, and shall accrue interest at the rate of 3 month U.S. Treasury Securities in effect as of September 30, 2000. Payment of the premium due under this paragraph 3 shall be made in accordance with paragraph 9 below.

4.   The Reinsureds and Reinsurer agree that, as the Reinsureds' surety business is in run-off, in consideration of the payment by each Reinsured of the Surety Premium, the Reinsurance Agreement shall provide coverage to the each Reinsured in respect of its surety business so that such business is included within the definition of Covered Liabilities in the Reinsurance Agreement. It is expressly understood that the Reinsureds' surety business as referenced herein does not include their respective bail and appeal bond business. It is furthermore expressly understood that certain bonds are continuous in nature and will generate premium until exonerated. The definition of Covered Liabilities will include all required renewals and extensions of such bonds. It is furthermore expressly understood and agreed that, with respect to the surety business referenced herein, Article 3, Exclusions, section (E) is amended to provide an exception for the surety business. By execution of this Endorsement, any subject surety bond in-force as of December 31, 2000; and any subsequent extension or renewal thereof which the Reinsured is required to provide, shall be reinsured hereunder regardless of the date on which a loss is deemed to have occurred, been reported or discovered. The Surety Premium shall be payable in accordance with paragraph 9 below and by each Reinsured in the following amounts:

        For Frontier: the sum of $31,464,476 payable as of July 1, 2000,
                      together with interest thereon from July 1, 2000

**Page 3**

through date of receipt of payment by Reinsurer at the rate of 3 month U.S. Treasury Securities in effect as of June 30, 2000, less any sums paid in respect of such business from July 1, 2000 through date of receipt of payment by Reinsurer, plus premium earned after September 30, 2000 on all bonds (net of external acquisition costs), which shall be in addition to the premium referenced above and paid to the Reinsurer as earned, on a quarterly basis.

For Frontier Pacific:

the sum of $6,089,799, payable as of October 1, 2000, together with interest thereon from October 1, 2000 through date of receipt of payment by Reinsurer at the rate of 3 month U.S. Treasury Securities in effect as of September 30, 2000, less any sums paid in respect of such business from October 1, 2000 through date of receipt of payment by Reinsurer, plus premium earned after September 30, 2000 on all bonds (net of external acquisition costs), which shall be in addition to the premium referenced above and paid to the Reinsurer as earned, on a quarterly basis.

It is understood and agreed that, as premium earned after September 30, 2000 (net of external acquisition costs) is paid to Reinsurer each quarter prospectively as set forth above, the Agreement shall be endorsed to increase the Reinsurers aggregate limit of liability set forth in paragraph 2 above, and the respective sublimits for each Frontier and Frontier Pacific as applicable for each company, on a dollar-for-dollar basis for each dollar of earned premium (net of external acquisition costs) actually paid to Reinsurer in such quarter.

5.    With effect from the Effective Date of the Reinsurance Agreement, Article 4, Definitions, section C, is hereby deleted and replaced with the following:

Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean the net liability of the Reinsured (i.e., the liability of the Reinsured less all Reinsurance Recoverables) in respect of Covered Liabilities paid on or after the Effective Date, save as otherwise excluded under Article 3. Ultimate Net Loss shall include, but is not limited to, punitive damages, settlements, judgments, arbitration panel awards, claim payments, Allocated Loss Adjustment Expenses, Unallocated Loss Adjustment Expenses, Administrative Costs, expenses and fees for determining coverage under any Insurance Policy/Reinsurance Contract, and any other fees or expenses

Page 4

for which the Reinsured is liable in respect of its net obligations for Covered Liabilities.

6.   With effect from the Effective Date of the Reinsurance Agreement, a new subsection H is added to Article 4, Definitions, as follows:

Wherever used in this Reinsurance, the term "Reinsurance Recoverables" shall mean those sums due or to become due to Reinsured from all reinsurance coverages of any kind (other than this Reinsurance) applicable to the Covered Liabilities as of the Effective Date (i.e. all reinsurance in place relating to the business from which any and all Covered Liabilities arise as of the Effective Date). The Reinsurance Recoverables shall be deemed collected as and when the Reinsured makes any payment on the Covered Liabilities which would involve the applicable reinsurance coverage, and the Reinsurer hereunder shall be liable only for that portion of the loss, Allocated Loss Adjustment Expenses or Unallocated Loss Adjustment Expenses paid by the Reinsured net of the Reinsurance Recoverables, whether or not they are actually collected by Reinsured and notwithstanding the failure of the Reinsured to make such collection, including but not limited to the insolvency of any reinsurer, the refusal to pay of any reinsurer or the compromise or commutation of any reinsurance coverage applicable to the Covered Liabilities. It is the express intention of the parties hereto that the Reinsured shall not assign or turn over to the Reinsurer any reinsurance to which it is entitled in connection with the Covered Liabilities, and that the Reinsurer shall not participate in the proceeds of any actual reinsurance recoveries recouped by the Reinsured in connection with the Covered Liabilities.

7.   With effect from the Effective Date of the Reinsurance Agreement, Article 5, Salvages, Subrogation and Other Recoveries, is deleted and replaced with the following:

The Reinsurer shall be subrogated, as respects any Ultimate Net Loss for which the Reinsurer shall actually pay or becomes liable to pay, but only to the extent of the amount of payment by, or the amount of liability of, the Reinsurer, to all rights of the Reinsured against any person or other entity who may be legally responsible in damages for said Ultimate Net Loss. The Reinsured hereby agrees to enforce such rights. In the event the Reinsured shall fail or neglect to do so, the Reinsurer is hereby authorized and empowered to bring any appropriate action in the name of the Reinsured or in the name of a reinsured or insured under a reinsurance contract or insurance policy reinsured herein to enforce such rights. It is expressly understood that this Article 5 does not apply to any reinsurance recoveries of the Reinsured.

Page 5

EX. A p108

In determining the amount of recoveries, salvages or reimbursements, there shall first be deducted from any amount recovered the expenses incurred in effecting the recovery (excluding salaries and expenses of officers and employees of the Reinsured).

All salvages, recoveries or reimbursements, after deduction of all expenses allowed as set forth above, recovered and received subsequent to an Ultimate Net Loss reimbursement by Reinsurer under this Contract shall be applied as if recovered and received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto; provided that nothing in this Article shall be construed to mean that Ultimate Net Losses under this Contract are not recoverable until all salvage, recovery and reimbursement has been determined.

8.   In consideration of the amendments set forth in paragraphs 5, 6 and 7 of this Endorsement No. 1, Frontier Insurance Company shall pay to the Reinsurer an Additional Premium in the amount of $6,697,000 (United States Dollars six million six hundred ninety-seven thousand). Such Additional Premium shall be payable as of July 1, 2000, and shall accrue interest at the rate of 3 month U.S. Treasury Securities in effect as of June 30, 2000. Payment of such Additional Premium shall be made in accordance with paragraph 9 below.

9.   The Reinsurer shall be paid all sums due under this Endorsement No. 1 and specified in paragraphs 3, 4 and 8 above in immediately available U.S. funds by wire transfer no later than January 5, 2001 to the following instructions:

> Wells Fargo Bank Nebraska, N.A.
> Omaha, Nebraska
> ABA #104000058
> For the account of National Indemnity Company
> Account No. 1150001492

10.  All other terms and conditions of the Reinsurance Agreement remain unchanged to the extent not inconsistent with the foregoing.

11.  This Endorsement constitutes a valid and enforceable amendment of the Reinsurance Agreement as provided for in Article 11.

Page 6

JAN-05-2001 FRI 10:37 AM                          FAX NO.                          P. 08

IN WITNESS WHEREOF, the parties have executed this Endorsement No. 1 by their duly authorized representatives.

FRONTIER INSURANCE COMPANY                NATIONAL INDEMNITY COMPANY

By: _____            By: _____
    President
Date:  1-5-2001                          Date:

FRONTIER PACIFIC INSURANCE COMPANY

By _____
    President
Date:  1-5-2001

Page 7

JAN-05-2001 FRI 03:44 PM                        FAX NO.                        P. 02

JAN-05-2001 14:39        ARGONAUT MIDWEST                                    P.02
JAN-05-2001 FRI 10:37 AM                        FAX NO.

**IN WITNESS WHEREOF, the parties have executed this Endorsement No. 1 by their duly authorized representatives.**

**FRONTIER INSURANCE COMPANY**          **NATIONAL INDEMNITY COMPANY**

By: _____            By: _____

Date:  1-5-2001                         Date:  1-5-2001

**FRONTIER PACIFIC INSURANCE COMPANY**

By: _____

Date:  1-5-2001

Page 7

TOTAL P.02

# EXHIBIT F

RECEIVED
REINSURANCE DIVISION

JUL 0 3 2002

FLORENCE CORNETT
REINSURANCE SPECIALIST

At IAS Part 19 of the Supreme Court
of the State of New York, County of
New York, at the Courthouse, 60
Centre Street, New York, New York
on the 10th day of October, 2001.

PRESENT:

HON. EDWARD H. LEHNER

JUSTICE

--------------------------------------------x

In the Matter of

The Application of

GREGORY V. SERIO, as Superintendent of Insurance
of the State of New York, for an order to take
possession of the property of and rehabilitate

FRONTIER INSURANCE COMPANY

--------------------------------------------x

Index No.: 405090/01

ORDER OF
REHABILITATION

Petitioner, Gregory V. Serio, Superintendent of Insurance of the State of New

York (the "Superintendent"), having moved this Court for an order to take possession of

the property of and rehabilitate Frontier Insurance Company ("Frontier");

NOW, upon reading and filing the order to show cause signed August 27,

2001, the petition of Gregory V. Serio, Superintendent of Insurance, by Kevin Rampe,

First Deputy Superintendent, duly verified August 24, 2001 and the emergency affidavit

of Kevin Rampe sworn to on August 27, 2001; (the exhibits annexed thereto); the cross

motion by Frontier Insurance Group dated September 7, 2001, the annexed proposed

petition, the affidavit of Suzanne Loughlin sworn to on September 7, 2001, the exhibits

annexed thereto; the affirmation in opposition by Mary Nicholls dated September 7,

2001; the affirmation in opposition by Adam J. Glatt dated September 7, 2001; the

affidavit of Kevin Rampe sworn to on October 3, 2001, and the exhibits annexed thereto;