1  **MUSICK, PEELER & GARRETT** LLP
   ATTORNEYS AT LAW
2  One Wilshire Boulevard, Suite 2000
   Los Angeles, California 90017-3383
   TELEPHONE 213-629-7612
3  FACSIMILE (213) 624-1376

4  Susan J. Field (State Bar No. 086200)
   s.field@mpglaw.com
   Richard S. Conn (State Bar No. 065513)
5  r.conn@mpglaw.com
   Barbora Pulmanova (State Bar No. 234028)
6  b.pulmanova@mpglaw.com

7  Attorneys for NATIONAL INDEMNITY COMPANY

8  ## UNITED STATES DISTRICT COURT

9  ## SOUTHERN DISTRICT OF CALIFORNIA

10

11  STEVE POIZNER, INSURANCE
    COMMISSIONER OF THE STATE
12  OF CALIFORNIA, in his capacity as
    Liquidator of Frontier Pacific Insurance
13  Company,

14          Plaintiff,

15      vs.

16  NATIONAL INDEMNITY
    COMPANY, a Nebraska corporation;
17  and DOES 1 through 10,

18          Defendant.

| | |
|---|---|
| Case No. 08 CV 772 L (POR) | |
| Assigned to the Hon. M. James Lorenz Courtroom 14 | |
| Complaint Filed: March 17, 2008 | |

**DECLARATION OF JOSEPH CASACCIO IN SUPPORT OF DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO STAY PROSECUTION OF ACTION PENDING ARBITRATION OF CLAIMS**

19  [NOTICE OF MOTION;
20  MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF RICHARD S. CONN; AND
21  [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH]
22

23  DATE:      **August 18, 2008**
    TIME:      **10:30 a.m.**
24  COURTROOM:  **14**

25  ///

26  ///

27  ///

28  ///

593916.1                                    1
**DECLARATION OF JOSEPH CASACCIO IN SUPPORT OF DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO STAY PROSECUTION OF ACTION PENDING ARBITRATION OF CLAIMS**

# DECLARATION OF JOSEPH CASACCIO

I, Joseph Casaccio, declare:

1.    At all times herein pertinent I was, and now am, Vice President of National Insurance Company ("NICO") defendant herein. As such, the facts set forth herein are known to me personally and if called as a witness I could competently testify thereto.

2.    By means of the instant motion, NICO seeks an order staying these proceedings pending arbitration of the controversies framed by the pleadings. The agreements providing for binding arbitration of disputes with Frontier Pacific Insurance Company ("FPIC") are attached to the Complaint of Plaintiff Insurance Commissioner (the "Commissioner) as Exhibits A (the "Center Re Agreement"), C (the "Novation Agreement"), D (the "NICO Agreement"), E (Endorsement 1 to the NICO Agreement) and G ("Endorsement 2 to the NICO Agreement"). True and correct copies of such exhibits are attached hereto for the convenience of the Court as Exhibits 4A, 4C, 4D, 4E and 4G. A true and correct copy of Endorsement No. 3 to the NICO Agreement, Exhibit H to the Comissioner's Complaint, is attached hereto as Exhibit 4H.

3.    The Center Re Agreement and the NICO Agreement each provide for reinsurance of risks in multiple states. These contracts thus affect interstate commerce.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___13th___ of June, 2008 at Stamford, Connecticut.

_____
Joseph Casaccio

589576.1

2

DECLARATION OF JOSEPH CASACCIO IN SUPPORT OF DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO STAY PROSECUTION OF ACTION PENDING ARBITRATION OF CLAIMS

1

## TABLE OF CONTENTS OF EXHIBITS

2

## TO DECLARATION OF JOSEPH CASACCIO

3

4

5

**Pages**

6   **Exhibit 4A** -   The Center Re Agreement..........................................................4-29

7   **Exhibit 4C** -   The Novation Agreement..........................................................30-37

8   **Exhibit 4D** -   The NICO Agreement.............................................................38-48

9   **Exhibit 4E** -   Endorsement 1 to the NICO Agreement.................................49-57

10  **Exhibit 4G** -   Endorsement 2 to the NICO Agreement.................................58-63

11  **Exhibit 4H** -   Endorsement 3 to the NICO Agreement.................................64-70

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

593916.1

3

# EXHIBIT 4A

Casaccio Decl.
Ex. 4A, Page 4

Coinsured Aggregate Excess of Loss
Reinsurance Agreement
Effective: January 1, 1995

issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

E. W. Blanch Co.

Reinsurance Services

3500 West 80th Street

Minneapolis, Minnesota  55431

K:\W\A\00115.DOC

# Table of Contents

| Article | | Page |
|---|---|---|
| I | Term | 1 |
| II | Territory | 1 |
| III | Business Covered | 2 |
| IV | Exclusions | 2 |
| V | Accident Year Limit | 4 |
| VI | Aggregate Limit | 4 |
| VII | Accident Year Retention | 4 |
| VIII | Coinsurance | 5 |
| IX | Accident Year Reinsurance Premium | 5 |
| X | Loss Settlements | 6 |
| XI | Funds Withheld | 6 |
| XII | Experience Account | 8 |
| XIII | Reinsurer's Margin | 9 |
| XIV | Commutation | 9 |
| XV | Reports and Remittances | 10 |
| XVI | Taxes | 11 |
| XVII | Covenants of the Company | 11 |
| XVIII | Definitions | 12 |
| XIX | Ultimate Net Loss | 13 |
| XX | Net Retained Lines | 14 |
| XXI | Right of Offset | 14 |
| XXII | Nonpayment of Premium and Losses | 15 |
| XXIII | Access to Records (BRMA 1C) | 15 |
| XXIV | Currency (BRMA 12A) | 15 |
| XXV | Errors and Omissions (BRMA 14A) | 16 |
| XXVI | Insolvency | 16 |
| XXVII | Arbitration | 17 |
| XXVIII | Service of Suit (BRMA 49D) | 18 |
| XXIX | Agency Agreement | 18 |
| XXX | Regulatory Authority | 18 |
| XXXI | Other Terms and Conditions | 19 |
| XXXII | Intermediary | 20 |
| | Schedule A | |
| | Schedule B | |

Casaccio Decl.
Ex. 4A, Page 6

# Coinsured Aggregate Excess of Loss
## Reinsurance Agreement
### Effective: January 1, 1995

issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.
*(hereinafter referred to collectively as the "Company")*

by

Centre Reinsurance
Company of New York
New York, New York
*(hereinafter referred to as the "Reinsurer")*

## Article I - Term

A.   The term ("Term") of this Agreement shall commence at 12:01 a.m., Eastern Standard Time, January 1, 1995 ("Effective Date") and shall remain in force until 11:59 p.m., Eastern Standard Time, December 31, 1997 ("Expiration Date"), unless canceled earlier.

B.   Either party may cancel this Agreement as provided for in Article IX - Accident Year Reinsurance Premium, Article XVII - Covenants of the Company, Article XXI - Right of Offset and Article XXII - Nonpayment of Premium and Losses.  Either party may rescind this Agreement as provided for in Article XXX - Regulatory Authority.

## Article II - Territory

This Agreement shall apply to policies issued for risks located in the United States of America, its territories, its possessions, the Commonwealth of Puerto Rico, the Caribbean, the District of Columbia and Canada.

F:\FRA\DOC112.DOC

*E. W. BLANCH CO.*
Reinsurance Services
Page 1

Casaccio Decl.
Ex. 4A, Page 7

## Article III - Business Covered

A.   Subject to the terms, conditions and limits, including, but not limited to, the Accident Year Limit and the Aggregate Limit of this Agreement, the Reinsurer agrees to indemnify the Company on an aggregate excess of loss basis for each covered Accident Year for Ultimate Net Loss incurred by the Company on all business written by the Company, except as excluded, in excess of the Accident Year Retention, and net of the amount of Ultimate Net Loss retained in accordance with Article VIII - Coinsurance, arising out of losses occurring during the Term. It is understood that the Company shall have the option to exclude new programs by providing the Reinsurer with prior written notice of its intent within 90 days of inception of the program.

B.   It is understood and agreed that losses arising under policies covered hereunder shall be allocated to an Accident Year according to the instructions for compiling the Company's Annual Statement as filed with the Company's state of domicile.

## Article IV - Exclusions

A.   This Agreement does not apply to and specifically excludes business written and classified by the Company as:

   1.   Reinsurance assumed (other than intercompany reinsurance between the reinsured companies and reinsurance assumed from the NCCI National Workers' Compensation Pool) under obligatory reinsurance agreements, except agency reinsurance where the policies involved are to be reunderwritten in accordance with the underwriting standards of the Company and reissued as the Company's policies at the next anniversary or expiration date.

   2.   Loss and/or damage and/or costs and/or expenses arising from seepage and/or pollution and/or contamination, other than contamination from smoke. Nevertheless, this exclusion shall not apply (a) if such interests are insured under a policy containing the Company's standard pollution limitation in effect at policy inception, or (b) where the Company issues a pollution coverage endorsement or policy under its Pest Control Program. This exclusion does not preclude payment of the cost of removing debris of property damaged by a loss otherwise covered hereunder, subject always to a limit of 25% of the Company's property loss under the applicable original policy.

   3.   As regards interests which at time of loss or damage are on shore, no liability shall attach hereto in respect of any loss or damage which is occasioned by war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, or martial law or confiscation by order of any government or public authority. This War Exclusion Clause shall not, however, apply to interests which at time of loss or damage are within the territorial limits of the United States of America (comprising the Fifty States of the Union, the District of Columbia, and including

Casaccio Decl.
Ex. 4A, Page 8

United States ownership), Canada, St. Pierre and Miquelon, provided such interests are insured under policies containing a standard war or hostilities or warlike operations exclusion clause. Nevertheless, this clause shall not be construed to apply to loss or damage occasioned by Riots, Strikes, Civil Commotion, Vandalism, Malicious Damage, including acts committed by agents of any government, party or faction engaged in war, hostilities or other warlike operation, provided such agents are acting secretly and not in connection with any operations of military or naval armed forces in the country where the interest insured is situated.

4. Nuclear risks as defined in the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (U.S.A.)," the "Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance (Canada)," the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Liability - Reinsurance (Canada)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (U.S.A.)" the "Nuclear Incident Exclusion Clause - Boiler and Machinery - Reinsurance (Canada)" and the "Nuclear Energy Risks Exclusion Clause (Reinsurance) (1994) (Worldwide Excluding U.S.A. & Canada) attached to and forming part of this Contract.

5. Liability as a member, subscriber or reinsurer of any Pool (other than the NCCI National Workers' Compensation Pool), Syndicate or Association; and any FAIR Plan or other combination of insurers or reinsurers formed for the purpose of covering specific perils, specific classes of business or for the purpose of insuring risks located in specific geographical areas.

6. Liability of the Company arising by contract, operation of law, or otherwise, from its participation or membership, whether voluntary or involuntary, in any insolvency fund. "Insolvency fund" includes any guaranty fund, insolvency fund, plan, pool, association, fund or other arrangement, however denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

7. Rehabilitation, residual market, Second Injury Fund and Guarantee Fund and similar type assessments.

8. Bid Bonds, Bail Bonds, License and Permit Bonds, Custom House Bonds, and Miscellaneous Bonds.

9. Retrospectively rated insurance (loss sensitive insurance policies).

10. Policyholder dividends.

Casaccio Decl.
Ex. 4A, Page 9

## Article V - Accident Year Limit

A.  The Reinsurer's obligation to indemnify the Company in respect of Ultimate Net Loss in excess of the sum of the Accident Year Retention and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article VIII - Coinsurance shall be subject to a total limit of liability for that Accident Year equal to 175% of Accident Year Reinsurance Premium.

B.  The Accident Year Limits shall be subject to Article VI - Aggregate Limit, and shall be used chronologically by Accident Year, i.e., Ultimate Net Loss is deemed to be ceded from the earliest Accident Year first, the next earliest second, and so on.  In the event that the estimate of ceded Ultimate Net Loss for an Accident Year changes over time, the cessions of Ultimate Net Loss by Accident Year shall be adjusted accordingly.

## Article VI - Aggregate Limit

A.  The Reinsurer's obligation of indemnity to the Company in respect of Ultimate Net Loss in excess of the Accident Year Retentions and net of the amount of Ultimate Net Loss retained by the Company in accordance with Article VIII - Coinsurance shall be subject to an Aggregate Limit of liability under this Agreement equal to the lesser of:

  1.  175% of the Accident Year Reinsurance Premiums paid for all covered Accident Years; or

  2.  $162,500,000.

B.  The Aggregate Limit of liability hereunder is subject to adjustment as provided for in Article XVII - Covenants of the Company, Article XXI - Right of Offset and Article XXII - Nonpayment of Premium and Losses.  Under no circumstances shall the total liability of the Reinsurer under or related to this Agreement exceed the Aggregate Limit.

## Article VII - Accident Year Retention

No claim shall be made under this Agreement for an Accident Year unless and until the Company shall have first incurred Ultimate Net Loss on Business Covered during the Accident Year in question in excess of an Accident Year Retention which shall be equal to the product of the Subject Net Earned Premium Income for the Accident Year and the following applicable factor:

| Accident Year | Applicable Factor |
|---|---|
| 1/1/95 through 12/31/95 | 66.0% |
| 1/1/96 through 12/31/96 | 65.0% |
| 1/1/97 through 12/31/97 | 64.0% |

Casaccio Decl.
Ex. 4A, Page 10

## Article VIII - Coinsurance

If for any Accident Year the Ultimate Net Loss is greater than the sum of the Accident Year Retention and the Reinsurer's applicable Accident Year Limit hereunder for that Accident Year, the Company shall coinsure and retain net for its own account a percentage of Ultimate Net Loss in excess of the Accident Year Retention equal to:

100% less the percentage derived by dividing (a) by (b), where,

(a) equals the Accident Year Limit, and

(b) equals the amount of Ultimate Net Loss in excess of the Accident Year Retention.

## Article IX - Accident Year Reinsurance Premium

A.  Subject to Article XI - Funds Withheld, the Company shall pay to the Reinsurer an Accident Year Reinsurance Premium in an amount equal to the product of the following net rates and the Company's projected Subject Earned Premium Income for each covered Accident Year, annually in advance:

| Accident Year | Net Rate |
|---|---|
| 1/1/95 - 12/31/95 | 14.0% |
| 1/1/96 - 12/31/96 | 13.5% |
| 1/1/97 - 12/31/97 | 13.0% |

B.  Appropriate adjustment of the Accident Year Reinsurance Premium shall be made and is payable within 60 days after each December 31. The Accident Year Reinsurance Premium shall be subject to a minimum amount equal to $20 million.

C.  If the projected Accident Year Reinsurance Premium as calculated by multiplying the above net rates by the Company's projected Subject Earned Premium Income (as identified in the planning process of the Company) for the Accident Year is less than the minimum premium, the Company may elect to commute this Agreement effective as of the beginning of such Accident Year.

D.  Upon such commutation, in accordance with paragraph C of Article IX, notice of which must be given in writing within 90 days after the commencement of such Accident Year, the Company shall, notwithstanding anything contained to the contrary in this Agreement, retain all amounts previously designated as "Funds Withheld," and the Reinsurer shall completely and finally be released in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under this Agreement.

Casaccio Decl.
Ex. 4A, Page 11

## Article X - Loss Settlements

The Reinsurer agrees to abide by the loss settlements made by the Company, provided such loss settlements are within the terms and conditions of the Business Covered and this Agreement. The Reinsurer agrees to pay all Ultimate Net Loss due hereunder and paid by the Company (or payable by the Company in case of insolvency in accordance with Article XXVI - Insolvency) quarterly in arrears, and payment will be due within forty-five (45) days following receipt of an account statement submitted by the Company to the Reinsurer. Ultimate Net Loss payments due by the Reinsurer shall first be paid by way of offset against the balance of the Funds Withheld Account until such account is exhausted.

## Article XI - Funds Withheld

A.  Subject to the terms herein, the Company shall retain any and all Reinsurance Premiums due hereunder on a funds withheld basis, provided however, that the Reinsurer's Margin shall be paid in cash to the Reinsurer and shall not be affected by the terms of this Article. In consideration of the Reinsurer agreeing to the Funds Withheld provision, the Company agrees that the Funds Withheld Balance may be set off by the Reinsurer against liability of any nature whatsoever (whether then contingent, due and payable, or in the future becoming due) that it may then have under this Agreement, and such setoff shall occur as a condition precedent to any payments by the Reinsurer hereunder.

B.  A "Funds Withheld Account" shall be maintained for each Accident Year covered under this Agreement. The "Funds Withheld Balance" shall equal the sum of the "Funds Withheld Account" for the Accident Years covered under this Agreement. The "Funds Withheld Account" for an individual Accident Year shall, at any point in time, be defined as:

    1.  100% of the cumulative Accident Year Reinsurance Premium due hereunder for the Accident Year, less

    2.  The cumulative Reinsurer's Margin paid for the Accident Year as defined herein, less

    3.  100% of cumulative Ultimate Net Loss payments (or offsets against this balance) for the Accident Year made by the Reinsurer, plus

    4.  The cumulative Funds Withheld Investment Credit for the Accident Year since the inception of this Agreement.

C.  Accident Year Reinsurance Premium, net of Reinsurer's Margin, shall be credited to the Funds Withheld Account on the date such monies are payable.

D.  Ultimate Net Loss due from the Reinsurer shall be charged against the Funds Withheld Account on the date such monies are due.

Casaccio Decl.
Ex. 4A, Page 12

E.   The Funds Withheld Investment Credit in any one calendar year shall be computed
separately for each Funds Withheld Account and shall, for any Funds Withheld Account,
equal the average daily balance of the Funds Withheld Account during that calendar year (or
portion thereof) multiplied by the interest credit rate (or pro rata portion thereof) applicable
to the individual Accident Year, credited annually, in arrears. The cumulative Funds
Withheld Investment Credit for any Funds Withheld Account shall equal the sum of the
Funds Withheld Investment Credit for such account for each calendar year since the
inception of this Agreement.

F.   The interest credit rate applicable to the Funds Withheld Account for an Accident Year
covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as
published in *The Wall Street Journal* on the first business day of such Accident Year plus
seventy (70) basis points as documented in the attached Schedule B of this Agreement.

G.   The Company promises to pay to the Reinsurer the Funds Withheld Balance immediately
upon the earlier of: 1) Commutation of this Agreement in accordance with Article XIV -
Commutation, 2) an Event of Default, 3) Rescission of the Agreement in accordance with
Article XXX - Regulatory Authority, 4) Cancellation in accordance with paragraph B of
Article XXI - Right of Offset, or 5) December 31, 2010. The Company shall not have the
right to prepay all or part of the Funds Withheld Balance without the Reinsurer's express
written consent.

H.   The following shall be defined as "Events of Default," and the whole of the Funds Withheld
Balance shall, without notice of demand of any kind being required, become immediately
due and payable, together with all accrued interest and other unpaid sums owing in relation
thereto:

1.   Payment Defaults - The Company fails to make any payment under this Agreement
when due and in the manner therein provided, except where the Reinsurer receives the
overdue payment within fifteen business days of the nonpayment; or

2.   Executions - Creditors attach or take possession of or distress, execution, sequestration,
seizure, attachment or other equivalent or analogous process is levied or enforced upon
or sued out against any material amount of the Company's assets; or

3.   Insolvency - The Company commences a proceeding or proceedings are commenced
against it seeking dissolution, winding-up, liquidation, administration, reorganization,
suspension or compromise of payments or other relief under any applicable
bankruptcy, insolvency or other similar law or seeking the appointment of an
administrator or a trustee, receiver, manager, receiver-manager, liquidator, custodian,
curator or other similar official of it or any substantial part of the Company's assets, or
the Company consents to any such relief (including any bankruptcy petition) or
appointment in involuntary proceedings taken against it, or makes a bulk sale of its
assets or a general assignment or proposal for the benefit of creditors, or fails or admits

R-WSA0000115.DOC

*E. W. BLANCH CO.*
Reinsurance Services
Page 7

Casaccio Decl.
Ex. 4A, Page 13

its inability to pay its debts as they become due, or suspends or ceases or threatens to suspend or cease carrying on business; or it takes any action in furtherance of any of the foregoing.

## Article XII - Experience Account

A.  A notional Experience Account shall be calculated by the Reinsurer from the Effective Date of this Agreement and maintained until there is a complete and final release of all the Reinsurer's obligations to the Company.

B.  An "Experience Account" shall be maintained for each Accident Year covered under this Agreement. The Experience Account Balance shall equal the sum of the individual Experience Accounts for all Accident Years covered under this Agreement. The "Experience Account" for an individual Accident Year shall, at any point in time, be defined as:

   1.  100% of the cumulative Accident Year Reinsurance Premium received by the Reinsurer (or Funds Withheld in accordance with Article XI - Funds Withheld) for such Accident Year, less

   2.  The cumulative Reinsurer's Margin paid for the Accident Year as defined herein, less

   3.  100% of cumulative Ultimate Net Loss payments (or offsets against Funds Withheld) for the Accident Year made by the Reinsurer, plus

   4.  The cumulative Experience Account Investment Credit for the Accident Year since inception of this Agreement.

C.  Accident Year Reinsurance Premium, net of the Reinsurer's Margin, shall be credited to the Experience Account on the date such monies are payable.

D.  Ultimate Net Loss payments due from the Reinsurer shall be charged against the Experience Account on the date such monies are due.

E.  The Experience Account Investment Credit in any one calendar year shall be computed separately for each Experience Account and shall, for any Experience Account, equal the average daily balance of the Experience Account during that calendar year (or portion thereof) multiplied by the interest credit rate (or pro rata portion thereof) applicable to the individual Accident Year, credited annually, in arrears. The cumulative Experience Account Investment Credit for any Experience Account shall equal the sum of the Experience Account Credit for such account for each calendar year since the inception of this Agreement.

Casaccio Decl.
Ex. 4A, Page 14

F.   The interest credit rate applicable to the Experience Account through December 31, 1998 for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year plus seventy (70) basis points as documented in the attached Schedule B of this Agreement.

G.   The interest credit rate applicable to the Experience Account after December 31, 1998 for an Accident Year covered under this Agreement shall be equal to the five (5) year U.S. Treasury note rate as published in *The Wall Street Journal* on the first business day of such Accident Year minus one hundred thirty (130) basis points .

## Article XIII - Reinsurer's Margin

The Reinsurer's Margin shall be equal to 8.0% of the Accident Year Reinsurance Premium payable under this Agreement.

## Article XIV - Commutation

A.   Subject to the terms of this Article, the Company may, at its sole option, commute this Agreement at any December 31, beginning on December 31, 1999, with ninety (90) days prior written notice by the Company to the Reinsurer.

B.   If the Company elects to commute this Agreement, the Reinsurer shall pay to the Company the following amounts within sixty (60) business days of the date of Commutation:

   1.   Commuted Value of ceded unpaid Ultimate Net Loss:

      a.   If, at the time of Commutation, the ceded unpaid Ultimate Net Loss, as defined herein, is less than or equal to the balance in the Experience Account, the Reinsurer agrees to pay all ceded unpaid Ultimate Net Loss at the amount valued by the Company.

      b.   If, at the time of Commutation, the ceded unpaid Ultimate Net Loss is greater than the balance in the Experience Account, the ceded unpaid Ultimate Net Loss shall be commuted at a present value amount to be mutually agreed. If the present value amount of the ceded unpaid Ultimate Net Loss cannot be mutually agreed by the Company and the Reinsurer, then a mutually acceptable independent third party actuary shall be called upon to make an independent estimation of the present value amount of the ceded unpaid Ultimate Net Loss (the cost of which shall be shared equally by the Company and Reinsurer). If the actuary's estimation is acceptable to both Reinsurer and Company, then this Agreement shall be commuted at the value as estimated by the actuary. If the actuary's value is unacceptable to either the Company or the Reinsurer, or if the parties cannot agree

Casaccio Decl.
Ex. 4A, Page 15

on the selection of the actuary, then this Agreement will not be commuted at that time.

    2.  Contingent Commission - Upon Commutation under subparagraph 1 above, the Reinsurer shall pay to the Company a Contingent Commission equal to the positive balance, if any, of the Experience Account after deducting the value of the commuted ceded unpaid Ultimate Net Loss as per subparagraph 1 above.

C.  Payment of the ceded unpaid Ultimate Net Loss and Contingent Commission, if any, by the Reinsurer as described above shall constitute a complete and final release of the Reinsurer in respect of any and all of the Reinsurer's obligations of any nature whatsoever to the Company under or related to this Agreement.

## Article XV - Reports and Remittances

A.  The Company shall furnish to the Reinsurer within thirty-five (35) days after the close of each calendar quarter:

    1.  Quarterly account of Subject Earned Premium Income segregated by line of business (and for the total of all lines) covered under this Agreement;

    2.  Quarterly accounts of paid and unpaid Ultimate Net Loss segregated by the line of business (and for the total of all lines) covered under this Agreement;

    3.  Quarterly accounts of paid Ultimate Net Loss ceded under this Agreement which are due to be paid by the Reinsurer to the Company. As respects the Funds Withheld Balance, Ultimate Net Loss amounts shall be deemed to be paid as of the date the Reinsurer agrees to the amount to be paid and such agreement shall be made within forty-five (45) days after receipt of this account; and

    4.  A reconciliation of the Funds Withheld Balance from inception to the close of the most recent preceding quarter.

B.  The Reinsurer shall furnish to the Company, within thirty-five (35) days after the close of each quarter, a reconciliation of the Experience Account from inception to the close of the most recent preceding quarter.

C.  All amounts due and payable under this Agreement shall be remitted directly by wire transfer between the Company and the Reinsurer with notice to the Intermediary, unless such amounts are withheld by the Company in accordance with Article XI - Funds Withheld.

D.  Any late payments by either party shall accrue interest at a rate of 1% per month.

Casaccio Decl.
Ex. 4A, Page 16

## Article XVI - Taxes

The Company shall pay all taxes of any nature associated with this Agreement and undertakes not to claim any deduction of the premium hereon when making Canadian tax returns or when making tax returns, other than Income or Profits Tax returns, to any State or Territory of the United States of America or the District of Columbia. However, this Article shall not impose any liability on the Company for any income, capital gains, profits or other similar taxes payable by the Reinsurer in respect of its operations or this Agreement.

## Article XVII - Covenants of the Company

The Company hereby warrants the following:

A.  The Company agrees to notify the Reinsurer of proposed acquisitions whose business the Company desires covered under this Agreement and not to change its mix of business, policy limits profile, claims handling procedures, loss reserving process (including the allocation of loss adjustment expense between allocated and unallocated), or the levels of reinsurance protection in any manner from that in effect at the inception of this Agreement which materially affects this Agreement or the obligations of the parties hereunder, unless the Company has received the prior written approval of the Reinsurer to such changes or acquisitions. Such approval shall not be unreasonably withheld.

    In the event that the Company does not adhere to this Covenant, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.  It is further agreed that the Reinsurer shall be notified of changes in respect of the claims adjusting services currently provided by Pioneer Claim Management, Inc. ("Pioneer"), formerly Wright Adjusting Company. The Company's payments to Pioneer for claims adjustment services that are included in Ultimate Net Loss hereunder shall not exceed the fees as specified in Schedule 1 of the contract between Pioneer and the Company dated January 1, 1987, unless mutually agreed.

C.  The Company agrees that the maximum policy limit covered under this Agreement shall be $5,000,000 and that any policy limits issued in excess of $5,000,000 shall be deemed to be $5,000,000 for all purposes of this Agreement. The exceptions to this Covenant shall be: 1) with respect to policies classified as Workers' Compensation, Excess Workers' Compensation, or Employers Liability, the maximum limit shall be that required by statute in the state in which any losses incurred under said policies shall be deemed to have occurred; and 2) with respect to Surety business, the Company agrees that the maximum

Casaccio Decl.
Ex. 4A, Page 17

limit of policies covered under this Agreement is $6,000,000 per principal and that any loss otherwise reinsured hereunder in excess of $6,000,000 shall be deemed to be $6,000,000 for purposes of this Agreement.

D.    It is further warranted by the Company that inuring reinsurance agreements as set forth in Exhibit A attached to and forming part of this Agreement shall remain in place during the Term, or it is so deemed, unless the Company has received the prior written approval of the Reinsurer to allow changes in the inuring reinsurance structure. Such approval shall not be unreasonably withheld.

## Article XVIII - Definitions

A.    "Subject Earned Premium Income" shall mean gross premiums earned during the Accident Year, less return premiums, less premiums for reinsurance ceded which inures to the benefit of this Agreement and amounts paid to the Florida Hurricane Catastrophe Fund.

B.    "Subject Net Earned Premium Income" shall mean Subject Earned Premium Income during the Accident Year less premiums ceded to this Agreement.

C.    "Accident Year" shall mean each period of twelve consecutive months following the Effective Date of this Agreement or following the anniversary date thereof falling within the Term of this Agreement, or if the period between the Effective Date or any anniversary date and the cancellation date of this Agreement is less than twelve months, such lesser period.

D.    "Extra Contractual Obligations" are defined as those liabilities not covered under any other provision of this Agreement and which arise from the handling of any claim on Business Covered hereunder, such liabilities arising because of, but not limited to, the following: failure by the Company to settle within the policy limit, or by reason of alleged or actual negligence, fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

The date on which any Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original accident, casualty, disaster or loss occurrence.

However, there shall be no recovery hereunder where the loss has been incurred due to the fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee of the Company acting individually or collectively or in collusion with a member of the Board of Directors, a corporate officer, supervisory employee or partner of any other corporation, partnership, or organization involved in the defense or settlement of a claim on behalf of the Company.

Casaccio Decl.
Ex. 4A, Page 18

E.   "Excess of Original Policy Limits Loss" shall mean any loss of the Company in excess of
the limit of its original policy, such loss in excess of the limit having been incurred because
of failure by it to settle within the policy limit or by reason of alleged or actual negligence,
fraud or bad faith in rejecting an offer of settlement or in the preparation of the defense or in
the trial of any action against its insured or in the preparation of an appeal consequent upon
such action.

However, there shall be no recovery hereunder where the loss has been incurred due to
fraud by a member of the Board of Directors, a corporate officer, or a supervisory employee
of the Company acting individually or collectively or in collusion with a member of the
Board of Directors, a corporate officer, a supervisory employee or partner of any other
corporation, partnership, or organization involved in the defense or settlement of a claim on
behalf of the Company.

## Article XIX - Ultimate Net Loss

A.   "Ultimate Net Loss" shall mean the actual loss incurred by the Company and all Allocated
Loss Adjustment Expenses ("ALAE") on the Business Covered on the Company's Net
Retained Lines, after making deductions for all recoveries, including, but not limited to, the
Florida Hurricane Catastrophe Fund, salvages and subrogations and shall include 80% of
the amounts of any Extra Contractual Obligations and 80% of the amounts of any Excess of
Original Policy Limits Loss.

B.   ALAE shall mean all legal expenses and other expenses (including interest accruing before
and/or after entry of judgments) incurred by the Company in connection with the
investigation, adjustment, settlement or litigation of claims or losses, including salaries and
expenses of the Company's field employees while adjusting such claims or losses and
expenses of the Company's officials incurred in connection with claims and losses. ALAE
includes, but is not limited to, the cost of claim services currently provided to Company by
Pioneer Claim Management, Inc. ("Pioneer"). Should such services be provided by a third
party or brought in house (such as through the merger of Pioneer into the Company), the
cost of such services shall be deemed to be ALAE.

However, items that the Company currently does not allocate as expenses to Pioneer and
currently categorizes as unallocated loss adjustment expenses in its Annual Statement
(except as provided above) such as salaries of certain of the Company's officials and certain
overhead charges such as rent, postal, lighting, cleaning, etc., shall not be included in
ALAE.

C.   All salvages, recoveries or payments recovered or received subsequent to a loss settlement
under this Agreement shall be applied as if recovered or received prior to the aforesaid
settlement and all necessary adjustments shall be made by the parties hereto, provided
always that nothing in this clause shall be construed to mean that Ultimate Net Loss under

this Agreement are not recoverable until the Company's Ultimate Net Loss has been ascertained.

D.   The Ultimate Net Loss, as determined by the Company, is subject to agreement by the Reinsurer. If the Reinsurer disagrees with the Ultimate Net Loss determined by the Company, a mutually agreed upon independent national actuarial firm shall be engaged to evaluate the Ultimate Net Loss covered under this Agreement, and such evaluation shall be binding. Such cost shall be shared equally by the Company and the Reinsurer. If the parties fail to agree on the selection of an independent national actuarial firm, each of them shall name two, of whom the other shall decline one, and the decision shall be made by drawing lots.

E.   Notwithstanding anything contained to the contrary in this Agreement, in arriving at the Ultimate Net Loss of the Company under this Agreement, property catastrophe losses shall be limited to $7,000,000 per Accident Year.

## Article XX - Net Retained Lines

A.   This Agreement applies only to that portion of any policy which the Company retains net for its own account, and in calculating the amount of any loss hereunder and also in computing the amount or amounts in excess of which this Agreement attaches, only loss or losses in respect of that portion of any policy which the Company retains net for its own account shall be included.

B.   The amount of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other reinsurer(s), whether specific or general, any amounts which may have become due from such reinsurer(s), whether such inability arises from the insolvency of such other reinsurer(s) or otherwise.

## Article XXI - Right of Offset

A.   The Company and the Reinsurer may offset any balance or amount due from one party to the other under this Agreement.

B.   In extension and not in limitation to paragraph A above, the Reinsurer shall have an absolute right to offset any amounts due to the Company against the Funds Withheld Balance. In the event that this right of offset between the Company and the Reinsurer is specifically disallowed or judged to be unenforceable by any court of competent jurisdiction, arbitration panel or regulatory body, then all amounts in the Funds Withheld Balance shall immediately become due and payable in full. If the Funds Withheld balance is not remitted to the Reinsurer within fifteen (15) days, the Reinsurer shall have the option to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the Aggregate

F. 95\A000015.DOC

Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

## Article XXII - Nonpayment of Premium and Losses

A.  Notwithstanding the foregoing, in the event that the Company fails to pay an Accident Year Reinsurance Premium within 15 days of the date such premium is due, the Reinsurer shall notify the Company in writing via registered mail of the overdue amount. In the event that the Company does not remit the overdue amount to the Reinsurer within 15 days of receiving such notification from the Reinsurer, the Reinsurer shall have the right to immediately cancel this Agreement by mailing the Company a written notice of cancellation, and the remaining Aggregate Limit, notwithstanding any provision to the contrary contained herein, shall be immediately reduced to an amount equal to the positive balance in the Experience Account (or zero if the Experience Account Balance is negative) as of the date of cancellation. The mailing of such notice shall be sufficient notice, and the effective date of cancellation shall be the date the notice of cancellation was posted.

B.  In the event the Reinsurer fails to pay losses recoverable from the Reinsurer under the Reports and Remittances terms of this Contract within 15 days of the date such loss payments are due, the Company shall notify the Reinsurer in writing via registered mail of the overdue amounts. In the event that the Reinsurer does not remit the overdue amounts to the Company within 15 days of receiving such notification from the Company, the Company shall have the right to immediately cancel this Agreement by mailing a written Notice of Cancellation to the Reinsurer. The mailing of such Notice shall be sufficient notice and the effective date of cancellation shall be the date the Notice of Cancellation was posted.

## Article XXIII - Access to Records (BRMA 1C)

The Company shall place at the disposal of the Reinsurer at all reasonable times, and the Reinsurer shall have the right to inspect through its designated representatives, during the term of this Contract and thereafter, all books, records and papers of the Company in connection with any reinsurance hereunder, or the subject matter hereof.

## Article XXIV - Currency (BRMA 12A)

A.  Whenever the word "Dollars" or the "$" sign appears in this Agreement, they shall be construed to mean United States Dollars and all transactions under this Agreement shall be in United States Dollars.

Casaccio Decl.
Ex. 4A, Page 21

B.  Amounts paid or received by the Company in any other currency shall be converted to United States Dollars at the rate of exchange at the date such transaction is entered on the books of the Company.

## Article XXV - Errors and Omissions (BRMA 14A)

Errors and omissions on the part of the Company shall not invalidate the reinsurance under this Agreement, provided such errors or omissions are corrected promptly after discovery thereof, but the liability of the Reinsurer under this Agreement or any exhibits or endorsements attached hereto shall in no event exceed the limits specified herein, nor be extended to cover any risks, perils or classes of insurance or reinsurance generally or specifically excluded herein.

## Article XXVI - Insolvency

A.  The portion of any risk or obligation assumed by the Reinsurer, when such portion is ascertained, shall be payable on demand of the Company at the same time as the Company shall pay its net retained portion of such risk or obligation, with reasonable provision for verification before payment and the reinsurance shall be payable by the Reinsurer, on the basis of the liability of the Company under the contract or contracts reinsured without diminution because of the insolvency of the Company.  In the event of insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, such portion shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of claims allowed against the Company by any court of competent jurisdiction or by any conservator, liquidator or statutory successor of the Company having authority to allow such claims, without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claims.  Payments by the Reinsurer as above set forth shall be made directly to the Company or to its conservator, liquidator or statutory successor, except where the contract of insurance or reinsurance specifically provides another payee of such reinsurance in the event of the insolvency of the Company.

B.  The Reinsurer shall be given written notice of the pendency of each claim or loss which may involve the reinsurance provided by this Agreement within a reasonable time after such claim or loss is filed in the insolvency proceeding. The Reinsurer shall have the right to investigate each such claim or loss and interpose at its own expense in the proceeding where the claim or loss is to be adjudicated, any defense available to the Company, its liquidator, receiver or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely a result of the defense undertaken by the Reinsurer.

C.  Nothing contained in this Article is intended to change the relationship of the parties to this Agreement or to enlarge upon the rights or obligations of either party hereunder except as

provided herein, to wit, to pay the statutory successor of the Company on the basis of the amount of liability determined in the liquidation or receivership proceeding rather than on the basis of the actual amount of loss paid by the liquidator, receiver or statutory successor to allowed claimants.

## Article XXVII - Arbitration

A.  Any dispute arising out of the interpretation, performance or breach of this Agreement, including the formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. Notice requesting arbitration must be in writing and sent certified or registered mail, return receipt requested.

B.  One arbitrator shall be chosen by each party and the two arbitrators shall, before instituting the hearing, choose an impartial third arbitrator (the "Umpire") who shall preside at the hearing. If either party fails to appoint its arbitrator within thirty (30) days after being requested to do so by the other party, the latter, after ten (10) days notice by certified or registered mail of its intention to do so, may appoint the second arbitrator.

C.  If the two arbitrators are unable to agree upon the Umpire within thirty (30) days of their appointment, the two arbitrators shall request the American Arbitration Association ("AAA") to provide a list of possible Umpires with the qualifications set forth in this Article and the parties shall then mutually agree upon an Umpire from this list. If the parties are unable to agree upon the Umpire within thirty (30) days of the receipt of the AAA list or if the AAA fails to provide such a list within thirty (30) days of the request, either party may apply to the United States Federal Court for the Southern District of New York to appoint an Umpire with those qualifications. The Umpire shall promptly notify in writing all parties to the arbitration of his selection.

D.  All arbitrators shall be disinterested active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's of London.

E.  Within thirty (30) days after notice of appointment of all arbitrators, the panel shall meet and determine timely periods for briefs, discovery procedures and schedules for hearings.

F.  The panel shall be relieved of all judicial formality and shall not be bound by the strict rules of procedure and evidence. Unless the panel agrees otherwise, arbitration shall take place in New York, New York, but the venue may be changed when deemed by the panel to be in the best interest of the arbitration proceeding. Insofar as the arbitration panel looks to substantive law, it shall consider the law of the State of New York. The decision of any two arbitrators when rendered in writing shall be final and binding. The panel is empowered to grant interim relief as it may deem appropriate.

G.  To the extent, and only to the extent, that the provisions of this Agreement are ambiguous or unclear, the panel shall make its decision considering the custom and practice of the

applicable insurance and reinsurance business. The panel shall render its decision within sixty (60) days following the termination of hearings, which decision shall be in writing, stating the reasons thereof. Judgment upon the award may be entered in any court having jurisdiction thereof.

H.   Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the cost of the third arbitrator. The remaining costs of the arbitration shall be allocated by the panel. The panel may, at its discretion, award such further costs and expenses as it considers appropriate, including but not limited to attorneys fees, to the extent permitted by law.

## Article XXVIII - Service of Suit (BRMA 49D) - (Applicable if the Reinsurer is not domiciled in the United States of America, and/or is not authorized in any State, Territory or District of the United States where authorization is required by insurance regulatory authorities)

A.   It is agreed that in the event the Reinsurer fails to pay any amount claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of any court of competent jurisdiction within the United States. Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

B.   Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Reinsurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement.

## Article XXIX - Agency Agreement

If more than one reinsured company is named as a party to this Agreement, the first named company shall be deemed the agent of the other reinsured companies for purposes of sending or receiving notices required by the terms and conditions of this Agreement, and for purposes of remitting or receiving any monies due any party.

## Article XXX - Regulatory Authority

A.   If the FASB, SEC, insurance regulatory or other regulatory body with appropriate jurisdiction issues an authoritative accounting pronouncement or order that, despite both parties' best faith efforts to comply with such pronouncement or order, significantly changes

Casaccio Decl.
Ex. 4A, Page 24

the accounting treatment of this Agreement, or if the SEC or insurance regulatory authority deems that this Agreement does not, from its inception, qualify as reinsurance on or before June 30, 1996, and such change is concurred with by the Company's auditors, the Reinsurer or the Company may rescind this Agreement effective concurrently with the date of the pronouncement or order.

B. Upon such rescission, the value of the ceded Unpaid Ultimate Net Loss will be set to zero ($), and the commutation provisions of this Agreement shall apply (including the Company's obligation to immediately pay the Funds Withheld Balance to the Reinsurer and the Reinsurer's obligation to pay the Company the Contingent Commission). The Reinsurer agrees to refund the Reinsurer's Margin paid to date in the event of such rescission.

C. The payments of the Contingent Commission and Reinsurer's Margin to the Company by the Reinsurer shall constitute a complete and final release of all of the Reinsurer's obligations to the Company under this Agreement.

## Article XXXI - Other Terms and Conditions

A. **Governing Law** - This Agreement shall be interpreted and governed by the laws of the State of New York without regard to its principles of choice of law and the laws or regulations for credit for reinsurance.

B. **Amendment and Alterations** - This Agreement may be changed, altered or amended as the parties may agree, provided such change, alteration or amendment is evidenced in writing or by endorsement executed by the Company and the Reinsurer.

C. **No Assignment** - This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives. Neither this Agreement, nor any right hereunder, may be assigned by any party without the written consent of the other party hereto.

D. **No Third Party Rights** - This Agreement is solely between the Company and the Reinsurer, and in no instance shall any other party have any rights under this Agreement except as expressly provided otherwise in Article XXVI - Insolvency.

E. **No Waiver** - No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of obligations hereunder by such other party hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such first party of its rights hereunder.

R:\VSA0009113.DOC

Casaccio Decl.
Ex. 4A, Page 25

## Article XXXII - Intermediary

E. W. Blanch Co. is hereby recognized as the Intermediary negotiating this Agreement for all
business hereunder. All communications (including but not limited to notices and statements)
relating to this Agreement shall be transmitted to the Company or the Reinsurer through
E. W. Blanch Co., Reinsurance Services, 3500 West 80th Street, Minneapolis, Minnesota 55431.
All amounts due under this Agreement (including but not limited to Reinsurance Premium and
Ultimate Net Loss) shall be remitted directly by wire transfer between the Company and the
Reinsurer with notice to the Intermediary.

**In Witness Whereof,** the parties hereto by their respective duly authorized representatives have
executed this Agreement as of the dates undermentioned at:

Rock Hill, New York,  this ____ day of ____ 1995.

Frontier Insurance Company
Frontier Pacific Insurance Company

New York, New York,  this ____ day of ____ 1995

Centre Reinsurance Company of New York

Casaccio Decl.
Ex. 4A, Page 26

Schedule A

to the

## Coinsured Aggregate Excess of Loss Reinsurance Agreement
### Effective: January 1, 1995

issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

## Inuring Reinsurance Agreements

1.  North American Reinsurance Casualty Excess, TC581B - $1,000,000 xs $1,000,000 per occurrence for CMP Liability, General Liability and Workers' Compensation. $1,000,000 xs $1,000,000 per physician/per occurrence for Medical Malpractice.

2.  North American Reinsurance Casualty Excess, TC581C - $1,000,000 xs $2,000,000 per occurrence for Workers' Compensation.

3.  North American Reinsurance Property Per Risk Excess of Loss TP341A - $300,000 xs $200,000 per risk, $900,000 xs $600,000 per occurrence.

4.  North American Reinsurance Property Per Risk Excess of Loss TP341B - $500,000 xs $500,000 per risk, $1,500,000 xs $1,500,000 per occurrence.

5.  Specific and Aggregate Excess Medical Stop Loss Quota Share through North American Treaty Corporation. Reinsures 75% up to $1 Million per person on specific policies and 75% of up to $1 Million in the aggregate on aggregate policies.

6.  High Limits Excess Reinsurance Contract through E. W. Blanch Co., for Excess Medical Benefits Stop Loss Program - $4,000,000 xs $1,000,000 per person for specific policies, and $4,000,000 xs $1,000,000 in the aggregate for aggregate policies.

7.  Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $1,000,000 xs $1,000,000 per person, $10,000,000 in the aggregate.

Casaccio Decl.
Ex. 4A, Page 27

8.  Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $3,000,000 xs $2,000,000 per person, $12,000,000 in the aggregate.

9.  Per Person Excess of Loss through E. W. Blanch Co., for Excess Workers' Compensation Program - $5,000,000 xs $5,000,000 per person, $15,000,000 in the aggregate.

10. Excess Workers' Compensation First Excess Catastrophe Reinsurance Contract through E. W. Blanch Co., for Excess Workers' Compensation Program, $40,000,000 xs $3,000,000 per occurrence, $1,000,000 maximum any one life.

11. Industrial Aid Aircraft Excess through E. W. Blanch Co., up to $5,000,000 per occurrence xs up to $500,000 per occurrence, maximum any one life up to $2,000,000.

12. Quota Share Agreement between Frontier and Frontier Pacific Insurance Companies. Frontier assumes 50% of the first $500,000 of loss per occurrence/principal for all lines of business except Custom House Bonds, Miscellaneous Bonds, License and Permit Bonds and Bail Bonds. Frontier also assumes 100% of $500,000 excess of $500,000 per occurrence/principal for all lines except as excluded above. Under this agreement, Frontier reinsures Frontier Pacific only.

13. Quota Share Agreement between Frontier, Frontier Pacific and National Guaranty Insurance Company for Contractor Surety bonds. Limit is 50% of $150,000 per principal, 50% of $300,000 per principal in the aggregate.

14. Quota Share Agreement between Frontier and First Delaware Insurance Company for Contractor Surety Bonds. Limit is 33.3% of $150,000 per principal.

15. Excess of Loss Agreement between Frontier and Munich American Reinsurance Company B-2144. Reinsures 66.7% of $350,000 xs $150,000 up to a per principal limit of 66.7% of $600,000. There is an annual aggregate limit of 66.7% of $1,000,000.

16. Automatic Facilities No. CAF 4252. Commercial Umbrella Liability Program with Munich American Reinsurance Company. Up to 80% of $1,000,000 and 100% of $4,000,000 xs $1,000,000 per occurrence.

17. Automatic Facilities No. CAF 4220 Social Service Umbrella Liability Program with Munich American Reinsurance Company. Up to 80% of $1 Million and 100% of $4 Million xs $1 Million per occurrence.

18. Surety Excess of Loss Agreement with NAC Re for Contract Surety Bonds and Subdivision Bonds. Up to 90% of $4 Million xs $1 Million. Annual limit of 90% of $8,000,000.

Casaccio Decl.
Ex. 4A, Page 28

Schedule B

to the

## Coinsured Aggregate Excess of Loss Reinsurance Agreement
### Effective: January 1, 1995

issued to

Frontier Insurance Company
Rock Hill, New York
and
Frontier Pacific Insurance Company
Los Angeles, California
and affiliated insurance companies of
The Frontier Insurance Group, Inc.

## Summary of Interest Rates

| Accident Year | Funds Withheld | Experience Account |
|---|---|---|
| 1995 | 8.53% | 8.53% |
| 1996 | To be determined | To be determined |
| 1997 | To be determined | To be determined |

# EXHIBIT 4C

NOVATION AGREEMENT
(hereinafter referred to as the "Novation Agreement")

Effective July 1, 2000

Among

**Frontier Insurance Company**

**Frontier Pacific Insurance Company**

**United Capitol Insurance Company**

And

**Western Indemnity Insurance Company**

Each of which is an affiliated insurance company of The Frontier Insurance Group, Inc.
(hereinafter referred to collectively as the "**Reinsured**")

And

**Zurich Reinsurance (North America), Inc.** (both directly and as successor company to
Centre Reinsurance Company of New York)
(hereinafter referred to as the "**Reinsurer**")

And

**National Indemnity Company**
(hereinafter referred to as the "**New Reinsurer**")

**ATTACHING TO AND FORMING PART OF:**
the Coinsured Aggregate Excess of Loss Reinsurance Agreement
Among Frontier Insurance Company, Frontier Pacific Insurance Company and Reinsurer,
Effective January 1, 1995
and
the Aggregate Excess of Loss Reinsurance Agreement
Between Reinsured and Reinsurer, Effective January 1, 1998
(Each as heretofore amended, modified or supplemented
hereinafter referred to collectively as the "**Reinsurance Agreements**")

## 1. RECITALS

1.1. WHEREAS, the Reinsured and the Reinsurer referred to above have entered into the Reinsurance Agreements; and

1.2. WHEREAS, the Reinsured, the Reinsurer and the New Reinsurer desire that the Reinsured shall be released from, and the New Reinsurer shall directly assume, responsibility for the Reinsurer's obligations and liabilities under and in connection with the Reinsurance Agreements.

NOW THEREFORE, the parties hereto hereby agree as follows:

## 2. NOVATION; RELEASE; INDEMNIFICATION

2.1. All obligations and liabilities on the Reinsured's part owed to the Reinsurer pursuant to the Reinsurance Agreements shall henceforth be owed to the New Reinsurer as though the New Reinsurer had originally entered into the Reinsurance Agreements as reinsurer in place of Reinsurer. Such obligations and liabilities shall include, without limitation, all liabilities and obligations related to the Funds Withheld Account, as defined in the Reinsurance Agreements.

2.2. The Reinsured hereby releases and fully discharges the Reinsurer, its affiliates and its and their respective directors, officers, employees, agents, attorneys, representatives, successors and assigns, from any and all claims, demands, actions, liabilities, obligations, duties, or causes of action, known or unknown which the Reinsured has, might have had, will have, or might have in the future, arising out of or connected with, in whole or in part, any event, act, omission, or transaction relating in any way to the Reinsurance Agreements; provided, however, that this Section 2.2 shall not apply to Reinsurer's obligation under Section 5.1 hereof to make the payment set forth therein.

2.3. The New Reinsurer accepts, assumes and agrees to perform and be bound by the obligations and liabilities expressed to be on the part of the Reinsurer arising pursuant to the Reinsurance Agreements as though the New Reinsurer and not the Reinsurer had originally entered into the Reinsurance Agreements as reinsurer in place of the Reinsurer.

2.4. The New Reinsurer agrees to indemnify, defend and hold the Reinsurer and its directors, officers, employees, agents, representatives, successors or assigns harmless from and against any losses, liabilities, damages, actions, claims, demands, judgments or reasonable expenses asserted or incurred after the effective date of this Novation Agreement and arising out of or connected with, in whole or in part, any event, act, omission, or transaction, relating in any way to the New Reinsurer's acceptance, assumption, performance or exercise of the Reinsurer's rights, duties, obligations or liabilities under, or any other act or omission of the New Reinsurer in respect of, the Reinsurance Agreements. The Reinsurer shall advise the

2

New Reinsurer of any claims under this Section 2.4 promptly after becoming aware thereof, but the failure to so advise shall not affect the New Reinsurer's obligations under this Section 2.4 except only to the extent the New Reinsurer is actually prejudiced by such failure to so advise. The New Reinsurer shall have the right to control, negotiate, litigate, compromise and/or otherwise dispose of or resolve any such claims or liabilities, and the Reinsurer shall tender to the New Reinsurer any such claims, and shall otherwise cooperate with the New Reinsurer in its handling of any such claims; provided, however, that to the extent the Reinsurer reasonably believes that there is a conflict of interest between the New Reinsurer and the Reinsurer, the Reinsurer shall, at its option, retain the right to dispose or resolve the portion of any such claims or liabilities subject to such a conflict of interest; and provided, further that the New Reinsurer shall not settle any claims or liabilities affecting or involving the Reinsurer unless, as part of such settlement, the Reinsurer shall be fully and completely discharged from any claim or liability relating thereto.

2.5.  Henceforth the Reinsurance Agreements shall be read and construed as though references therein to the Reinsurer were references to the New Reinsurer and not the Reinsurer.

2.6.  The Reinsurer shall have no liability or obligation to any person or entity (including, but not limited to the Reinsured and the New Reinsurer) arising out of or in connection with the Reinsurance Agreements.  In furtherance and not in limitation of the foregoing, the New Reinsurer will not make any claim against the Reinsurer arising out of or in connection with any failure on the part of the Reinsurer to comply with any obligations under the Reinsurance Agreements, or any other matter or thing whatsoever arising out of or in connection with the Reinsurance Agreements; provided, however, that nothing herein shall affect the Reinsurer's obligation under Section 5.1 hereof to make the payment set forth therein.

2.7.  The Reinsured hereby acknowledges and agrees with, and undertakes to the New Reinsurer that the obligations of the Reinsurer under the Reinsurance Agreements have to date been performed in accordance with the terms of the Reinsurance Agreements and that the Reinsured will not make any claim against the New Reinsurer arising out of or in connection with any failure on the part of the Reinsurer to comply with any such obligations.

## 3.  REPRESENTATIONS AND WARRANTIES OF THE REINSURED AND THE NEW REINSURER

The Reinsured and the New Reinsurer hereby warrant and represent to the Reinsurer that: (i) they are entities in good standing in their respective places of domicile; (ii) that the execution of this Novation Agreement is fully authorized by each of them; (iii) that the person or persons executing this Novation Agreement have the necessary and appropriate authority to do so; (iv) that there are no pending conditions, agreements, transactions, or negotiations to which any of them are a party that would render this Novation Agreement or any part thereof void, voidable, or unenforceable; (v) this Novation Agreement is enforceable against the Reinsured and the New Reinsurer in accordance with the terms and conditions hereof; (vi) they have obtained any and all required corporate, insurance or other regulatory, or other governmental

3

approvals and consents required to execute this Novation Agreement and all such approvals and consents are in effect as of the effective date of this Novation Agreement; (vii) this Novation Agreement, does not and will not conflict with any provisions of any other contracts in place between the Reinsured and any other party, nor will the Reinsured's agreement to enter into this Novation Agreement and accept the terms and conditions hereof conflict with any provisions of any other such contracts; (viii) no proceeding for insolvency, liquidation, rehabilitation, conservation, bankruptcy, dissolution, general assignment for the benefit of creditors, nor regulatory, or other legal, equitable, or statutory proceeding is pending to which the Reinsured or the New Reinsurer is a party or with which Reinsured is involved, and no such proceeding is contemplated, which may in any way prevent, delay, limit, or otherwise inhibit Reinsured's full and timely performance of its duties and obligations under this Novation Agreement; and (ix) neither the Reinsured nor the New Reinsurer is subject to any order, decree, injunction, judgment, settlement, governmental action, or other action by any court, arbitral tribunal, department of insurance, or other governmental authority which may in any way prevent, delay, limit, or otherwise inhibit their full and timely performance of its duties and obligations under this Novation Agreement.

## 4. REPRESENTATIONS AND WARRANTIES OF THE REINSURER

The Reinsurer hereby warrants and represents that: (i) it is an entity in good standing in its place of domicile; (ii) that the execution of this Novation Agreement is fully authorized by the Reinsurer; (iii) that the person or persons executing this Novation Agreement on the part of the Reinsurer shall have the necessary and appropriate authority to do so; (iv) that there are no pending agreements, transactions, or negotiations to which the Reinsurer is a party that would render the Novation Agreement or any party thereof void, voidable, or unenforceable; (v) this Novation Agreement is enforceable against the Reinsurer in accordance with the terms and conditions hereof; and (vi) that no authorization, consent or approval of any government entity is required to make this Novation Agreement valid and binding upon it.

## 5. PAYMENTS BY REINSURER TO NEW REINSURER AND REINSURED TO NEW REINSURER

5.1 Notwithstanding anything else contained herein, the New Reinsurer's obligations hereunder shall be conditioned on that within five (5) business days after execution of this Novation Agreement the Reinsurer shall pay to the New Reinsurer in immediately available funds the sum of US$68,200,000.

5.2 The Reinsured shall pay to the New Reinsurer the Funds Withheld Account for all Accident Years in respect of the Reinsurance Agreement effective January 1, 1995. Until such time as this payment is made, the Funds Withheld Account shall continue to accrue all interest and Funds Withheld Investment Credits. Until such time as the Funds Withheld Account is paid to the New Reinsurer, the Reinsured shall offset balances due from the New Reinsurer as a result of this Novation, against the Funds Withheld Account in strict accordance with the terms of the Reinsurance Agreement.

4

Casaccio Decl.
Ex. 4C, Page 34

## 6. CONSIDERATION

The New Reinsurer and the Reinsured acknowledge and agree that Reinsurer's agreements set forth in this Novation Agreement, including, but not limited to, its agreement to pay to the New Reinsurer the amount specified in Section 5.1 hereof, constitutes good and adequate consideration to the Reinsured and the New Reinsurer for the releases, indemnifications and other agreements of the Reinsured and the New Reinsurer under this Novation Agreement, including, but not limited to, the releases set forth in Section 2.2, and the indemnification and assumption of obligations and liabilities set forth in Section 2.4.

## 7. MISCELLANEOUS

7.1.  This Novation Agreement may be executed in any number of counterparts by the different parties hereto on separate counterparts, each of which when executed and delivered shall constitute an original, but all of which shall together constitute one and the same instrument.

7.2.  This Novation Agreement shall be read and considered as an integral part of the aforementioned Reinsurance Agreements and in the case of any conflict with any part of said Reinsurance Agreements the provisions of this Novation Agreement shall prevail.

7.3.  The rights, duties and obligations set forth herein shall inure to the benefit of and be binding upon any and all predecessors, successors, affiliates, officers, directors, employees, parents, subsidiaries, stockholders, liquidators, receivers and assigns of the parties hereto.

7.4.  This Novation Agreement contains the entire agreement between the parties as respects its subject matter.  All discussions and agreements previously entertained between the parties concerning the subject matter of the commutation are merged into this Novation Agreement.

7.5.  This Novation Agreement may not be modified or amended, nor any of its provisions waived, except by an instrument in writing, signed by the parties hereunder.

7.6.  The parties hereto and each of them do hereby covenant and agree to do such things and execute such further documents, agreements and assurances as may be necessary or advisable from time to time in order to carry out the terms and conditions of this Novation Agreement in accordance with their true intent.

7.7.  This Novation Agreement shall be governed by and construed in accordance with the laws of the State of New York and the parties hereto irrevocably submit to the non-exclusive jurisdiction of the Courts in the State of New York and to the extent permitted by law expressly waive all rights to challenge or otherwise limit such jurisdiction.



Casaccio Decl.
Ex. 4C, Page 35

This Novation Agreement has been duly executed by each of the parties as follows:

For and on Behalf of:

Frontier Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

Frontier Pacific Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

United Capitol Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000


For and on Behalf of:

Western Indemnity Insurance Company

Name: GERARD HARTWICK
Title: VICE PRESIDENT
Date: December 21, 2000

6

Casaccio Decl.
Ex. 4C, Page 36

For and on Behalf of:

Zurich Reinsurance (North America), Inc.

Name: _Joel Klassen_
Title: _S V P_
Date: December 21, 2000


For and on Behalf of:

**National Indemnity Company**

Name: _Brian G. Snover_
Title: _Vice President_
Date: December 21, 2000

N:\DATA\UW\UW\BOUND\FRONTIER\Review\2000\novation\NOV_1.doc

7

Casaccio Decl.
Ex. 4C, Page 37

# EXHIBIT 4D

Casaccio Decl.
Ex. 4D, Page 38

AGGREGATE REINSURANCE AGREEMENT

Between

FRONTIER INSURANCE COMPANY,

ROCK HILL, N.Y.

and

NATIONAL INDEMNITY COMPANY,

OMAHA, NEBRASKA

1

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Frontier Insurance Company, (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall incept at 12:01 A.M. Eastern Daylight Time July 1, 2000 (the "Effective Date"). Unless novated pursuant to Article 7, this Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the Aggregate Limit of Liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all Covered Liabilities.

Reinsurer, through the Claims Administrator, shall pay on behalf of the Reinsured any and all Ultimate Net Loss in relation to Covered Liabilities subject to the terms, conditions, exclusions and Aggregate Limit stated in this Reinsurance.  Subject to Article 12, Reinsurer's obligations to pay, through the Claims Administrator, on behalf of the Reinsured are not dependent upon prior payment by the Reinsured of Ultimate Net Loss. As the parties to this Reinsurance intend that Reinsurer, through the Claims Administrator, shall pay all amounts of Ultimate Net Loss due Insureds and other persons as and when due directly on behalf of the Reinsured in accordance with Article 16.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurers' liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss in connection with Covered Liabilities, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance. Reinsurer, therefore, agrees that its coverage obligation under this Reinsurance is identical in any and all respects to the Reinsured's coverage obligations for Covered Liabilities subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance. The parties to this Reinsurance intend that, subject to the terms, conditions and exclusions of this Reinsurance and the Aggregate Limit, the Reinsured shall be subject to no liability for Ultimate Net Loss whatsoever for Covered Liabilities which are covered by Reinsurer hereunder.

## ARTICLE 2.  INDEMNITY

Reinsurer, through the Claims Administrator, hereby agrees to pay on behalf of the Reinsured the Ultimate Net Loss for an amount of up to U.S. $800,000,000 (Eight Hundred Million United States Dollars) (the "Aggregate Limit"). UNDER NO CIRCUMSTANCES WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $800,000,000 (EIGHT HUNDRED MILLION UNITED STATES DOLLARS) IN THE AGGREGATE INCLUSIVE OF ALL EXPENSES AND COSTS BY REASON OF ENTERING INTO THIS REINSURANCE. In applying Article 2, all Ultimate Net Loss arising out of this Reinsurance shall be included in determining the time of exhaustion of the Aggregate Limit. A single Aggregate Limit shall apply to this Reinsurance.

## ARTICLE 3.  EXCLUSIONS

A. This Reinsurance shall not cover any liability paid or booked as paid by Reinsured before the Effective Date as determined by the books and records of Reinsured;

B. Save as otherwise expressly provided herein, this Reinsurance shall not cover any liability of the Reinsured that was Due and Payable prior to the Effective Date. This exclusion shall not be construed

2

Casaccio Decl.
Ex. 4D, Page 40

to exclude from coverage loss payments that are awaiting payment in the normal process following settlement and/or billing in respect of such losses.

The phrase "Due and Payable" in this Exclusion B shall mean existing, uncontingent, undisputed and in respect of which payment of a known fixed amount can be enforced either immediately or after a known fixed period of time.

Nothing in this Exclusion B shall be construed to exclude liabilities not accepted or agreed by Reinsured prior to the Effective Date even though Insureds may have presented claims, commenced suits, advices, proofs of loss (or other billing statements) for such liabilities. Examples of such liabilities would include, but not be limited to, liabilities for which Reinsured instituted a coverage investigation, or denied coverage pending further detail or information with respect to environmental, toxic tort, latent disease or asbestos related claims. (These categories are not exclusive but merely by way of example and guide.)

C.   This Reinsurance shall not cover any liability of the Reinsured for: (1) any tortious act of the Reinsured; (2) any failure of the Reinsured to carry out its contractual obligations under the Insurance Policies/Reinsurance contracts in good faith; or (3) any action of the Reinsured in bad faith. Coverage for the Reinsured's liability for any act or omission by the Reinsurer and/or the Claims Administrator, acting on the Reinsured's behalf or as the Reinsured's agent pursuant to this Reinsurance shall not be excluded. With respect to activities not involving the fraud or purposeful tortious conduct of the Reinsured, this Exclusion shall only operate upon a final determination that the Reinsured was guilty of the stated wrongful conduct and then only as respects damages awarded directly therefor.

D.   This Reinsurance shall not cover any tax, whether paid directly by the Reinsured or billed to the Reinsured by or through a cedent, regardless of whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax. Notwithstanding the foregoing, a tax applicable to any expense or fee for which Reinsurer is liable under this Reinsurance shall be included as Ultimate Net Loss and shall not be excluded hereunder.

E.   This Reinsurance shall not cover any liability incurred by Reinsured under Insurance Policies/Reinsurance Contracts issued after December 31, 1999. Furthermore, this Reinsurance shall not cover, under occurrence-based business, occurrences after December 31, 1999. For claims-made business, this Reinsurance shall not cover claims made after December 31, 1999, other than claims which were reported prior to December 31, 1999 as part of tail coverage provided on a policy issued within the covered period.

ARTICLE 4.   DEFINITIONS

A.   Wherever used in this Retrocession, the term "Covered Liabilities" shall mean all insurance and reinsurance obligations of the Reinsured incurred by Reinsured during Accident Years 1999 and prior. "Accident Year" means on occurrence-based business, all occurrences during a given calendar year, and, on claims-made business, all claims made during a given calendar year. Claims

3

made after 12/31/1999 for which coverage is provided by Reinsured under policies written on a claims-made basis where the policy expired prior to 12/31/99 save an extended reporting endorsement shall be understood to have been made during Accident Year 1999 and shall be covered by this Reinsurance.

B.  Wherever used in this Reinsurance, the term "Insurance Policy/Reinsurance Contract" shall mean any and all binders, insurance policies, surety bonds, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insures or reinsures Covered Liabilities.

C.  Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean the sums payable by the Reinsured as Covered Liabilities on or after the Effective Date save as otherwise excluded under Article 3. Ultimate Net Loss shall include, but is not limited to, punitive damages, settlements, judgments, arbitration panel awards, claim payments, Allocated Loss Adjustment Expenses, Unallocated Loss Adjustment Expenses, Administrative Costs, expenses and fees for determining coverage under any Insurance Policy/Reinsurance Contract, expenses to seek any recoveries, consideration for commutations, reinstatement premium payable to Reinsured's reinsurers or Retrocessionaires and any other fees or expenses of any nature or kind for which the Reinsured is liable under any Insurance Policy/Reinsurance Contract.

D.  Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expense" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys fees, expenses, fees and interest accrued prior to or after any judgment, award, agreement or compromise (excluding Administrative Costs) incurred in connection with any defense, investigation or audit of, resistance to or negotiations in relation to Covered Liabilities. Expenses which are not Allocated Loss Adjustment Expenses shall be Unallocated Loss Adjustment Expenses.

E.  Wherever used in this Reinsurance, the term "Administrative Costs" shall mean all costs and expenses (including salaries of officials and employees of the Reinsurer and/or Claims Administrator) incurred by Reinsurer and/or Claims Administrator, in connection with its obligations as described in Article 16 of this Reinsurance on or after the Effective Date, but which are not allocated to a specific loss or to a specific Insurance Policy/Reinsurance Contract. Administrative Costs shall be included in Ultimate Net Loss.

F.  Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured arising under any Insurance Policy/Reinsurance Contract.

G.  Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract, and the term "Claimant" shall mean a person asserting a claim against an Insured for which the Insured claims coverage under an Insurance Policy/Reinsurance Contract.

ARTICLE 5.  SALVAGES AND SUBROGATION AND OTHER RECOVERIES

It is hereby understood and agreed that the Reinsured assigns to Reinsurer any rights with respect to salvage, subrogation or reinsurance recoveries which may have accrued to Reinsured prior to the Effective Date

4

in connection with Covered Liabilities for so long as this Reinsurance is in effect. For so long as this Reinsurance is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insureds in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled. The Reinsured specifically assigns to Reinsurer all rights which Reinsured has to collect subrogation, salvage and all other amounts due Reinsured. The Reinsurer is hereby authorized and empowered to bring any appropriate action to enforce such rights in the name of the Reinsured to the extent Reinsurer has been granted said rights. The whole of any receipts of Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer.

## ARTICLE 6.  PREMIUM

As the sole consideration for the rights and obligations set forth in this Reinsurance, Reinsurer agrees to accept and Reinsured agrees to pay a Reinsurance Premium of $490,000,000 (Four Hundred Ninety Million United States Dollars) less Ultimate Net Loss paid by Reinsured on or after the Effective Date but before September 27, 2000 plus interest from the Effective Date through September 27, 2000 at the rate of three month U.S. Treasury Securities in effect at the close of the financial markets on June 30, 2000 on the average daily balance of Reinsurance Premium less Ultimate Net Loss Paid. Premium shall be payable by noon Eastern Daylight Time on September 27, 2000. It is understood that some components of Ultimate Net Loss used to compute the amount of funds transferred on September 27, 2000 will necessarily be estimates and that a true-up to actual amounts, with interest, will be completed no later than November 1, 2000. Payment shall be made in immediately available U.S. funds as follows:

To National Indemnity Company by wire transfer to:

Wells Fargo Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058
For the account of National Indemnity Company
Account No. 1150001492

## ARTICLE 7.  NOVATION

Subject to the approval of the New York Department of Insurance, the Reinsured shall have the option to negotiate a novation or replacement of this Reinsurance at December 31, 2001 or any calendar quarter ending thereafter. The Reinsured shall provide notice of its election of this option to the Reinsurer no less than forty-five (45) days prior to the date it wishes to novate or replace the Reinsurance provided hereunder. Upon novation or replacement, and following execution by the parties of Reinsurer's Novation, Indemnification and Hold Harmless Agreement, Reinsurer shall transfer to the Novating/Replacement Reinsurer 97.5% of Reinsurance Premium, or such other amount as mutually agreed, less all Ultimate Net Loss (including all Allocated and Unallocated Loss Adjustment Expenses and all Administrative Costs) paid by Reinsurer under this Reinsurance.

5

Casaccio Decl.
Ex. 4D, Page 43

ARTICLE 8.   CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurers to or on behalf of the Reinsured in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange commercially in effect for large transactions on the date the original payment is made by the Reinsurer.

ARTICLE 9.   ERRORS AND OMISSIONS

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it has under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the other do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on any party hereto greater than would have attached had such error or omission not occurred.

ARTICLE 10.   ACCESS TO RECORDS

A.        By Reinsurer. The Reinsured shall make available for inspection, and place at the disposal of Reinsurer at all reasonable times, all records of the Reinsured relating to this Reinsurance. The Reinsured shall also make available for inspection and place at the disposal of Reinsurer at all reasonable times, all records to which the Reinsured may have access, by terms of any reinsurance agreement or otherwise. Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance.

B.        By the Reinsured. The Reinsurer shall make available for inspection, and place at the disposal of the Reinsured at all reasonable times, all records of the Reinsurer relating to Covered Liabilities under this reinsurance. The Reinsurer shall also make available for inspection and place at the disposal of the Reinsured at all reasonable times all such records to which the Reinsurer may have access, by terms of any reinsurance agreement or otherwise. The Reinsured shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsurer relating to the business covered by this Reinsurance, and any Insurance Policy/Reinsurance Contract in the possession of Reinsurer. It is agreed that the Reinsured's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance.

ARTICLE 11.   ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable, except as set forth in the Novation provision. This Reinsurance is the entire agreement between the Reinsurer and the Reinsured and shall

6

not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein. Reinsurer agrees that this Reinsurance shall not be subject to any claims brought by it whatsoever arising out of any alleged statements, representations, disclosures or non-disclosures by, or on behalf of, the Reinsured. No liability shall attach to the Reinsured in this regard save in the event of Reinsured's proven deliberate misrepresentation or non-disclosure.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsurer and the Reinsured. No amendment to the Insurance Policies/Reinsurance Contracts after the Effective Date shall enlarge or alter the obligations or liabilities of the parties hereunder unless the parties have consented in writing to such amendment. This Reinsurance may not be assigned by Reinsured or Reinsurer without the consent of the other party hereto. In the event that any provision of this Reinsurance is found to be invalid, voidable, void or otherwise unenforceable, the intention of the parties is that the remaining provisions shall be reformed so as to carry out their mutual intentions.

ARTICLE 12  INSOLVENCY OF THE REINSURED

In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to Reinsured or to its liquidator, receiver, conservator or statutory successor as and when due by Reinsured under the terms of the Insurance Policies/Reinsurance Contracts.

In the event of the insolvency of the Reinsured , this reinsurance shall be payable directly to the company or to its liquidator, receiver, conservator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the insolvent company without diminution because of the insolvency of the company or because the liquidator, receiver, conservator or statutory successor of the company has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the company shall give written notice to the Reinsurer of the pendency of a claim against the company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defense or defenses that it may deem available to the company or its liquidator, receiver, conservator or statutory successor.  The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the Court, against the company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the company solely as a result of the defense undertaken by the Reinsurer.

It is further understood and agreed that, in the event of the insolvency of the Reinsured, the reinsurance under this Contract shall be payable directly by the Reinsurer to the company or to its liquidator, receiver or statutory successor, except as provided by Section 4118(a) of the New York Insurance Law or except (1) where the Reinsurer with the consent of the direct insured or insureds has assumed such policy obligations of the company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of the company to such payees.

7

ARTICLE 13.   NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

ARTICLE 14.   RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Reinsurance.

ARTICLE 15.   NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 100 First Stamford Place
> Stamford, Connecticut 06902
> Attn:    General Counsel
> Telecopy: (203) 363-5221
>
> Frontier Insurance Company
> 195 Lake Louise Marie Road
> Rock Hill, NY 12775
> Attn: President - Telecopy: (845) 796-1900

Any party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties. Notice shall be deemed effective:

1.  if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  if sent by certified mail at the expiration of seventy-two (72) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

ARTICLE 16.   REINSURERS RIGHT TO ASSOCIATE

In connection with this Reinsurance, the Reinsured has entered into a Claims Administration Agreement with National Liability & Fire Insurance Company (the Claims Administrator).  Notwithstanding that agreement, the Reinsurer hereunder shall be entitled at its own expense to associate in the handling of any claims, whether direct or reinsurance and commutations, both inwards or outwards, in connection with the business covered hereunder.

8

Article 17    CHANGE IN ADMINISTATIVE PRACTICES OR CORPORATE STRUCTURE

The Reinsured shall not voluntarily undergo or make any change in its administrative practices, corporate structure, or domicile without the prior written consent of the Reinsurer, which shall not be unreasonably withheld.  This provision shall not be construed to restrict Reinsured from implementing new internal procedures or protocols in the normal course of its business.

Article 18    ARBITRATION

This Clause shall form a separate Agreement between the Reinsured and the Reinsurer from the main Contract (the terms and conditions of which are more fully expressed hereintofore).

All matters in difference between the Reinsured and the Reinsurer (hereinafter referred to as "the parties") in relation to this reinsurance, including its formation and validity, and whether arising during or after the period of this reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out.

Unless the parties agree upon a single Arbitrator within thirty days of one receiving a written request from the other demanding Arbitration, the Claimant (the party requesting Arbitration) shall appoint his Arbitrator and give written notice thereof to the Respondent.  Within thirty days of receiving such notice the Respondent shall appoint his Arbitrator and give written notice thereof to the Claimant, failing which the Claimant may nominate an Arbitrator on behalf of the Respondent.

Should the Arbitrators fail to agree, they shall appoint by mutual agreement only, an Umpire to whom the matter in difference shall be referred.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons employed or engaged in a senior position in Insurance or Reinsurance underwriting or claims.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

All costs of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in the discretion of the Arbitration Tribunal who may direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, N.Y. and the Arbitration Tribunal shall apply the laws of New York as the proper law of this Reinsurance.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal shall be in writing and binding upon the parties who covenant to carry out the same.  If either of the

9

parties should fail to carry out any award the other may apply for its
enforcement to a court of competent jurisdiction in any territory in which
the party in default is domiciled or has assets or carries on business

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to
be executed in duplicate by their duly authorized representatives

This 2 7 day of April, 2000 by Frontier Insurance Company

Title: President

This 2 7 day of April, 2000 by National Indemnity Company

Title: Vice President

10

Casaccio Decl.
Ex. 4D, Page 48

# EXHIBIT 4E

Casaccio Decl.
Ex. 4E, Page 49

JAN 05-2001 FRI 10:05 AM                    FAX NO.                    P. 02

ENDORSEMENT NO. 1

to the

AGGREGATE REINSURANCE AGREEMENT

between

FRONTIER INSURANCE COMPANY,
Rock Hill, New York

and

NATIONAL INDEMNITY COMPANY,
Omaha, Nebraska



Page 1

WHEREAS, the Frontier Insurance Company (the "Reinsured") and National Indemnity Company (the "Reinsurer") have entered into an Aggregate Reinsurance Agreement effective July 1, 2000 (the "Reinsurance Agreement") concerning "Covered Liabilities" as defined in the Reinsurance Agreement arising from Accident Years 1999 and prior (such liabilities as are covered in the Reinsurance Agreement being referred to herein as the "Covered Business");

WHEREAS, in connection with the mutual agreement of the Reinsured and Reinsurer to add to the Reinsurance Agreement coverage in respect of the 1999 and prior business of Frontier Pacific Insurance Company ("Frontier Pacific"), a subsidiary of the Reinsured;

WHEREAS, the Reinsureds and the Reinsurer have agreed to include within the Reinsurance Agreement coverage for their respective surety business exposures written as of the date of this Endorsement and prior; and

WHEREAS, as a result of the foregoing, the Reinsured and Reinsurer have mutually agreed to clarify in this Endorsement that the Reinsured shall continue to receive the full benefit of its existing reinsurance coverage such that the Reinsurer shall continue to be responsible for the net losses paid by the Reinsured;

NOW, THEREFORE, the Reinsured and Reinsurer agree to modify and amend the Reinsurance Agreement as follows:

1.    With effect from October 1, 2000, the "Reinsured" is amended to include Frontier Pacific. All references to Reinsured throughout the Reinsurance Agreement are understood to be to both Frontier Insurance Company and Frontier Pacific.

2.    The Reinsurance Agreement, Article 2, Indemnity, is hereby deleted and replaced with the following:

Reinsurer, through the Claims Administrator or directly, hereby agrees to pay on behalf of the Reinsured the Ultimate Net Loss for an amount of up to U.S. $858,554,275. **UNDER NO CIRCUMSTANCES WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $858,554,275 IN THE AGGREGATE INCLUSIVE OF ALL EXPENSES AND COSTS BY REASON OF ENTERING INTO THIS REINSURANCE.** In applying Article 2, all Ultimate Net Loss arising out of this Reinsurance shall be included in determining the time of exhaustion of the Aggregate Limit. A single Aggregate Limit shall apply to this Reinsurance.

Subject to the foregoing, it is understood and agreed that the available limit for each Reinsured shall be further limited as follows: in respect of Frontier

Page 2

Casaccio Decl.
Ex. 4E, Page 51

JAN-05-2001 FRI 10:06 AM                    FAX NO.                              P. 04

Insurance Company, the Reinsurer shall be liable for no more than U.S. $811,464,476 Ultimate Net Loss inclusive of all Expenses and Costs by reason of entering into this Reinsurance. In respect of Frontier Pacific, the Reinsurer shall be liable for no more than U.S. $47,089,799 Ultimate Net Loss inclusive of all Expenses and Costs by reason of entering into this Reinsurance. The sublimits set forth in this paragraph are a part of and subject to the Aggregate Limit of Liability of U.S. $858,554,275. All payments made by Reinsurer in respect of either Reinsured, whether made before, on, or after the date of this Endorsement No. 1, shall serve to erode the Aggregate Limit of Liability.

3.    The Reinsureds shall pay to the Reinsurer a premium of $21 million (United States Dollars twenty-one million) in consideration of the Reinsurer's agreement to include Frontier Pacific as a Reinsured under the Agreement. With respect to Frontier Pacific, references to "Effective Date" in the Reinsurance Agreement are understood to be to October 1, 2000. Such premium payment shall be payable as of October 1, 2000, and shall accrue interest at the rate of 3 month U.S. Treasury Securities in effect as of September 30, 2000. Payment of the premium due under this paragraph 3 shall be made in accordance with paragraph 9 below.

4.    The Reinsureds and Reinsurer agree that, as the Reinsureds' surety business is in run-off, in consideration of the payment by each Reinsured of the Surety Premium, the Reinsurance Agreement shall provide coverage to the each Reinsured in respect of its surety business so that such business is included within the definition of Covered Liabilities in the Reinsurance Agreement. It is expressly understood that the Reinsureds' surety business as referenced herein does not include their respective bail and appeal bond business. It is furthermore expressly understood that certain bonds are continuous in nature and will generate premium until exonerated. The definition of Covered Liabilities will include all required renewals and extensions of such bonds. It is furthermore expressly understood and agreed that, with respect to the surety business referenced herein, Article 3, Exclusions, section (E) is amended to provide an exception for the surety business. By execution of this Endorsement, any subject surety bond in-force as of December 31, 2000, and any subsequent extension or renewal thereof which the Reinsured is required to provide, shall be reinsured hereunder regardless of the date on which a loss is deemed to have occurred, been reported or discovered. The Surety Premium shall be payable in accordance with paragraph 9 below and by each Reinsured in the following amounts:

        For Frontier: the sum of $31,464,476 payable as of July 1, 2000, together with interest thereon from July 1, 2000

Page 3

through date of receipt of payment by Reinsurer at the rate of 3 month U.S. Treasury Securities in effect as of June 30, 2000, less any sums paid in respect of such business from July 1, 2000 through date of receipt of payment by Reinsurer, plus premium earned after September 30, 2000 on all bonds (net of external acquisition costs), which shall be in addition to the premium referenced above and paid to the Reinsurer as earned, on a quarterly basis.

For Frontier
Pacific:       the sum of $6,089,799, payable as of October 1, 2000, together with interest thereon from October 1, 2000 through date of receipt of payment by Reinsurer at the rate of 3 month U.S. Treasury Securities in effect as of September 30, 2000, less any sums paid in respect of such business from October 1, 2000 through date of receipt of payment by Reinsurer, plus premium earned after September 30, 2000 on all bonds (net of external acquisition costs), which shall be in addition to the premium referenced above and paid to the Reinsurer as earned, on a quarterly basis.

It is understood and agreed that, as premium earned after September 30, 2000 (net of external acquisition costs) is paid to Reinsurer each quarter prospectively as set forth above, the Agreement shall be endorsed to increase the Reinsurers aggregate limit of liability set forth in paragraph 2 above, and the respective sublimits for each Frontier and Frontier Pacific as applicable for each company, on a dollar-for-dollar basis for each dollar of earned premium (net of external acquisition costs) actually paid to Reinsurer in such quarter.

5.   With effect from the Effective Date of the Reinsurance Agreement, Article 4, Definitions, section C, is hereby deleted and replaced with the following:

Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean the net liability of the Reinsured (i.e., the liability of the Reinsured less all Reinsurance Recoverables) in respect of Covered Liabilities paid on or after the Effective Date, save as otherwise excluded under Article 3. Ultimate Net Loss shall include, but is not limited to, punitive damages, settlements, judgments, arbitration panel awards, claim payments, Allocated Loss Adjustment Expenses, Unallocated Loss Adjustment Expenses, Administrative Costs, expenses and fees for determining coverage under any Insurance Policy/Reinsurance Contract, and any other fees or expenses

Page 4

for which the Reinsured is liable in respect of its net obligations for Covered Liabilities.

6.    With effect from the Effective Date of the Reinsurance Agreement, a new subsection H is added to Article 4, Definitions, as follows:

Wherever used in this Reinsurance, the term "Reinsurance Recoverables" shall mean those sums due or to become due to Reinsured from all reinsurance coverages of any kind (other than this Reinsurance) applicable to the Covered Liabilities as of the Effective Date (i.e. all reinsurance in place relating to the business from which any and all Covered Liabilities arise as of the Effective Date).   The Reinsurance Recoverables shall be deemed collected as and when the Reinsured makes any payment on the Covered Liabilities which would involve the applicable reinsurance coverage, and the Reinsurer hereunder shall be liable only for that portion of the loss, Allocated Loss Adjustment Expenses or Unallocated Loss Adjustment Expenses paid by the Reinsured net of the Reinsurance Recoverables, whether or not they are actually collected by Reinsured and notwithstanding the failure of the Reinsured to make such collection, including but not limited to the insolvency of any reinsurer, the refusal to pay of any reinsurer or the compromise or commutation of any reinsurance coverage applicable to the Covered Liabilities.   It is the express intention of the parties hereto that the Reinsured shall not assign or turn over to the Reinsurer any reinsurance to which it is entitled in connection with the Covered Liabilities, and that the Reinsurer shall not participate in the proceeds of any actual reinsurance recoveries recouped by the Reinsured in connection with the Covered Liabilities.

7.    With effect from the Effective Date of the Reinsurance Agreement, Article 5, Salvages, Subrogation and Other Recoveries, is deleted and replaced with the following:

The Reinsurer shall be subrogated, as respects any Ultimate Net Loss for which the Reinsurer shall actually pay or becomes liable to pay, but only to the extent of the amount of payment by, or the amount of liability of, the Reinsurer, to all rights of the Reinsured against any person or other entity who may be legally responsible in damages for said Ultimate Net Loss. The Reinsured hereby agrees to enforce such rights.  In the event the Reinsured shall fail or neglect to do so, the Reinsurer is hereby authorized and empowered to bring any appropriate action in the name of the Reinsured or in the name of a reinsured or insured under a reinsurance contract or insurance policy reinsured herein to enforce such rights.   It is expressly understood that this Article 5 does not apply to any reinsurance recoveries of the Reinsured.

Page 5

In determining the amount of recoveries, salvages or reimbursements, there shall first be deducted from any amount recovered the expenses incurred in effecting the recovery (excluding salaries and expenses of officers and employees of the Reinsured).

All salvages, recoveries or reimbursements, after deduction of all expenses allowed as set forth above, recovered and received subsequent to an Ultimate Net Loss reimbursement by Reinsurer under this Contract shall be applied as if recovered and received prior to the aforesaid settlement and all necessary adjustments shall be made by the parties hereto; provided that nothing in this Article shall be construed to mean that Ultimate Net Losses under this Contract are not recoverable until all salvage, recovery and reimbursement has been determined.

8.    In consideration of the amendments set forth in paragraphs 5, 6 and 7 of this Endorsement No. 1, Frontier Insurance Company shall pay to the Reinsurer an Additional Premium in the amount of $6,897,000 (United States Dollars six million six hundred ninety-seven thousand).  Such Additional Premium  shall be payable as of July 1, 2000, and shall accrue interest at the rate of 3 month U.S. Treasury Securities in effect as of June 30, 2000. Payment of such Additional Premium shall be made in accordance with paragraph 9 below.

9.    The Reinsurer shall be paid all sums due under this Endorsement No. 1 and specified in paragraphs 3, 4 and 8 above in immediately available U.S. funds by wire transfer no later than January 5, 2001 to the following instructions:

> Wells Fargo Bank Nebraska, N.A.
> Omaha, Nebraska
> ABA #104000058
> For the account of National Indemnity Company
> Account No. 1150001492

10.    All other terms and conditions of the Reinsurance Agreement remain unchanged to the extent not inconsistent with the foregoing.

11.    This Endorsement constitutes a valid and enforceable amendment of the Reinsurance Agreement as provided for in Article 11.

Casaccio Decl.
Ex. 4E, Page 55

JAN-05-2001 FRI 10:37 AM                          FAX NO.                          P. 08

IN WITNESS WHEREOF, the parties have executed this Endorsement No. 1 by their duly authorized representatives.

FRONTIER INSURANCE COMPANY              NATIONAL INDEMNITY COMPANY

By: _____                   By: _____
     President
Date:  1-5-2001                          Date:

FRONTIER PACIFIC INSURANCE COMPANY

By: _____
     President
Date:  1-5-2001

Page 7

JAN-05-2001 FRI 03:44 PM                          FAX NO.                          P. 02

JAN-05-2001  14:39        ARRENGUT MIDWEST
JAN-05-2001 FRI 10:37 AM                          FAX NO.                    P. 02
                                                                            P. 01

IN WITNESS WHEREOF, the parties have executed this Endorsement No. 1 by their duly
authorized representatives.

FRONTIER INSURANCE COMPANY              NATIONAL INDEMNITY COMPANY

By:                                     By:

Date:  1-5-2001                         Date:  1-5-2001


FRONTIER PACIFIC INSURANCE COMPANY

By:

Date:  1-5-2001




Page 7




TOTAL P.02

# EXHIBIT 4G

Casaccio Decl.
Ex. 4G, Page 58

ENDORSEMENT #2

to the

AGGREGATE REINSURANCE AGREEMENT

and

ADMINISTRATION AGREEMENT

among

FRONTIER INSURANCE COMPANY
in Rehabilitation
and

NATIONAL INDEMNITY COMPANY,
Omaha, Nebraska

and

NATIONAL LIABILITY & FIRE INSURANCE COMPANY,
Stamford, Connecticut

WHEREAS, Premier Insurance Company (the "Reinsured") and National Indemnity Company (the "Reinsurer") have entered into an Aggregate Reinsurance Agreement effective July 1, 2000 (the "Reinsurance Agreement") concerning "Covered Liabilities" as defined in the Reinsurance Agreement and whereas, as part of the the Reinsurance Agreement, the Reinsured and National Liability & Fire Insurance Company (the "Administrator") entered into an Administration Agreement concerning the Covered Liabilities;

WHEREAS, the parties modified the Reinsurance Agreement as set forth in Endorsement No. 1 to the Reinsurance Agreement;

WHEREAS, the Reinsured is now under the control of its Rehabilitator, who represents and warrants that it has all necessary authority and power to bind the Reinsured and the New York State Department of Insurance Liquidation Bureau to this Endorsement; and

WHEREAS, in consideration of their mutual promises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Rehabilitator and Reinsurer have mutually agreed to amend, modify or otherwise revise the Reinsurance Agreement and the Administration Agreement, on an interim basis and subject to the ongoing approval of both the Rehabilitator and the Reinsurer in order to promote the orderly rehabilitation of the Reinsured, in the manner set out below;

NOW, THEREFORE, the parties agree as follows:

1.  The Rehabilitator shall seek an order from the Supreme Court of the State of New York staying all actions against the Reinsured and staying all actions in which the Reinsured is obligated to defend a party for 180 days from entry of the order. The Rehabilitator will seek further stays following that period if appropriate given the Reinsured's circumstances and the circumstances of the rehabilitation.

2.  The Administrator will assist in the management of the Reinsured's administration, including claims negotiation and reinsurance collection, other than any business for which Clarendon National Insurance Company or its related parties ("Clarendon") has a direct or out-through obligation to any insured or cedent of the Reinsured ("Clarendon Business"). The principal administration efforts will be conducted out of the Reinsured's offices. The Rehabilitator authorizes the Administrator to compromise, settle, on a 100% basis, all non-Clarendon business of the Reinsured, including all non-Clarendon unallocated loss adjustment expenses ("ULAE") of the Reinsured, commencing immediately, with the exception of bond obligations which are accelerated due to the Reinsured's rehabilitation or failure of the Reinsured to continue to qualify as an authorized insurer or surety and any assumed reinsurance. All loss and allocated loss adjustment expense ("ALAE") paid by the Reinsurer which

2

is not due or then payable by the Reinsurer under its existing reinsurance obligations to the Reinsured constitutes a loan by the Reinsurer to the Reinsured which will carry interest at the prime rate. This loan includes both the reinsurance due (whether collectible or not) on business currently reinsured by the Reinsurer under the Reinsurance Agreement and business not currently reinsured by the Reinsurer, but does not include Clarendon Business.

3.     The Reinsurance Agreement currently includes ULAE on business covered thereunder as part of the cover's aggregate limit. With respect to ULAE to be paid by the Reinsurer under this Endorsement, the parties hereby agree that 40% of payments made by the Reinsurer at this time constitute "loan" and 60% be constitute loss subject to the aggregate limit under the Reinsurance Agreement. In addition, the Reinsurer will loan the Reinsured funds needed for non-ULAE operational expenses approved by the Reinsurer, under the same terms and conditions provided herein. The percentage allocation of the ULAE as expressed above shall be subject to ongoing revision by the parties should they determine that a different allocation is appropriate.

4.     The Administrator will account for and track, commencing immediately, that portion of funds paid by the Reinsurer which are attributable to the Reinsurer's existing reinsurance obligations, and that portion of funds paid which constitutes the loan. The Reinsurer and the Rehabilitator each has the right unilaterally to cease this arrangement at any time. Once ceased, all loan sums and accrued interest owed to the Reinsurer will be immediately offset against the Reinsurer's remaining reinsurance obligations to the Reinsured. The Reinsured and the Rehabilitator individually and collectively agree to this method of loan and repayment and the Rehabilitator deems such loan to be an administrative expense of the Rehabilitation proceeding.

5.     As part of the Administrator's duties, it will administer the collection of all third-party reinsurance, other than the Clarendon Business, owed to the Reinsured. The Rehabilitator hereby grants the right to collect and pursue, by arbitration or litigation if necessary, all reinsurance due the Reinsured and to compromise and settle all individual reinsurance billings as appropriate. The Administrator will not commute any reinsurance agreements without obtaining the Rehabilitator's specific prior approval. All collected sums will be applied to reduce the outstanding loan amount, plus interest, due the Reinsurer as they are collected.

6.     Consistent with Article 12 of the Reinsurance Agreement, "Insolvency of the Reinsured," all reinsurance payments made by the Reinsurer during the rehabilitation of the Reinsured shall be made directly to the Rehabilitator, which shall make payments with such funds. The

3

Administrator and Reinsurer shall make no payments not within the terms of Article 12 or without the approval of the Rehabilitator.

7.  All other terms and conditions of the Reinsurance Agreement and the Administration Agreement remain unchanged to the extent not inconsistent with the foregoing. Should the arrangement set out herein be terminated by either the Reinsurer or the Rehabilitator, any terms and conditions not modified by the foregoing shall have full force and effect, provided that the Reinsurer's remaining obligations shall be offset by sums owing to the Reinsurer or Administrator as set forth above.

8.  Under no circumstances, howsoever arising, shall anything herein be construed to expand or enlarge the Reinsurer's aggregate limit, inclusive of all expenses and costs, under the Reinsurance Agreement. Reinsurer shall be liable for no sums in excess of the limit, including sums paid both before and after the effective date of this Endorsement.

9.  This Endorsement constitutes a valid and enforceable amendment of the Reinsurance Agreement as provided for in Article 11.

10. Notwithstanding anything herein to the contrary, the Reinsured and Rehabilitator individually and collectively agree that ultimate authority for the settlement of claims and collection of reinsurance shall remain with the Rehabilitator.

11. The signatories hereto warrant and represent that they have full authority to execute this document on behalf of the respective entities.

IN WITNESS WHEREOF, the parties have executed this Endorsement by their duly authorized representatives.

4

Casaccio Decl.
Ex. 4G, Page 62

FRONTIER INSURANCE COMPANY,          NATIONAL INDEMNITY COMPANY
By its Rehabilitator

By: _____         By: _____

Date: Sept. 30, 2001                   Date: Sept. 20, 2001

NATIONAL LIABILITY & FIRE INSURANCE COMPANY

By: _____

Date: Sept. 2, 2001

Assistant Reins. Agree. President/Mgt.

# EXHIBIT 4H

Casaccio Decl.
Ex. 4H, Page 64

ENDORSEMENT NO. 3

to the

AGGREGATE REINSURANCE AGREEMENT

Between

FRONTIER INSURANCE COMPANY (IN REHABILITATION)

Rock Hill, New York

And

NATIONAL INDEMNITY COMPANY,

Omaha, Nebraska

WHEREAS, the Frontier Insurance Company in Rehabilitation (the "Reinsured") and National Indemnity Company (the "Reinsurer") have entered into an Aggregate Reinsurance Agreement effective July 1, 2000 (the "Reinsurance Agreement") concerning "Covered Liabilities" as defined in the Reinsurance Agreement and arising under Accident Years 1999 and prior;

WHEREAS, in connection with the Reinsurance Agreement, the parties also entered into an Administration Agreement among themselves and National Liability & Fire Insurance Company (the "Administration Agreement");

WHEREAS, the parties mutually amended the terms of the Reinsurance Agreement as reflected in Endorsement Nos. 1 and Endorsement No. 2 to the Reinsurance Agreement;

WHEREAS, the parties also entered into a Novation Agreement effective July 1, 2000 concerning an Aggregate Excess of Loss Reinsurance Agreement effective January 1, 1998 and a Coinsured Aggregate Excess of Loss Agreement Effective January 1, 1995 (the "Centre Re Agreements"). The liabilities covered in the Reinsurance Agreement and/or the Centre Re Agreements are referred to herein as the "Covered Liabilities" and/or "Covered Business;"

WHEREAS, the Reinsured and the Reinsurer ( or the "parties") have agreed to amend and modify the foregoing agreements and arrangements, effective January 1, 2004 and as more fully set forth herein; and

1

Casaccio Decl.
Ex. 4H, Page 65

WHEREAS, as a result of the foregoing, the Reinsured and the Reinsurer have mutually agreed to set forth in this Endorsement No. 3 the terms and conditions of the parties' agreement and that the Reinsurance Agreement and other above-referenced agreements shall be mutually deemed modified to the extent inconsistent with the agreements and statements contained herein;

NOW THEREFORE, in consideration of the mutual promises and releases set out herein and for other good and valuable consideration, the Reinsured and the Reinsurer agree as follows:

1.  As a condition precedent to the other modifications and agreements set out herein, the Reinsurer and Reinsured agree to expeditiously reconcile their account balances and remaining obligations under the existing reinsurance agreements and arrangements as of December 31, 2003. The reconciliation shall be performed consistent with the terms of the agreements and prior agreed upon practices. Upon their mutual agreement to the pertinent reconciled balances, the parties shall so stipulate to such balances and include such stipulation in the presentation of this Endorsement number 3 to the Rehabilitation Court for approval of this Endorsement. Such stipulation shall set forth the total net sum due to NICO, including accrued interest, arising from the Reinsurance Agreement as amended, the funds held under the Centre Re novation, the Administration Agreement and any other sums (the "NICO Balance").

2.  Effective January 1, 2004, the Reinsurer shall have no further obligation or liability whatsoever with respect to the Reinsured's surety business, including but not limited to indemnity sums, allocated or unallocated expense or other costs, under the Reinsurance Agreement or otherwise. The "Covered Business" and "Covered Liabilities" shall not include the Reinsured's surety business. Frontier's surety bond claims will not be reinsured under the Reinsurance Agreement. Any amounts paid by Reinsurer after December 31, 2003, on surety claims shall be included as an offset under Paragraph 7 hereto against obligations of NICO.

3.  Effective January 1, 2004, the Reinsured shall have no obligation to pay surety premium earned after December 31, 2003 to the Reinsurer.

4.  The Reinsured shall keep all surety subrogation collected after December 31, 2003.

5.  The Reinsurer shall have no administrative rights or obligations with respect to the handling of surety claims or the collection of reinsurance after December 31, 2003. The Reinsurer's administrative rights with respect to the non-surety business shall continue without change. In accordance with the foregoing, paragraph 5 of Endorsement No. 2 to the Reinsurance Agreement is hereby deleted.

6.  Effective January 1, 2004, there shall be an aggregate going-forward sub-limit of "Reinsurer's obligations in respect of ULAE" in the amount of $15 million. Subject to and without waiver of this aggregate sub-limit,

2

Reinsurer shall have no liability for any ULAE paid by Reinsured in respect of calendar year 2004 greater than $4.5 million (the "2004 ULAE sublimit"). In each successive calendar year, Reinsurer's sub-limit in respect of ULAE for such year shall be reduced by $500,000 from the previous year's sublimit ( for example, Reinsurer's "2005 ULAE sublimit" shall be $4 million). The amount of "Reinsurer's obligations in respect of ULAE" shall be mutually agreed based upon that portion of the claims activity that are "Covered Liabilities" related to all claims activity.

7.    Ten days following approval of this agreement by the Rehabilitation Court in a final, non-appealable order, the Reinsurer shall pay the sum of $50 million to the Reinsured. The Reinsurer's obligation to pay $50 million shall be reduced by the sum of all payments made by the Reinsurer after December 31, 2003 in excess of the Reinsurer's contractual obligations after December 31, 2003 pursuant to the Reinsurance Agreement as amended in this Endorsement No. 3. In addition thereto, Reinsurer shall pay accrued interest on the $50 million sum at the same rate of 6% that has been agreed to apply to sums loaned by NICO to Frontier under Endorsement No. 2, such interest to accrue on the net amount of the $50 million owed to Frontier as of the date of final approval of this Endorsement No. 3 from January 1, 2004.

8.    With effect from December 31, 2003, the Reinsurer releases the Reinsured from any and all obligation or liability with respect to repayment of $140 million of the NICO Balance. To the extent that the NICO Balance is greater than $140 million, the Reinsurer shall pay to the Reinsurer that amount by which the NICO Balance exceeds $140 million. Conversely, to the extent that the NICO Balance is less than $140 million, the Reinsurer shall pay to the Reinsured that amount by which $140 million exceeds the NICO Balance. Payment shall be made ten days following entry of a final, non-appealable order approving this Agreement of the Rehabilitation Court.

9.    With respect to the Centre Re Funds Held balance at December 31, 2003, the Reinsurer agrees not to collect this amount from Frontier as part of the $140 million of NICO Balance forgiveness referenced above, effective January 1, 2004. The Reinsurer agrees that it may only collect the remaining funds held balance from the other participants to the Centre Re Reinsurance Agreements and the Novation. In addition, Reinsurer shall abide by Reinsured's decision as to whether or not to relieve Frontier Pacific Insurance Company ("FPIC") from its obligations in respect of the funds held balance under the Centre Re Reinsurance Agreements and Novation.

10.    Effective January 1, 2004, with respect to claims payments previously made and claims payments made thereafter, the Reinsurance Agreement shall be treated as other reinsurance inuring to the benefit of the Aggregate Excess of Loss Agreement Effective January 1, 1998.

11.    Effective January 1, 2004, the Reinsurer shall have no obligation to the Reinsured with respect to the Centre Re Agreements and Novation.

3

12.    Effective January 1, 2004, the Reinsurer's remaining aggregate limit of liability under the Reinsurance Agreement shall be Ultimate Net Loss $225 million. Under no circumstances howsoever arising shall Reinsurer be liable to pay any sum greater than Ultimate Net Loss $225 million by reason of entering into the Reinsurance Agreement and the related arrangements above-referenced, as amended, after January 1, 2004. This aggregate limit of liability includes all sums due any reinsured under the Reinsurance Agreement, including Frontier Pacific Insurance Company ("FPIC"). The Reinsured and FPIC shall mutually confirm to Reinsurer their agreement as to respective sub-limits for each within the Reinsurer's $225 million aggregate limit.   Frontier and FPIC have the right to jointly reallocate the sub-limit from one entity to the other as needed provided they jointly confirm such agreement to the Reinsurer in writing prior to such revised respective sub-limits taking effect. In any case, the Reinsured and the Reinsurer mutually agree and acknowledge that Reinsurer shall not be obligated to make any payments under the Reinsurance Agreement in excess of the $225 million aggregate limit, and in the absence of mutual agreement as to FPIC's sub-limit, Reinsurer shall be entitled to protect itself from risking overpayment, either by offset or otherwise.

13.    The Reinsured shall release the Reinsurer from any and all claims related to the reinsurance in effect on December 31, 2003 except for the amended obligations as set forth in this Endorsement 3.

14.    The Reinsured shall hold the Reinsurer and Administrator harmless and indemnify the Reinsurer and Administrator against any claims of third parties in respect of sums that would otherwise be recoverable under the reinsurance and the Administrative Agreement and this amendment of the reinsurance and Administrative Agreement, but this hold harmless and indemnification obligation shall not extend to claims against the Reinsurer or Administrator as tortfeasors.

15.    The Reinsurer retains its right of immediate offset to its reinsurance obligations consistent with prior practice should the Reinsurer make a payment in excess of its obligations under the Reinsurance Agreement, as amended, or otherwise have an off-settable claim against the Reinsured. For example, if the NICO balances total $10 million, Frontier has paid $15 million in covered liabilities and the remaining reinsurance limit is $100 million, then NICO first offsets the $10 million balance against its reinsurance obligation of $15 million, and in that instance NICO must pay $5 million and the remaining limit will be $85 million.

16.    Endorsement No. 2 to the Reinsurance Agreement is modified such that Reinsurer may, but shall not be obligated to, make any loan to Reinsured.

All other terms and conditions of the Reinsurance Agreement and Administrative Agreement remain unchanged to the extent not inconsistent with the foregoing. Any terms and conditions not modified by the foregoing shall have full force

4

and effect, provided that each party's continued obligations may be offset by sums owing to the other party, occasioned by the assumption by one party of liability transferred to the other party hereunder.

       This Endorsement constitutes a valid and enforceable amendment of the Reinsurance Agreement as provided for in Article 11 of the Reinsurance Agreement.

       The signatories hereto warrant and represent that they have full authority to execute this document on behalf of the respective entities.

IN WITNESS WHEREOF, the parties have executed this Endorsement by their duly authorized representatives

FRONTIER INSURANCE COMPANY IN REHABILITATION

By: James P. O'Connor, Special Deputy
New York State Insurance Department Liquidation Bureau
As Rehabilitator for Frontier


NATIONAL INDEMNITY COMPANY

By:

NATIONAL LIABILITY & FIRE INSURANCE COMPANY

By:

5

Casaccio Decl.
Ex. 4H, Page 69

DEC-09-2004  16:21                              P.02

*Handout at Court Conference by FICR - 12/14/04*

## NICO TREATY

**Cash Paid NICO:**

Original Premiums and Fees:

| | |
|---|---|
| Original Premium | 400,000,000 |
| Option Fee | 15,000,000 |
| Other Fee | 100,000 |

Endorsement #1 Premium and Fees:

| | |
|---|---|
| Settle Ceded Reinsurance Issue | 6,697,000 |
| FIC Surety Premiums Earned Paid | 31,464,476 |

Total Cash Paid NICO        543,261,476

Ceded Paid Losses by NICO        382,961,220

Net Cash Held By NICO        160,300,256

**LIMIT REMAINING:**

| | |
|---|---|
| Original Limit | 811,464,476 |
| Additional Surety Limit | 44,874,350 |
| Revised Limit | 856,338,826 |
| Ceded Paid Losses by NICO | 382,961,220 |
| LIMIT REMAINING | 473,377,606 |

| | |
|---|---|
| ENDORSEMENT # 3  AGGREGATE | 225,000,000 |
| LIMIT GIVEN UP | 248,377,606 |
| LOAN FORGIVEN | 145,027,068 |
| NICO CASH TO FIC | 45,000,000 |
| TOTAL COMPENSATION TO FIC | 190,027,068 |
| LIMIT BENEFIT TO NICO | 58,350,538 |
| INTEREST SAVINGS IN 2004 ESTIMATED | 9,000,000 |
| NET LIMIT BENEFIT TO NICO | 49,350,538 |

# **PROOF OF SERVICE**

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within entitled action; my business address is One Wilshire Boulevard, Suite 2000, Los Angeles, California 90017-3383.

On June 27, 2008, I served the foregoing document(s) described as **DECLARATION OF JOSEPH CASACCIO IN SUPPORT OF DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO STAY PROSECUTION OF ACTION PENDING ARBITRATION OF CLAIMS** on the interested parties in this action by placing a copy thereof enclosed in a sealed envelope addressed as follows:

    **See Attached List**

☒   **BY MAIL.**  I caused such envelope with postage thereon fully prepaid to be placed in the U.S. Mail at Los Angeles, California.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒   **BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION.**  Based upon the Court's order for mandatory e-filing, I provided the documents listed above electronically to the Court's website and thereon to those parties on the Service List maintained by that website by submitting an electronic version of the documents to the Court's website.  The documents are deemed filed and served on the date that they were uploaded to the Court's website.

☐   **BY FACSIMILE TRANSMISSION.**  I caused such document to be transmitted to the addressee(s) facsimile number(s) noted herein.  The facsimile machine used complies with Rule 2003 and no error was reported by the machine.  Pursuant to Rule 2008(e), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

Executed on June 27, 2008, at Los Angeles, California.

☐   **(State)**     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒   **(Federal)**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                               s/Kathleen Slevcove
                               Kathleen Slevcove

593916.1

**SERVICE LIST**

| | |
|---|---|
| 1 | |
| 2 | EDMUND G. BROWN, JR.<br>  Attorney General of the State of<br>California<br>W. DEAN FREEMAN<br>  Supervising Deputy Attorney General<br>DIANE SPENCER SHAW<br>LISA W. CHAO<br>  Deputy Attorneys General<br>300 South Spring Street, Suite 1702<br>Los Angeles, California 90013<br><br>Telephone:  (213) 897-2486<br>Fax:  (213) 897-5775 | Attorneys for Plaintiff Steve Poizner,<br>Insurance Commissioner of the State of<br>California in his capacity as Liquidator<br>of Frontier Pacific Insurance Company |

1

2 EDMUND G. BROWN, JR.
   Attorney General of the State of
3 California
W. DEAN FREEMAN
4   Supervising Deputy Attorney General
DIANE SPENCER SHAW
5 LISA W. CHAO
   Deputy Attorneys General
6 300 South Spring Street, Suite 1702
Los Angeles, California 90013
7
Telephone:  (213) 897-2486
8 Fax:  (213) 897-5775

Attorneys for Plaintiff Steve Poizner,
Insurance Commissioner of the State of
California in his capacity as Liquidator
of Frontier Pacific Insurance Company

9 LAZLO KOMJATHY, JR.
Department of Insurance
10 45 Fremont Street, 24th Floor
San Francisco, California 94105
11
Telephone:  (415) 538-4413
12

Attorneys for Plaintiff Steve Poizner,
Insurance Commissioner of the State of
California in his capacity as Liquidator
of Frontier Pacific Insurance Company

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 72

MUSICK, PEELER
& GARRETT LLP
ATTORNEYS AT LAW

593916.1

**DECLARATION OF JOSEPH CASACCIO IN SUPPORT OF DEFENDANT NATIONAL INDEMNITY
COMPANY'S MOTION TO STAY PROSECUTION OF ACTION PENDING ARBITRATION OF CLAIMS**