1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  W. DEAN FREEMAN
   Supervising Deputy Attorney General
3  FELIX E. LEATHERWOOD
   Supervising Deputy Attorney General
4  DIANE SPENCER SHAW, State Bar No. 73970
   Deputy Attorney General
5  LISA W. CHAO, State Bar No. 198536
   Deputy Attorney General
6      300 South Spring Street, Room 1702
       Los Angeles, California  90013
7      Telephone:  (213) 897-2486
       Fax:  (213) 897-5775
8
   LASZLO KOMJATHY, JR., State Bar No. 99861
9  California Department of Insurance
       45 Fremont Street, 24th Floor
10     San Francisco, CA 94105
       Telephone:  (415) 538-4413
11     Fax:  (415) 904-5896

12 Attorneys for Plaintiff Steve Poizner, Insurance Commissioner
   of the State of California, in his capacity as the Liquidator of
13 Frontier Pacific Insurance Company

14                  UNITED STATES DISTRICT COURT

15              SOUTHERN DISTRICT OF CALIFORNIA

16

17

18 STEVE POIZNER, INSURANCE              CASE NO.  08 CV 772 L (POR)
   COMMISSIONER OF THE STATE OF
19 CALIFORNIA, in his capacity as the    PLAINTIFF'S OPPOSITION TO
   Liquidator of Frontier Pacific Insurance   DEFENDANT'S MOTION TO STAY
20 Company,                              PROSECUTION OF ACTION
                                         PENDING ARBITRATION OF
21          Plaintiff,                   CLAIMS

22      v.

23 NATIONAL INDEMNITY COMPANY, a         [DECLARATIONS OF WILLARD
   Nebraska corporation; and DOES 1 through   ROBERTS AND LISA W. CHAO
24 10,                                   FILED CONCURRENTLY
                                         HEREWITH]
25          Defendants.

26                                       Hearing Date:  August 18, 2008
                                         Time:          10:30 a.m.
27                                       Courtroom:     14
                                         Judge:         Hon. M. James Lorenz
28

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   BACKGROUND ............................................................................................ 2

      A.    FPIC's Liquidation............................................................................ 2

      B.    Pre-Liquidation Reinsurance Agreements ........................................ 3

            1.    The Novated Contracts............................................................ 3

            2.    The NICO Aggregate Reinsurance Agreement........................ 4

      C.    Subsequent Agreements Between NICO and Frontier........................ 5

      D.    NICO Claims It is Unable to Pay Covered Losses Due FPIC ............ 6

III.  ARGUMENT ................................................................................................. 8

      A.    The Commissioner Is Not A Party To Endorsement No. 3 And
            Thus Cannot Be Compelled To Arbitrate Any Dispute Arising
            From That Agreement ........................................................................ 8

            1.    The Dispute Is Limited to Endorsement No. 3. ....................... 9

            2.    No Contractual Principles Require the Commissioner to
                  Arbitrate Disputes Concerning Endorsement No. 3................ 11

      B.    The Liquidation Order Bars NICO From Compelling Arbitration. ...... 13

      C.    Arbitration Of This Dispute Is Not Appropriate. .............................. 15

      D.    Stay Is Not Warranted For Non-Arbitrable Claims. .......................... 16

IV.   CONCLUSION.............................................................................................. 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

*Aicco, Inc. v. Insurance Co. of N. Am.*,
90 Cal.App.4th 579 (2001) ................................................................................4

*AT&T Technologies, Inc. v. Communications Workers of Am.*,
475 U.S. 643, 106 S. Ct. 1415, 89 L.Ed.2d 648 (1986) ...................................8

*Bennett v. Liberty National Fire Insurance Co.*,
968 F.2d 969 (9th Cir. 1992)............................................................................10

*Chastain v. Union Security Life Ins. Co.*,
502 F. Supp. 2d 1072 (C.D. Cal. 2007) .............................................................9

*Comedy Club, Inc. v. Improv West Assocs.*,
514 F.3d 833 (9th Cir. 2007)..............................................................................8

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006)...................................................................8, 9, 13

*Davister Corp. v. United Republic Life Ins. Co.*,
152 F.3d 1277 (10th Cir. 1998) .......................................................................15

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213, 105 S. Ct. 1538 (1985) .............................................................16

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates,
S.A.S.*,
269 F.3d 187 (3d Cir. 2001)........................................................................10, 13

*Lowden v. T-Mobile USA, Inc.*,
512 F.3d 1213 (9th Cir. 2008).............................................................................8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1, 103 S. Ct. 927, 74 L.Ed.2d 765 (1983) ........................................9

*Munich Am. Reinsurance Co. v. Crawford*,
141 F.3d 585 (5th Cir. 1998) ...........................................................................15

*Quackenbush v. Allstate Ins. Co.*,
121 F.3d 1372 (9th Cir. 1997)....................................................................10, 15

*Thomson-CSF, S.A. v. American Arbitration Ass'n*,
64 F.3d 773 (2d Cir. 1995).................................................................................12

*Three Valleys Muni. Water Dist. v. E.F. Hutton & Co.*,
925 F.2d 1136 (9th Cir. 1991)............................................................................8

*Travelers Indemnity Co. v. Gillespie*,
50 Cal.3d 82 (1990) ............................................................................................4

*United States v. Fabe*,
508 U.S. 491, 113 S. Ct. 2202 (1993) .............................................................14

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960) ............................................................ 8

*Victoria v. Superior Court (Kaiser Foundation Hospitals)*,
    40 Cal.3d 734 (1985) ............................................................................................................ 8

*Webster v. Superior Court*,
    46 Cal.3d 338 (1988) .......................................................................................................... 14

*Zurich American Ins. Co. v. Watts Industries, Inc.*,
    417 F.3d 682 (7th Cir. 2005).......................................................................................... 11, 12

## STATUTES

9 U.S.C. § 4 ............................................................................................................................ 8

15 U.S.C. § 1012(b) ............................................................................................................... 14

15 U.S.C. §§ 1011-1015 ........................................................................................................ 14

Cal. Ins. Code § 1011 ............................................................................................................ 13

Cal. Ins. Code § 1016 ............................................................................................................ 13

Cal. Ins. Code § 1020 .................................................................................................. 13, 14, 15

Cal. Ins. Code § 1033 ............................................................................................................ 16

Cal. Ins. Code § 1063.1 ......................................................................................................... 16

Cal. Ins. Code § 1063.2 ......................................................................................................... 16

Cal. Ins. Code § 1063.5 ......................................................................................................... 16

## OTHER AUTHORITIES

Graydon S. Staring, Law of Reinsurance § 21:1 (2008) ......................................................... 15

# I.

## INTRODUCTION

Subsequent to the appointment of Plaintiff Insurance Commissioner of the State of California ("Commissioner"),[1] as Liquidator of Frontier Pacific Insurance Company ("FPIC"), Defendant National Indemnity Insurance Company ("NICO") and FPIC's parent company, Frontier Insurance Company ("Frontier"), entered into an agreement entitled Endorsement No. 3. Pursuant to that agreement, NICO agreed to not collect $40 million in unpaid premiums due to NICO from Frontier, to waive the collection of $140 million loaned to Frontier under a prior agreement and to pay Frontier an additional $50 million.

Having waived its rights to collect the $40 million from Frontier, NICO now asserts that under Endorsement No. 3, it retains the right to offset the waived $40 million against the millions it owes FPIC, subject to Frontier's ability to instruct it to release FPIC.  The Commissioner disputes NICO's interpretation and brought this action to determine the effect of Endorsement No. 3.  After removing this action from state court and invoking this court's jurisdiction, NICO now seeks to stay prosecution of this action pending arbitration in New York.  NICO contends that the arbitration clauses in the reinsurance agreements govern the dispute over the legal effect of Endorsement No. 3 and that this action should be stayed pending arbitration.

The subject matter of this declaratory relief action is Endorsement No. 3.  The Commissioner did not agree to amend the terms of the reinsurance agreement to include arbitrating his dispute with NICO regarding the interpretation and the legal effect of Endorsement No. 3.  Without the Commissioner's consent to be bound by Endorsement No. 3, NICO's arguments as to why its motion for stay should be granted are unsupportable.  Fundamental to NICO's ability to compel arbitration is the existence of an agreement to arbitrate the matter in dispute.  The Commissioner in this action does not assert or seek enforcement of any contractual rights under any reinsurance agreement between FPIC and NICO.  To the contrary, the Commissioner seeks to resolve disputes concerning the legal interpretation and the effect of an

---

[1]  When FPIC became insolvent in 2001, Harry Low was the Commissioner.  As of January 1, 2007, Steve Poizner succeeded as the Insurance Commissioner of the State of California.

- 1 -

1  agreement between NICO and Frontier, the former parent of FPIC.  The Commissioner is not a

2  party to that agreement and has no obligation to arbitrate.  Moreover, NICO has not argued that

3  the Commissioner is bound by any contractual theories that require nonparties to arbitrate.

4       Further, the injunctions set forth under California law and the order governing FPIC's

5  liquidation prohibit NICO from unilaterally binding the Commissioner to arbitrate where he has

6  not agreed to do so.[2]  This dispute also is not appropriate for arbitration because it does not

7  involve specialized terms and knowledge regarding the reinsurance industry, and the costs of

8  arbitration are prohibitive since FPIC is already in liquidation.  Finally, even if the Court finds

9  that certain claims must be arbitrated, it may sever the arbitrable and non-arbitrable claims, and

10  only stay those claims subject to arbitration.

11       Because the Commissioner is not required to arbitrate his dispute with NICO, the Court

12  should deny NICO's request to stay this action pending arbitration.

13                                              **II.**

14                                       **BACKGROUND**

15  **A.    FPIC's Liquidation**

16       FPIC was a California domestic insurance company that transacted insurance in California

17  and other states.  It was a wholly owned subsidiary of Frontier, a New York insurance company.

18  *See* Declaration of Willard Roberts ("Roberts Decl."), ¶ 5.

19       FPIC's financial difficulties arose after its parent, Frontier, was placed into rehabilitation

20  in the State of New York and FPIC could no longer collect the $12.8 million owed by Frontier to

21  FPIC as its reinsurer.  *Id.*, ¶ 6.  On November 30, 2001, FPIC was placed into liquidation upon

22  the order ("Liquidation Order") of the California Superior Court for the County of San Diego, in

23  the matter entitled *Insurance Commissioner v. Frontier Pacific Insurance Company*, Case No.

24  GIC 774028, and the Commissioner was appointed as the liquidator pursuant to California

25  Insurance Code section 1010, et seq.  *Id.*, ¶ 7 at Exhibit A, pp. 6-13.

26

27  _____

[2]  NICO concedes the existence of injunctions under the order appointing the Commissioner as
liquidator of FPIC.  *See* Memorandum of Points and Authorities in Support of NICO's Motion to

28  Stay Prosecution of Action Pending Arbitration of Claims ("Motion"), pp.14-15 & fn.3.

1    The Commissioner has been diligently marshaling FPIC's assets and winding up its

2    operations.  The Commissioner's ability to marshal assets, however, has been thwarted by the

3    extensive commingling of Frontier's and FPIC's accounts, their book of business and the

4    reinsurance agreements.  *Id.* at ¶ 8.

5    Reinsurance is normally the largest asset of an insolvent insurer.  The Commissioner as

6    liquidator has the responsibility to continue to collect reinsurance recoverables and disburse such

7    funds primarily to the California Insurance Guarantee Association ("CIGA") to pay policyholder

8    claims made against FPIC.  As of this year, the Commissioner has completed most aspects of

9    FPIC's insolvency proceeding, including the resolution of almost all of the claims and the

10   collection of a substantial portion of FPIC's assets.  The only significant matter that prevents the

11   Commissioner from closing the estate and distributing assets to claimants is the collection of

12   reinsured losses of the estate including over an estimated $28 million ultimately owed by NICO.

13   *Id.*

14   **B.    Pre-Liquidation Reinsurance Agreements**

15   Prior to its liquidation, FPIC and Frontier entered into three reinsurance agreements with

16   NICO as their reinsurer.  NICO assumed two of the agreements pursuant to a Novation

17   Agreement, and entered into a third agreement directly with Frontier, which was subsequently

18   amended to include FPIC.  Roberts Decl., ¶ 9.

19   **1.    The Novated Contracts**

20   FPIC and its parent, Frontier, were each the reinsured under the Coinsured Aggregate

21   Excess Loss Reinsurance Agreement effective January 1, 1995, and the Aggregate Excess Loss

22   Reinsurance Agreement effective January 1, 1998 (collective "Centre Re Agreements") with

23   Centre Reinsurance Company of New York and its successor Zurich Reinsurance (North

24   America), Inc. ("Zurich Re").  *Id.*, ¶ 10.

25   The Centre Re Agreements allowed FPIC and Frontier to withhold all of the insurance

26   premiums due the reinsurers in a funds held account less the reinsurers' margins of 8% and 8.75%

27   ("Centre Re Funds Held"), respectively, so that FPIC and Frontier can reimburse themselves for

28   reinsured losses.  *Id.*, ¶ 11.  As of December 31, 2003, Frontier was in default under the Centre

- 3 -

Re Agreements and owed NICO approximately $40 million in premiums for deficiencies in the Centre Re Funds Held account. *See* Declaration of Lisa W. Chao ("Chao Decl."), Exhibit 5 at p. 45, ¶ 27.

On or about December 21, 2000, with FPIC and Frontier's consent, NICO entered into a Novation Agreement with Zurich Re which substituted NICO as the reinsurer for FPIC and Frontier. In consideration for assuming all of Zurich Re's obligations and liabilities under the Centre Re Agreements, NICO received $68,200,000 from Zurich Re. *See* Roberts Decl., ¶ 12. The novation thus released Zurich Re and its predecessor Centre Re from their obligations and responsibilities under the reinsurance agreements.[3]

### 2.    The NICO Aggregate Reinsurance Agreement

Just prior to the Novation Agreement, on September 27, 2000, NICO and Frontier entered into an Aggregate Reinsurance Agreement, effective date of July 1, 2000 (the "NICO Agreement"). *See* Roberts Decl., ¶ 13; Declaration of Joseph Casaccio in Support of NICO's Motion to Stay Prosecution of Action Pending Arbitration of Claims ("Casaccio Decl."), Exhibit 4D at pp. 71-80. On January 5, 2001, the NICO Agreement was amended by Endorsement No. 1 to add FPIC as an additional reinsured. FPIC paid NICO a $21 million premium in consideration of NICO's agreement to pay on behalf of Frontier and FPIC up to $858,554,275 with NICO's liability to FPIC limited to a maximum of $47,089,799 for all covered losses. *See* Roberts Decl., ¶ 13; Casaccio Decl., Exhibit 4E at pp. 82-89.

Article 11 of the NICO Agreement required the written consent of all parties to amend or change the terms of the agreement as follows:

> The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsurer and the Reinsured. No amendment to the Insurance Policies/Reinsurance Contracts after the Effective Date shall enlarge or alter the obligations or liabilities of the parties hereunder unless the parties have consented in writing to such amendment….

Casaccio Decl., Exhibit 4D at p. 77.

---

[3] Zurich Re would have remained liable to the Frontier companies jointly with NICO unless there was a novation. *See*, *e.g.*, *Travelers Indemnity Co. v. Gillespie*, 50 Cal.3d 82 (1990); *Aicco, Inc. v. Insurance Co. of N. Am.*, 90 Cal.App.4th 579 (2001).

1    **C.    Subsequent Agreements Between NICO and Frontier**

2        On August 27, 2001, Frontier was taken into temporary rehabilitation by the

3    Superintendent of Insurance of the State of New York.  *See* Chao Decl., Exhibit 5 at pp. 43-44, ¶

4    20.  Frontier's rehabilitation caused FPIC to be declared insolvent and conserved by the

5    Commissioner on September 7, 2001.  *See* Roberts Decl., ¶ 6.

6        On October 15, 2001, an Order of Rehabilitation was entered by the Supreme Court of the

7    State of New York, County of New York ("Rehabilitation Court"), appointing the Superintendent

8    as rehabilitator.  Chao Decl., Exhibit 1 at pp. 4-8.  In an attempt to work out its liquidity issues,

9    Frontier entered into Endorsement No. 2 to the NICO Agreement with NICO.  Under

10   Endorsement No. 2, NICO was designated as an administrator to assist Frontier and loaned

11   approximately $140 million to Frontier.  Casaccio Decl., Exhibit G at pp. 91-95.  FPIC was not a

12   party to Endorsement No. 2 nor did NICO or Frontier seek the Commissioner's consent.  *Id.*

13       Subsequently, Frontier and NICO entered into Endorsement No. 3 further amending the

14   terms the NICO Agreement and Endorsements Nos. 1 and 2 as between NICO and Frontier.  *See*

15   Casaccio Decl., Exhibit 4H at pp. 97-102.  Pursuant to Endorsement No. 3, Frontier and NICO

16   agreed to reconcile all their account balances and all remaining obligations under the Centre Re

17   Agreements and the NICO Agreement, including the net sums due to NICO and accrued interest

18   thereon ("NICO Balance").  *Id.*, p. 98 at ¶ 1.  In lieu of exercising its right to offset Frontier's $40

19   million unpaid premium obligation to fund the Centre Re Funds Held account against NICO's

20   reinsurance obligations to Frontier, NICO agreed to pay $50 million to Frontier, less payments

21   made to Frontier after December 31, 2003, and to release Frontier from its obligations of up to

22   $140 million on the NICO Balance.  *Id.*, p. 99 at ¶¶ 7-9.  Endorsement No. 3 also reduced NICO's

23   remaining aggregate liability limit to all reinsureds under the NICO Agreement to $225 million

24   without affecting FPIC's sublimit.[4]  *Id.*, p. 100 at ¶ 12.

25

26   [4]  Despite Frontier's representation to the Rehabilitation Court that Endorsement No. 3 resolved
     all issues between it and NICO, NICO now asserts that Frontier continues to have an interest in
27   the Centre Re Funds Held balance.  NICO claims that to the extent it does not pay FPIC, the
     aggregate liability limits under the NICO Agreement will be preserved for the benefit of Frontier.
28   *See* Motion, p. 4, fn.1.

- 5 -

1    In addition to releasing Frontier from its liability to pay $40 million in premium shortfall

2    in the Centre Re Funds Held account to NICO, Frontier and NICO purported to shift all of

3    Frontier's $40 million Centre Re Funds Held liability onto FPIC at the sole discretion of Frontier

4    as follows:

5          9.      With respect to the Centre Re Funds Held balance at December 31, 2003,
                   the Reinsurer agrees not to collect this amount from Frontier as part of the
6                  $140 million of NICO Balance forgiveness referenced above, effective
                   January 1, 2004.  The Reinsurer agrees that it may only collect the
7                  remaining funds held balance from the other participants to the Centre Re
                   Reinsurance Agreements and the Novation.  In addition, Reinsurer shall
8                  abide by Reinsured's decision as to whether or not to relieve Frontier
                   Pacific Insurance Company ("FPIC") from its obligations in respect of the
9                  funds held balance under the Centre Re Reinsurance Agreements and
                   Novation.
10

11   *Id.*, p. 99.  NICO purportedly received a net benefit of $49,350,538 as a result of Endorsement

12   No. 3.  (*Id.*, p. 102.)

13         Neither the Commissioner nor FPIC is a party to Endorsement No. 3.  *Id.*, Exhibit 4H;

14   Chao Decl., Exhibit 5 at p. 46, ¶ 30.

15         In July 2004, Frontier made an initial petition to the Rehabilitation Court for approval of

16   Endorsement No. 3.  Chao Decl., Exhibit 2 at pp. 9-23; Exhibit 5 at p. 46, ¶ 31.  On April 4, 2005,

17   Frontier renewed its petition to approve Endorsement No. 3.  *Id.*, Exhibit 5 at p. 46, ¶ 34; Exhibit

18   3 at pp. 24-32.  Frontier represented to the Rehabilitation Court *inter alia* that Frontier would

19   receive $45 million in cash and $145 million of debt relief and that Frontier could not be

20   rehabilitated without the $45 million infusion of cash.  *Id.*, Exhibit 3 at pp. 25-27, ¶¶ 5, 7; Exhibit

21   5 at p. 46, ¶¶ 34-35.  NICO did not object to or otherwise controvert the representations made by

22   Frontier and on July 28, 2005, the Rehabilitation Court approved Endorsement No. 3.  *Id.*, Exhibit

23   4 at pp. 33-38; Exhibit 5 at p. 46, ¶ 36.

24   **D.    NICO Claims It is Unable to Pay Covered Losses Due FPIC**

25         Throughout FPIC's liquidation, the Commissioner worked with Frontier and NICO to

26   reconcile loss data, and report and collect on reinsurance recoverables.  This was necessary since

27   all of the accounts and records were commingled and in the possession of Frontier at its principal

28   office located in New York.  Roberts Decl., ¶ 14.

- 6 -

1    In January 2005, the Commissioner submitted a billing to NICO for payment of FPIC's

2    claims under the NICO Agreement.  *Id*., ¶ 15.  In June 2005, during the course of meetings with

3    Frontier and NICO, the Commissioner agreed that he would await the Rehabilitation Court's

4    approval of Endorsement No. 3 before re-billing NICO for FPIC's losses.  *Id.*  Neal Conolly, the

5    designated agent of Frontier, represented to the Commissioner that once Endorsement No. 3 was

6    approved by the New York rehabilitation court, FPIC would be able to collect the reinsurance

7    receivables due from NICO.  *Id.*

8    On or about September 20, 2005, after receipt of the order approving Endorsement No. 3,

9    Frontier submitted FPIC's reinsurance losses in the principal amount of $4,883,090 to NICO for

10   payment.  *Id.*, ¶ 16.  NICO, however, refused to pay based on the terms of Endorsement No. 3.  It

11   claimed that under Paragraph 9 of Endorsement No. 3, only Frontier can make the unilateral

12   decision on whether to release FPIC from such liability.  *Id.*, ¶ 17.  Most recently, NICO asserted

13   again that unless Frontier instructs otherwise, FPIC was now liable for the $40 million in liability

14   incurred by Frontier and which NICO forgave as to Frontier.  *Id.*  Frontier in turn has proposed

15   that it would direct NICO to release FPIC from Frontier's $40 million liability on the condition

16   that FPIC waive all inter-company balances between Frontier and FPIC, including a $19 million

17   owed by Frontier to FPIC.  *Id.*, ¶ 18.

18   Faced with NICO's reliance on Endorsement No. 3 to not pay FPIC without Frontier's

19   instruction, and the inability to collect reinsurance funds to distribute to CIGA to pay policy

20   claims and to wind up the estate, the Commissioner filed a complaint in the Superior Court of the

21   State of California for the County of San Diego seeking declaratory relief as to the effect of

22   Endorsement No. 3 on the FPIC liquidation estate.  NICO removed this action to this Court and

23   now seeks to stay this action pending arbitration.  NICO contends that the Commissioner is bound

24   by the arbitration clauses under the reinsurance agreements to arbitrate Endorsement No. 3.  The

25   Commissioner, however, is not a signatory to Endorsement No. 3 and thus cannot be compelled

26   to arbitrate disputes concerning Endorsement No. 3.

27   ///

28   ///

- 7 -

1

**III.**

2

**ARGUMENT**

3

**A.     The Commissioner Is Not A Party To Endorsement No. 3 And Thus Cannot Be Compelled To Arbitrate Any Dispute Arising From That Agreement.**

4

5      It is a cardinal rule that an arbitration clause cannot be enforced against a party who has

6    not agreed to arbitrate.  The United States Supreme Court has long recognized that "arbitration is

7    a matter of contract and a party cannot be required to submit to arbitration any dispute which he

8    has not agreed so to submit."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363

9    U.S. 574, 582, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960); *see AT&T Technologies, Inc. v.*

10   *Communications Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L.Ed.2d 648 (1986)

11   (reiterating the principles established in *United Steelworkers*).  The threshold question of whether

12   an arbitration agreement exists between the parties must be decided by the court.  *AT&T*

13   *Technologies, Inc.*, 475 U.S. at 652; *Three Valleys Muni. Water Dist. v. E.F. Hutton & Co.*, 925

14   F.2d 1136, 1041 (9th Cir. 1991).

15      The Ninth Circuit follows the doctrine that in general non-parties are not bound to

16   arbitrate a dispute unless an arbitration agreement exists.[5]  *See Comedy Club, Inc. v. Improv West*

17   *Assocs.*, 514 F.3d 833, 844-845 (9th Cir. 2007); *Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir.

18   2006).  Thus, the Court must first find that a valid agreement to arbitrate the dispute exists in

19   order to require Commissioner to arbitrate under Endorsement No. 3.  *See* 9 U.S.C. § 4; *Lowden*

20   *v. T-Mobile USA, Inc.*, 512 F.3d 1213, 1217 (9th Cir. 2008).  If the Court finds that no agreement

21   exists to require the Commissioner to arbitrate, it then must determine if the Commissioner must

22   still arbitrate as a nonsignatory under the ordinary contract principles of 1) incorporation by

23   reference, 2) assumption, 3) agency, 4) veil piercing/alter ego, and 5) estoppel as well as third

24   party beneficiaries.  *Comer v. Micor, Inc.*, 436 F.3d at 1101.

25      Further, the Federal Arbitration Act's liberal policy in favor of arbitration concerns only

26

27   ────────────

[5]   California case law is in accord.  The California Supreme Court has held that "'the policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate.'"

28   *Victoria v. Superior Court (Kaiser Foundation Hospitals)*, 40 Cal.3d 734, 739 (1985).

- 8 -

1     "'the scope of arbitrable issues.'" *Comer v. Micor, Inc.*, 436 F.3d at 1104 n.11 (citing *Moses H.*

2     *Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L.Ed.2d 765

3     (1983)). This policy "does not apply to the determination of whether there is a valid agreement to

4     arbitrate between the parties; instead '[o]rdinary contract principles determine who is bound.'"

5     *Id.*; *see Chastain v. Union Security Life Ins. Co.*, 502 F. Supp. 2d 1072, 1075 n.2 (C.D. Cal. 2007)

6     (finding that court not bound by the liberal policy in favor of arbitration to determine that no valid

7     arbitration agreement existed).

8         **1.**      **The Dispute Is Limited to Endorsement No. 3.**

9        The Commissioner is not bound to arbitrate disputes concerning Endorsement No. 3

10     because he is not a party to that agreement. NICO does not dispute this fact. Instead, NICO's

11     request to stay this case pending arbitration does not address the threshold question of whether a

12     valid arbitration agreement between it and the Commissioner exists or whether the arbitration

13     clause can be invoked to compel the Commissioner to arbitrate the meaning of an agreement to

14     which he is not a party. It simply assumes that the arbitration provisions contained in the Centre

15     Re Agreements and the NICO Agreement are applicable. (Motion, pp. 7:22-8:1.) NICO

16     primarily relies on the federal policy in favor of arbitration and <u>its presumption</u> that the dispute is

17     within the scope of arbitration. (Motion, pp. 8-13.) None of those arguments, however, address

18     the question of whether the Commissioner is required to arbitrate disputes under Endorsement

19     No. 3, and the underlying question of the legal effects of NICO waiving its right to offset the $40

20     million owed to it by Frontier, releasing Frontier of its obligation to pay NICO $40 million, as

21     well as paying an additional $50 million to Frontier upon the New York Rehabilitation Court's

22     approval of Endorsement No. 3.

23        NICO's bald assertion that the "Commissioner effectively seeks to recover reinsurance

24     balances that have accrued" is untenable, especially since NICO relies on Endorsement No. 3 as

25     the basis of its inability to pay FPIC's claims. The relief sought by the Commissioner is limited

26     to the legal effect of Endorsement No. 3. The Commissioner seeks declarations that (1) FPIC is

27     not bound by any obligations that Frontier and NICO attempt to impose on it pursuant to

28     Endorsement No. 3; (2) Endorsement No. 3 had the effect of satisfying any obligation of FPIC or

Frontier to NICO for outstanding premiums; and (3) NICO's attempt to setoff additional premium incurred by Frontier and waived by NICO against FPIC pursuant to Endorsement No. 3 violates California Insurance Code section 1031. The circumstances here are thus distinguishable from *Bennett v. Liberty National Fire Insurance Co.*, 968 F.2d 969, 971-972 (9th Cir. 1992), and *Quackenbush v. Allstate Insurance Co.*, 121 F.3d 1372, 1380 (9th Cir. 1997), where the liquidator sought to enforce contractual rights under the reinsurance agreements.

The fact that Endorsement No. 3 implicates underlying obligations under the reinsurance agreements does not make the arbitration clauses in those agreements binding on this dispute. In *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187 (3d Cir. 2001), the Third Circuit rejected just such an argument. In that case, a subsidiary of DuPont entered into a joint venture agreement ("Agreement") that contained an arbitration agreement. While DuPont was not a party to the agreement, the Agreement stated that DuPont would provide certain assistance to the joint venture. DuPont also entered into several related agreements with the joint venture company. *Id.* at 191-192. When the joint venture failed, DuPont filed an action against another joint venturer, Rhodia Fiber, and its parent, Rhodia, not for breach of the Agreement, but for breach of an oral agreement and fraudulent misrepresentations that occurred much later. The district court refused to compel arbitration under the Agreement.

In affirming, the Third Circuit recognized that the Agreement contained a valid arbitration agreement, but found that DuPont was not a signatory to the Agreement and also not bound to arbitrate under traditional contract principles. *Id.* at 194. The court further considered that some of DuPont's claims against the subsidiary arise in part from the underlying Agreement and whether DuPont should be estopped from repudiating the Agreement. *Id.* at 200. However, the Court found that because DuPont alleged a separate oral agreement, the core of the case was the conduct of defendants with respect to the later agreement, and not the breach of the Agreement. *Id.* at 201.

Similarly, the Commissioner has not alleged any breach of the reinsurance agreements. The core dispute in this case pertains to NICO's conduct with respect to Endorsement No. 3 to pay Frontier $50 million (¶ 7), to release Frontier from repayment of $140 million NICO loan

- 10 -

1    balance (¶ 8) and as part of NICO's forgiveness of the $140 million to agree not to collect from

2    Frontier the $40 million funds held balance (¶ 9) thereby waiving all of its rights to offset against

3    the obligations incurred by Frontier all to the purported detriment of FPIC. *See* Casaccio Decl.,

4    Exhibit 4H at p. 99. Neither FPIC nor the Commissioner is a party to this agreement. Thus, the

5    fact that the reinsurance agreements contain arbitration clauses does not compel the

6    Commissioner to arbitrate this separate dispute concerning Endorsement No. 3.

7          **2.**       **No Contractual Principles Require the Commissioner to Arbitrate Disputes Concerning Endorsement No. 3.**

8

9          The Commissioner cannot be forced to arbitrate his claims under any contractual

10   principles regarding the legal effect of Endorsement No. 3 and NICO's release of Frontier of its

11   obligations to pay premium obligations. The court in *Zurich American Insurance Co. v. Watts*

12   *Industries, Inc.*, 417 F.3d 682 (7th Cir. 2005), refused such a request by an insurer to compel a

13   subsidiary to arbitrate a dispute based on an agreement between the insurer and the parent

14   company. In that case, both Watts Industries, Inc. (Watts) and its subsidiary, James Jones

15   Company (Jones) were named insureds under liability policies issued by Zurich. Watts also

16   entered into several separate deductible agreements with Zurich, but Jones did not. The

17   deductible agreement provided that the named insureds under the liability policies shall be jointly

18   and severally responsible for the obligations under the deductible agreement. *Id.* at 687. The

19   liability policies did not contain any arbitration clauses, but the deductible agreements did. *Id.* at

20   684. When Watts and Jones were sued in two cases in California, they tendered the claims to

21   Zurich, which refused to provide coverage. Watts and Jones each filed suit against Zurich for

22   defense and indemnity under the liability policies. Zurich in turn filed a petition to compel

23   arbitration in Illinois federal court against both parties. *Id.* at 685.

24         In refusing to compel Jones to arbitrate, the Seventh Circuit found that the deductible

25   agreements' language to include named insured did not evidence any agreement by Jones to

26   arbitrate its dispute with Zurich. There was no argument that Jones attempted to assume any

27   obligations under the deductible agreements or that those agreements were incorporated by

28   reference into the liability policies. *Id.* at 687. The Court found that the existence of parent and

- 11 -

1   subsidiary relationship itself did not create any alter ego or agency relationship so as to bind

2   Jones.  Finally, Zurich failed to show that Jones received any *direct* benefit from the deductible

3   agreements, and Jones has not sought to enforce any rights under the deductible agreements.  *Id.*

4   at 688.

5        Similarly, the principles of incorporation by reference, assumption, agency, veil

6   piercing/alter ego, estoppel, and third party beneficiary do not apply in this case.

7        First, Endorsement No. 3 is a separate agreement entered into by Frontier and NICO that

8   binds only Frontier and NICO.  The fact that it is appended to the NICO Agreement does not

9   mean that all of terms of the Endorsement No. 3 are incorporated into the NICO Agreement with

10   respect to FPIC.  In fact, Article 11 of the NICO Agreement prohibits any amendment without

11   FPIC's consent.   Here, FPIC is not a party to Endorsement No. 3, and thus did not provide its

12   written consent to the incorporation of the NICO Agreement into Endorsement No. 3 or vice

13   versa.  Thus, NICO and Frontier's agreement did not make the Commissioner's dispute with

14   NICO subject to the arbitration clause.

15        Second, "a party may be bound by an arbitration clause if its subsequent conduct indicates

16   that it is assuming the obligation to arbitrate."  *Thomson-CSF, S.A. v. American Arbitration Ass'n*,

17   64 F.3d 773, 777 (2d Cir. 1995).  There is no claim that FPIC took any action to assume

18   Endorsement No. 3.

19        Third, NICO has not claimed that Frontier acted as an agent of FPIC in executing

20   Endorsement No. 3.  Indeed, the Liquidation Order specifically enjoins any person from

21   interfering with FPIC's assets and the Commissioner's management of those assets.  Roberts

22   Decl., Exhibit A at pp. 11-13, ¶¶ 25, 29.

23        Fourth, the close relationship of a parent and its subsidiary may in some circumstances

24   justify piercing the corporate veil.  *Thomson-CSF*, 64 F.3d at 777.  However, as Frontier and

25   FPIC are under orders of rehabilitation and liquidation, respectively, there is no question that

26   Frontier could not act as an alter ego of FPIC.

27        Fifth, "[e]quitable estoppel 'precludes a party from claiming the benefits of a contract

28   while simultaneously attempting to avoid the burdens that contract imposes.'"  *Comer v. Micor*,

- 12 -

1   *Inc.*, 436 F.3d at 1101 (citation omitted).  While a nonsignatory may be estopped from avoiding

2   arbitration if it "'knowingly exploited the agreement containing the arbitration clause despite

3   having never signed the agreement,'" there is no assertion that FPIC exploited Endorsement No. 3

4   for its benefit.  *Id.* (citing *DuPont*, 269 F.3d at 199).

5        Finally, neither the Commissioner nor FPIC is a third party beneficiary of Endorsement

6   No. 3.  A signatory may enforce an arbitration agreement against a third party beneficiary if the

7   contract "reflects the express or implied intention of the parties to the contract to benefit the third

8   party."  As NICO contends that FPIC is now liable for Frontier's $40 million debt that NICO

9   forgave Frontier of under Endorsement No. 3, there is clearly no intent, express or implied, under

10  Endorsement No. 3 to benefit FPIC.  Rather Endorsement No. 3 is designed to burden FPIC with

11  $40 million in liability incurred by Frontier that NICO had an absolute right to offset against its

12  obligations to Frontier but elected to waive instead.  *See* Casaccio Decl., Exhibit 4A at p. 44,

13  Article XI.[6]

14       Thus, none of the contractual principles compel the Commissioner to arbitrate his dispute

15  with NICO under Endorsement No. 3.

16  **B.    The Liquidation Order Bars NICO From Compelling Arbitration.**

17       NICO incorrectly interprets the injunctions under the Liquidation Order as asserting over

18  *in rem* jurisdiction that does not prohibit any award of declaratory relief by arbitration.  The

19  Liquidation Order contains a number of injunctions staying actions taken against the

20  Commissioner that not only affect the assets of the insolvent insurer, but also interfere with the

21  Commissioner's management of the liquidation.

22       Further, California Insurance Code section 1020 specifically empowers this Court to issue

23  the injunctive orders set forth in the Liquidation Order to preclude litigation against the insolvent

24  estate in part as follows, requires that upon the issuance of an order either under California

25  Insurance Code section 1011 or 1016, or at any time thereafter, the court shall issue such other

26

27  _____

    [6.]  Article XI(A), provides in part that "[i]n consideration of the Reinsurer agreeing to the Funds
28  Withheld provision, the Company agrees the Fund Withheld Balance may be **set off by the
    Reinsurer against liability of any nature whatsoever**…." (Emphasis added.)

1  injunctions or orders as may be deemed necessary to prevent any or all of the following

2  occurrences:

3      (a) Interference with the commissioner or the proceeding.
        (b) Waste of assets of such person.
4      **(c) The institution or prosecution of any actions or proceedings.**
        (d) The obtaining of preferences, judgments, attachments, or other liens against
5      such person or its assets.
        (e) The making of any levy against any such person or its assets....
6

7  (Emphasis added.)

8      The Legislature determined that, as a matter of vital public policy, once the conservation

9  and liquidation orders were issued it was essential that the assets of the insurance company be

10 conserved and not depleted.  Section 1020 thus "reflects a legislative intent to preserve an

11 insolvent insurer's assets for orderly disposition by the commissioner." *Webster v. Superior*

12 *Court*, 46 Cal.3d 338, 344 (1988) (permitting relief from stay for personal injury action to be filed

13 against insolvent insurer when plaintiff does not seek recovery against insolvent insurer's assets).

14 Accordingly, the injunctive orders in the Liquidation Order are statutorily mandated to ensure the

15 orderly distribution of estate assets and to prevent waste.

16     The specific injunctions set forth in Section 1020 reverse preempt the Federal Arbitration

17 Act pursuant to the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which provides that "No

18 Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any

19 State for the purpose of regulating the business of insurance … unless such Act specifically

20 relates to the business of insurance…."  15 U.S.C. § 1012(b).

21     In *United States v. Fabe*, 508 U.S. 491, 501-502, 113 S. Ct. 2202 (1993), the United

22 States Supreme Court set forth the following three-part test to determine whether McCarran-

23 Ferguson Act should be applied to reverse preempt federal law:  (1) whether the federal statute at

24 issue "specifically relate to the business of insurance"; (2) whether the state statute enacted "for

25 the purpose of regulating the business of insurance"; and (3) whether the application of the

26 federal statute would "impair, interfere, or supercede" the state statute.  The Ninth Circuit has

27 determined that under *Fabe*, a reinsurer such as NICO could not invoke an arbitration clause to

28 compel arbitration of its claims against an insolvent insurer.  *See Quackenbush v. Allstate Ins.*

- 14 -

1   *Co.*, 121 F.3d at 1381.  Courts in other jurisdictions applying the test under *Fabe* have similarly

2   found that state insolvency statute's stay of litigation reverse preempted the FAA so as to bar

3   reinsurers from compelling the liquidator to arbitrate.  *See Davister Corp. v. United Republic Life*

4   *Ins. Co.*, 152 F.3d 1277 (10th Cir. 1998) (finding that Utah insurance insolvency statutes reverse

5   preempted the FAA); *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590-596 (5th Cir.

6   1998) (finding same under Oklahoma insurance insolvency statutes).

7          NICO's attempt to compel the Commissioner to arbitrate without his consent would

8   violate Section 1020 and the Liquidation Order irrespective of whether the relief sought is

9   monetary or equitable.  Section 1020 bars all actions and does not distinguish between actions for

10  damages from actions for equity.  It also reverse preempts the FAA to the extent it requires

11  arbitration of any dispute.

12         Thus, NICO is barred from requiring the Commissioner to arbitrate this dispute when the

13  Commissioner has not agreed to do so.

14  **C.    Arbitration Of This Dispute Is Not Appropriate.**

15         While reinsurance arbitration may be appropriate in some circumstances, requiring the

16  Commissioner to arbitrate this dispute over Endorsement No. 3 is not appropriate in this case for

17  several reasons.  First, this is not a usual reinsurance dispute concerning specialized accounting or

18  reinsurance coverage that would require expertise in the reinsurance industry.  This is a dispute

19  over the legal effect of third party contracts that attempts to release a party of its $40 million debt

20  and bind an insolvent insurance company solely to its detriment.  It also involves insolvency law.

21         Further, any purported advantages of arbitration disappear when applied to an insolvent

22  reinsured.  Arbitration is expensive.  *See* Graydon S. Staring, Law of Reinsurance § 21:1 (2008).

23  The parties must pay for their party arbitrator as well as a neutral and pay all related facility

24  expenses, travel expenses and lodging.  NICO also asserts that the seat of the arbitration panel

25  must be in New York, thus requiring the Commissioner to potentially retain New York counsel,

26  and bring witnesses to New York.  FPIC is already in a deficit of over $8.5 million.  Requiring

27  the estate to expend precious funds to pay arbitrators and related arbitrations expenses is an

28  inordinate waste of estate assets and against the public interests.  Every dollar that is spent to pay

- 15 -

1    arbitrators and the associated expenses of arbitration is one dollar less to pay the policyholders

2    and other creditors of FPIC.  In turn, the people of the State of California must pay more to cover

3    the losses that are not paid by the FPIC's estate as a result of NICO and Frontier's attempt to

4    shore up their own assets.[7]

5        Arbitration is also not expeditious.  NICO and Frontier's concerted action to have FPIC

6    shoulder the burdens of Frontier's rehabilitation by way of Endorsement No. 3 has already

7    delayed the Commissioner's ability to wind up the FPIC's estate.  The Commissioner has

8    completed almost all tasks with respect to FPIC.  His inability to collect the reinsurance proceeds

9    from NICO because of NICO's reliance on Endorsement No. 3 is a significant obstacle to the

10    Commissioner's closing of the estate.

11        Thus, the Commissioner should not be required to arbitrate the effect of Endorsement No.

12    3 where arbitration would be a waste of estate assets and time consuming.

13    **D.    Stay Is Not Warranted For Non-Arbitrable Claims.**

14        Even if the Court finds that only some of the Commissioner's claims are non-arbitrable,

15    the Court may sever the arbitrable and non-arbitrable claims, and stay this action only as to the

16    arbitrable claims.  The United States Supreme Court has specifically approved the bifurcation of

17    arbitrable and non-arbitration causes of actions as follows:  "The preeminent concern of Congress

18    in passing the [Arbitration] Act was to enforce private agreements ... and that concern requires

19    that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation...."

20    *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1538 (1985).

21        Therefore, the Court should not stay the non-arbitrable claims the Commissioner has

22    asserted against NICO.

23

24    [7]  Post-liquidation policyholder claims made against FPIC are paid by the estate, or if a "covered

25    claim," paid by CIGA.  Cal. Ins. Code §§1033, 1063.1 and 1063.2.  CIGA pays all "covered
      claims" up to $500,000.  Cal. Ins. Code § 1063.1(c).  CIGA in turn has a claim against the assets

26    of FPIC for the amount of policyholder claims it pays on behalf of FPIC.  Cal. Ins. Code §
      1033(a)(2) (providing that CIGA claims are Class 2 after expense of administration).  To the

27    extent FPIC's assets are insufficient to pay all covered claims and all other policyholder claims,
      CIGA must pay them out of its reserves, which are derived from an assessment on each insurance

28    policy issued in California.  Cal. Ins. Code § 1063.5.

- 16 -

1

**IV.**

2

**CONCLUSION**

3        Based on the foregoing, the Commissioner respectfully requests that the Court deny the

4   motion to stay this action pending arbitration of claims because the Commissioner is not a party

5   to Endorsement No. 3 and has not agreed to arbitrate his claims with NICO.

6

7   Dated: August 4, 2008                      EDMUND G. BROWN JR., Attorney General
                                               of the State of California
8                                              W. DEAN FREEMAN
                                               Supervising Deputy Attorney General
9                                              FELIX E. LEATHERWOOD
                                               Supervising Deputy Attorney General
10                                             DIANE SPENCER SHAW
                                               Deputy Attorney General
11                                             LISA W. CHAO
                                               Deputy Attorney General
12

13
                                               s/Lisa W. Chao
14                                             Attorneys for Plaintiff Steve Poizner,
                                               Insurance Commissioner of the State of California,
15                                             in his capacity as the Liquidator of Frontier Pacific
                                               Insurance Company
16                                             E-mail:  Lisa.Chao@doj.ca.gov

17

18

19

20

21

22

23

24

25

26

27

28